# EXHIBIT A-1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
2                  BROWNSVILLE DIVISION

3    MARIO ALANIZ, JR.          ) (
                                ) (
4    VS.                        ) (      CIVIL ACTION NO.
                                ) (
5    THE CITY OF SULLIVAN CITY, ) (        B-04-040
     TEXAS, TEXAS, GUMARO FLORES,) (
6    In his and Official Capacity) (
     As Mayor of Sullivan City,  ) (
7    REYNALDO RUIZ and FROILAN   ) (
     RAMIREZ, in their Individual) (
8    And Official Capacities as  ) (
     Commissioners and ROLANDO   ) (
9    GONZALEZ, in his Individual ) (
     And Official Capacity as    ) (
10   City Manager                ) (

11   ************************************************************

12                  ORAL DEPOSITION OF
                    MARIO ALANIZ, JR.
13                  JANUARY 4, 2005

14   ************************************************************

15     ORAL DEPOSITION OF MARIO ALANIZ, JR., produced as a

16   witness at the instance of the DEFENDANTS, and duly

17   sworn, was taken in the above-styled and numbered cause

18   on the 4TH of JANUARY, 2005, from 10:29 A.M. to 1:03

19   P.M. and 2:05 P.M. TO 3:51 P.M., before JOHN W. FELLOWS,

20   CSR in and for the State of Texas, reported by machine

21   shorthand, at the offices of SANCHEZ, WHITTINGTON, JANIS

22   & ZABARTE, 100 N. Expressway 83, Brownsville, Cameron

23   County, Texas, pursuant to the Federal Rules of Civil

24   Procedure and the provisions stated on the record or

25   attached hereto.



Hill & Romero
Certified Court Reporters



DEPOSITION OF MARIO ALANIZ, JR., TAKEN JANUARY 4, 2005

**45**

11:10:18 1 you they were not hiring; is that right?

11:10:22 2 A. Yes, sir.

11:10:22 3 Q. Then you applied at Schlumberger on April 7?

:26 4 A. Yes, sir.

:10:28 5 Q. Talked to Mary in person for a position as a

11:10:30 6 truck driver, and he -- and she told you they were not

11:10:32 7 hiring?

11:10:32 8 A. Yes.

11:10:32 9 Q. Okay. Any other places that you could think

11:10:34 10 of that you applied to?

11:10:40 11 A. Over the phone I spoke to Lieutenant Ochoa

11:10:44 12 from Palmview Police Department.

11:10:52 13 Q. When was that?

11:10:52 14 A. I don't recall the date on that.

11:10:56 15 Q. And what did Ochoa tell you?

11:11:00 16 A. Says that because of the Mayor's

11:11:04 17 relationship or -- with their Mayor, thinks they're

11:11:10 18 compadres, it was difficult for me to get a job there.

11:11:16 19 Q. Did he tell you anything that Sullivan

11:11:20 20 City's Mayor had said?

11:11:24 21 A. No, sir.

11:11:24 22 Q. Okay. So all he's saying is, is -- all

11:11:30 23 Ochoa is saying, Look, there's a relationship between

11:11:30 24 these two Mayor's, going to be difficult for you to

11:11:32 25 get a job?

Hill & Romero
Certified Court Reporters

**46**

11:11:34 1 A. He said la politica, not going to get a job

11:11:38 2 there or allow you to get a job there.

11:11:38 3 Q. Okay. Okay. You don't know if he was

11:11:42 4 telling the truth or not, right?

11:11:44 5 A. No, sir.

11:11:44 6 Q. That's just what he was telling you?

11:11:46 7 A. The same thing was told to me by Chief

11:11:48 8 Ontiveros from Peñitas Police Department. I talked to

11:11:54 9 him in person. At the beginning of the year he told

11:11:58 10 me that -- way he said was, the politicas not going to

11:12:02 11 allow me to hire you. Take care of what you have to

11:12:06 12 take care, then come and talk to me.

11:12:08 13 Q. What -- what do you think he meant by that?

11:12:14 14 What do you mean -- what do you think -- what did you

11:12:16 15 understand him to mean by "take care of what you need

11:12:18 16 to take care of"?

11:12:20 17 A. To get the civil deal that we're going

11:12:24 18 through now with.

11:12:24 19 Q. Finish up with the lawsuit?

11:12:26 20 A. Yes, sir.

11:12:26 21 Q. Okay. You don't know if he was talking

:26 22 about the problems in hiring you was because of the

:36 23 lawsuit as opposed to because of whatever had happened

11:12:38 24 at Sullivan? In other words, you don't know if the

11:12:44 25 problem was -- there's a difference between reporting

Hill & Romero
Certified Court Reporters

**47**

11:12:50 1 something --

11:12:50 2 A. Yes.

11:12:50 3 Q. -- and filing a lawsuit?

11:12:52 4 A. The way he put it, the way he -- I

11:12:56 5 understood it was, that, you know, because of the

11:12:58 6 politics, everybody's friend of everybody, I couldn't

11:13:00 7 get a job there.

11:13:00 8 Q. Okay. But you don't know what he actually

11:13:04 9 meant?

11:13:04 10 A. No, sir, I don't.

11:13:04 11 Q. I have to ask him that?

11:13:06 12 A. That's what I understood.

11:13:13 13 Q. Okay. I notice you provided us with a copy

11:13:14 14 of a course you took on June 16, 2004 at the Hidalgo

11:13:18 15 County Sheriff's Academy?

11:13:20 16 A. Yes, sir.

11:13:22 17 Q. Because at that time you were still a

11:13:24 18 Reserve Deputy, right?

11:13:24 19 A. Yes, sir.

11:13:24 20 Q. So did the Sheriff's Department pay for

11:13:28 21 that?

11:13:30 22 A. They provided the training, yes, sir.

11:13:30 23 Q. They provided the training for you. Okay.

11:13:52 24 You're married?

11:13:52 25 A. Yes, sir.

Hill & Romero
Certified Court Reporters

**48**

11:13:54 1 Q. What's your wife's name?

11:13:56 2 A. San Juanita Alaniz.

11:13:58 3 Q. Any children?

11:14:04 4 A. Yes, sir.

11:14:04 5 Q. What are their names and ages?

11:14:06 6 A. Mario E. Alaniz. He's going to be 17 this

11:14:12 7 month.

11:14:14 8 Q. And who else?

11:14:16 9 A. Denise Alaniz.

11:14:16 10 Q. Denise?

11:14:20 11 A. Yes.

11:14:20 12 Q. How old is she?

11:14:24 13 A. She's 13.

11:14:24 14 Q. Any others?

11:14:30 15 A. Juan A. Alaniz. He's nine.

11:14:30 16 Q. Do you have any other children --

11:14:32 17 A. No, sir.

11:14:32 18 Q. -- from any other -- let me ask you about

11:17:06 19 the relationship between you and Hernan Guerra.

11:17:18 20 A. Yes, sir.

11:17:20 21 Q. He had been the Assistant Chief while you

11:17:32 22 were Chief of Police, right?

11:17:32 23 A. Yes, sir.

11:17:34 24 Q. How long had he been Assistant Chief? In

11:17:40 25 other words, you got made Chief --

Hill & Romero
Certified Court Reporters

49

| | | |
|---|---|---|
| 11:17:44 | 1 | A. Like a month after I was promoted. |
| 11:17:52 | 2 | Q. When were you made Chief? |
| 11:17:54 | 3 | A. I believe it was in July of 2002. I'm not |
| :00 | 4 | sure on the date. |
| 18:00 | 5 | Q. 2002 or 2003? |
| 11:18:04 | 6 | A. 2000 and -- |
| 11:18:04 | 7 | Q. Were you Chief for a year or for a few |
| 11:18:06 | 8 | months? |
| 11:18:06 | 9 | A. No. 2002. |
| 11:18:08 | 10 | Q. So you were -- so you were Chief for |
| 11:18:10 | 11 | about -- for about a year? |
| 11:18:10 | 12 | A. Over a year, yes, sir. |
| 11:18:12 | 13 | Q. Okay. Okay. So shortly after you became |
| 11:18:16 | 14 | Chief, he became Assistant Chief? |
| 11:18:18 | 15 | A. Yes. He was the Assistant Chief prior to my |
| 11:18:22 | 16 | promotion. |
| 11:18:30 | 17 | Q. So he was Assistant Chief before you became |
| 11:18:32 | 18 | Chief? |
| 11:18:32 | 19 | A. Yes, sir. |
| 11:18:34 | 20 | Q. Did you feel that he believed he should've |
| 11:18:38 | 21 | been Chief instead of you? |
| 11:18:38 | 22 | A. Yes, sir. |
| 11:18:38 | 23 | Q. Who made the decision to make you Chief |
| 11:18:46 | 24 | instead? |
| 11:18:48 | 25 | A. The Commission. |

Hill & Romero
Certified Court Reporters

50

| | | |
|---|---|---|
| 11:18:50 | 1 | Q. You know if the Mayor recommended that as |
| 11:18:52 | 2 | well? |
| 11:18:54 | 3 | A. No, sir. |
| 11:18:54 | 4 | Q. Why not? I mean, how do you know that? |
| 11:18:56 | 5 | A. Because he told me that he thought that |
| 11:18:58 | 6 | Hernan's been there longer, he deserved to be the |
| 11:19:02 | 7 | Chief of Police. He talked to me before I was |
| 11:19:06 | 8 | promoted -- or offered the position and told me that I |
| 11:19:08 | 9 | would be Hernan's assistant. And since Hernan didn't |
| 11:19:12 | 10 | know how to do his job, I could teach him and we could |
| 11:19:16 | 11 | work together. |
| 11:19:16 | 12 | Q. Okay. So during the time that you were |
| 11:19:28 | 13 | Chief and he was assistant, you felt that he |
| 11:19:34 | 14 | didn't -- he believed he should've been Chief instead |
| 11:19:34 | 15 | of you? |
| 11:19:38 | 16 | A. Yes, sir. |
| 11:19:38 | 17 | Q. Now, what time did you find out about |
| 11:19:52 | 18 | the -- I guess, the no confidence movement? You know |
| 11:19:54 | 19 | what I'm talking about by that? |
| 11:19:56 | 20 | A. Yes, sir. |
| 11:19:56 | 21 | Q. Can you explain for us, please, what you |
| :00:00 | 22 | understand I mean by that? |
| .02 | 23 | A. As far as when they were trying to put |
| 11:20:04 | 24 | together a letter of no confidence? |
| 11:20:04 | 25 | Q. Right. In other words, a number of the |

Hill & Romero
Certified Court Reporters

51

| | | |
|---|---|---|
| 11:20:06 | 1 | police officers, including Hernan, were trying to put |
| 11:20:10 | 2 | together a letter of no confidence, meaning they |
| 11:20:12 | 3 | didn't have any confidence in you, and they wanted to |
| 11:20:14 | 4 | submit that to the City Manager or to the Commission, |
| 11:20:18 | 5 | correct? |
| 11:20:18 | 6 | A. Yes, sir. |
| 11:20:18 | 7 | Q. Okay. When did you first find out about |
| 11:20:20 | 8 | that? |
| 11:20:22 | 9 | A. Late October. I don't recall the date. Of |
| 11:20:26 | 10 | 2003. |
| 11:20:28 | 11 | Q. Would it have been September? Some time in |
| 11:20:30 | 12 | September-October? |
| 11:20:34 | 13 | A. I believe it was in October. I don't recall |
| 11:20:46 | 14 | the date. |
| 11:20:46 | 15 | MR. AGUILAR: Off the record. |
| 11:21:40 | 16 | (Recess). |
| 11:21:40 | 17 | Q. (By Mr. Aguilar) Okay. So by October, you |
| 11:22:02 | 18 | had heard that there was this movement going, right? |
| 11:22:06 | 19 | A. Yes, sir. |
| 11:22:06 | 20 | Q. And did you also understand that Hernan was |
| 11:22:08 | 21 | leading it? |
| 11:22:10 | 22 | A. Yes, sir. |
| 11:22:10 | 23 | Q. How did you feel about that? |
| 11:22:14 | 24 | A. I wasn't surprised; kind of figured it was |
| 11:22:20 | 25 | coming along. |

Hill & Romero
Certified Court Reporters

52

| | | |
|---|---|---|
| 11:22:22 | 1 | (Exhibit No. 3 was marked). |
| 11:22:24 | 2 | Q. (By Mr. Aguilar) Hand you what I marked as |
| 11:22:28 | 3 | Exhibit 3. You recognize that? |
| 11:22:32 | 4 | A. Yes, sir. |
| 11:22:34 | 5 | Q. This indicates -- this is a letter that you |
| 11:22:40 | 6 | sent to the City Manager indicating that you had been |
| 11:22:44 | 7 | advised the day before that Assistant Chief Guerra was |
| 11:22:48 | 8 | attempting to get everybody to write affidavits and |
| 11:22:50 | 9 | put together a no confidence letter against you, |
| 11:22:56 | 10 | right? |
| 11:22:56 | 11 | A. Yes, sir. |
| 11:22:56 | 12 | Q. Did you feel this was kind of like a power |
| 11:22:58 | 13 | struggle? |
| 11:23:00 | 14 | A. Yes, sir. |
| 11:23:00 | 15 | Q. You indicated, Until this -- at the end, |
| 11:23:06 | 16 | Until this matter is resolved, I'm relieving |
| 11:23:10 | 17 | Assistant Chief Guerra of his supervisory duties. Why |
| 11:23:14 | 18 | were -- why did you do that? Why did you feel there |
| 11:23:16 | 19 | was a need to do that? |
| 11:23:16 | 20 | A. Because he was the one threatening the |
| 11:23:22 | 21 | officers. I had a meeting right before this one. |
| 11:23:22 | 22 | This was when I was approached by all the officers. |
| 11:23:30 | 23 | Everyone was there except for Hernan Guerra. This is |
| 11:23:30 | 24 | where they started coming out in the open how they |
| 11:23:38 | 25 | were being threatened by Hernan, and that Hernan was |

Hill & Romero
Certified Court Reporters

**53**

11:23:40 1   telling them that the Mayor and the City Manager
11:23:42 2   needed their help in creating that letter so that they
11:23:44 3   could get rid of them.
:48 4       Q.   I'm sorry, say it again.  That what?
.23:48 5     A.   That the Mayor and the City Manager needed
11:23:54 6   the officers help in signing that letter so that they
11:24:00 7   could get rid of them.
11:24:00 8       Q.   Okay.  Did any of the officers say that they
11:24:02 9   had actually talked to the Mayor?
11:24:06 10    A.   No, sir.
11:24:06 11      Q.   Or is it just Hernan?
11:24:06 12    A.   Hernan.
11:24:08 13      Q.   In other words, it was Hernan saying that
11:24:10 14  the Mayor and whoever else wanted this?
11:24:12 15    A.   If I recall correctly, yes, sir.
11:24:14 16      Q.   Okay.  Saying that Hernan and the Mayor
11:24:24 17  wanted to get rid of you?
11:24:28 18    A.   That they needed to get rid of me and they
11:24:32 19  needed -- that the Mayor and the City Manager needed
11:24:36 20  their help to get rid of me.
11:24:36 21      Q.   They needed to sign these documents so that
11:24:40 22  they could get rid of you?
11:24:40 23    A.   Their help with the letter.
11:24:42 24      Q.   I'm sorry?
11:24:42 25    A.   That's what they -- they needed their help

Hill & Romero
Certified Court Reporters

**54**

11:24:46 1   to get rid of me.  And by getting rid of me was
11:24:46 2   through that letter.
11:24:48 3       Q.   Okay.  But it was just Hernan saying this?
11:24:52 4     A.   According to the officers, yes.
11:24:54 5       Q.   Yeah.  Remember making a comment or -- or
11:25:06 6   comment to the effect of -- or something along the
11:25:08 7   lines, Look, either you're with me or against me?
11:25:12 8     A.   Who made a comment?
11:25:14 9       Q.   Do you remember making comment saying,
11:25:16 10  Either you're with me or you're against me?
11:25:18 11    A.   Me making a comment?
11:25:18 12      Q.   Yes.
11:25:20 13    A.   No, sir.  What I talked to the officers, I
11:25:24 14  asked them, you know, How far do you guys want this
11:25:28 15  to go?  Because they started talking about threats
11:25:30 16  and how they were threatened to get terminated if
11:25:34 17  they -- the meeting they came out open and started
11:25:36 18  talking about everything that was going on between
11:25:38 19  them and Hernan Guerra.
11:25:40 20      Q.   Okay.
11:25:42 21    A.   And what I asked them was, How far do you
:44 22  guys want to take this?  Because we might end up in
.44 23  court over this.
11:25:48 24      Q.   What did they say?
11:25:50 25    A.   They said they were willing to go all the

Hill & Romero
Certified Court Reporters

**55**

11:25:52 1   way.  The officers were there, except for Hernan
11:26:02 2   Guerra, Dispatcher Jaime De La Garza was there, and
11:26:04 3   the Judge was also there in that meeting.
11:26:08 4       Q.   What Judge?
11:26:08 5     A.   Jaime De La Garza.
11:26:14 6       Q.   What happened as a result of this letter?
11:26:30 7     A.   Nothing.
11:26:30 8       Q.   Did you talk to the City Manager?
11:26:32 9     A.   Well, the -- the day after the meeting, I
11:26:36 10  went and met with the Mayor at his residence, told him
11:26:40 11  what was going on.  He assured me nothing was going
11:26:44 12  on.  Well, I told him, Well, until I finish
11:26:46 13  investigating this, because the turmoil Hernan is
11:26:50 14  creating, I'm going to relieve him of his duties as
11:26:52 15  supervisor.  The Mayor told me I wasn't going to do
11:26:56 16  that.  Just told me to think about it for a month
11:27:00 17  until I cooled down, just forget about it.
11:27:02 18      Q.   Said, basically, to do nothing, think about
11:27:06 19  it for a month?
11:27:08 20    A.   Yes.
11:27:08 21      Q.   Did anybody else tell you anything?
11:27:08 22    A.   Rolando Gonzalez.
11:27:10 23      Q.   What did he tell you?
11:27:12 24    A.   Not to take any actions against Hernan
11:27:14 25  Guerra until the next city meeting.

Hill & Romero
Certified Court Reporters

**56**

11:27:18 1       Q.   And when was that?
11:27:20 2     A.   That -- according to him, it was going to be
11:27:22 3   the following week after this.
11:27:26 4       Q.   So he's telling you -- he's saying, No, you
11:27:28 5   cannot relieve him of his duties?
11:27:30 6     A.   Yes.
11:27:30 7       Q.   Okay.  Anybody else tell you anything?
11:27:34 8     A.   That was it, that I can remember.
11:27:36 9       Q.   Okay.  What happened at the next meeting?
11:27:38 10    A.   There was no meeting.  The following week I
11:27:40 11  asked the Mayor, and he told me, Are you still
11:27:44 12  interested in taking this to the Commission?  I said,
11:27:46 13  Yes, sir.  We need to deal with this, to take care of
11:27:50 14  this problem.  And he says, Well, we're not going to
11:27:52 15  have a meeting especially for you guys.  There never
11:27:54 16  was a meeting.
11:27:56 17      Q.   Okay.  And then you put -- when was the next
11:27:58 18  City Commission meeting?
11:27:58 19    A.   I believe it was until I was terminated.
11:28:04 20      Q.   They didn't have a meeting in November at
11:28:06 21  all?
11:28:06 22    A.   I don't recall.
11:28:08 23      Q.   Okay.  Whenever the next meeting was, you
11:28:10 24  were not part of the agenda?
11:28:12 25    A.   No, sir.

Hill & Romero
Certified Court Reporters

57

| | | |
|---|---|---|
| 11:28:12 | 1 | Q.   Okay.  Your issue was not part of the |
| 11:28:14 | 2 | agenda? |
| 11:28:14 | 3 | A.   No, sir. |
| 1:16 | 4 | Q.   And, basically, your -- your decision to |
| .28:28 | 5 | relieve Assistant Chief Guerra of his supervisory |
| 11:28:32 | 6 | duties was overruled by the City Manager; is that |
| 11:28:34 | 7 | right? |
| 11:28:34 | 8 | A.   And the Mayor. |
| 11:28:36 | 9 | Q.   Well, does the Mayor make that decision? |
| 11:28:38 | 10 | A.   I don't know. |
| 11:28:40 | 11 | Q.   You do not know? |
| 11:28:40 | 12 | A.   He was giving me orders not to take any |
| 11:28:42 | 13 | actions. |
| 11:28:42 | 14 | Q.   You don't know whether the Mayor has the |
| 11:28:44 | 15 | authority to do that or not? |
| 11:28:48 | 16 | A.   Well, he's the Mayor.  As far as I know, he |
| 11:28:48 | 17 | can. |
| 11:28:48 | 18 | Q.   Okay.  As far as -- as far as you |
| 11:28:48 | 19 | understand -- |
| 11:28:48 | 20 | A.   Yes, sir. |
| 11:28:50 | 21 | Q.   -- the Mayor can actually make decisions on |
| 11:28:54 | 22 | hiring and firing? |
| 11:28:56 | 23 | A.   I don't know about hiring and firing, but |
| 11:28:58 | 24 | relieving him.  All I was going to do is demote him. |
| 11:29:02 | 25 | Q.   Suspending him, demoting him, things like |

Hill & Romero
Certified Court Reporters

58

| | | |
|---|---|---|
| 11:29:02 | 1 | that |
| 11:29:02 | 2 | A.   I wasn't suspending him.  I was going to |
| 11:29:06 | 3 | demote him. |
| 11:29:06 | 4 | Q.   Okay.  As far as demotion decisions, you |
| 11:29:08 | 5 | think the Mayor can make those? |
| 11:29:10 | 6 | A.   For what I understood wen I was hired or |
| 11:29:16 | 7 | promoted, I was going to be able to make those |
| 11:29:18 | 8 | decisions. |
| 11:29:20 | 9 |       MR. AGUILAR:  Objection, nonresponsive. |
| 11:29:22 | 10 | Q.   (By Mr. Aguilar)  My question was, did you |
| 11:29:24 | 11 | have -- did you believe that the Mayor had the |
| 11:29:28 | 12 | authority to make demotion decisions? |
| 11:29:30 | 13 | A.   I believe the Mayor had authority to order |
| 11:29:32 | 14 | me to do this. |
| 11:29:34 | 15 | Q.   Okay.  And do you have any -- what basis do |
| 11:29:48 | 16 | you have to explain that?  In other words, what's your |
| 11:29:50 | 17 | basis for believing the Mayor could order you do that? |
| 11:29:54 | 18 | A.   Just the basis that he's the Mayor. |
| 11:29:54 | 19 | Q.   Just because he's the Mayor? |
| 11:29:56 | 20 | A.   Yes, sir. |
| 11:29:58 | 21 | Q.   You're not familiar with the City's |
| 79:58 | 22 | personnel policies -- |
| 00 | 23 | A.   They don't have a personnel policy. |
| 11:30:00 | 24 | Q.   Or what the City's rules are -- |
| 11:30:02 | 25 | A.   No, sir. |

Hill & Romero
Certified Court Reporters

59

| | | |
|---|---|---|
| 11:30:02 | 1 | Q.   I have to finish my question.  You're not |
| 11:30:04 | 2 | familiar with what the City's rules are or what the |
| 11:30:08 | 3 | restrictions are according to the Texas Codes or |
| 11:30:10 | 4 | statutes that say, that the Mayor can or cannot do |
| 11:30:16 | 5 | things like suspend officers, demote officers or order |
| 11:30:20 | 6 | you to do so? |
| 11:30:22 | 7 | A.   No, sir. |
| 11:30:22 | 8 | Q.   Okay. |
| 11:30:24 | 9 | A.   As far as I know, he can. |
| 11:30:26 | 10 | Q.   But you don't know what basis you have |
| 11:30:30 | 11 | to -- to say that? |
| 11:30:32 | 12 | A.   No, sir. |
| 11:30:32 | 13 | Q.   Is that right? |
| 11:30:32 | 14 | A.   No. |
| 11:30:32 | 15 | Q.   Okay.  I'm looking at your Petition.  In |
| 11:30:58 | 16 | your Petition you say that in late November 2003, Blas |
| 11:31:02 | 17 | Gonzalez -- you, through your Sergeant, Blas Gonzalez, |
| 11:31:06 | 18 | started reporting violations of law to the Hidalgo |
| 11:31:08 | 19 | County D.A.'s office, to other law enforcement |
| 11:31:10 | 20 | officials, including the FBI, and you informed the |
| 11:31:14 | 21 | City Manager and D.A.'s office. |
| 11:31:18 | 22 |       You go on to say that -- it appears |
| 11:31:20 | 23 | what you were reporting was, that the Mayor was |
| 11:31:22 | 24 | interfering with the police business and ordering |
| 11:31:24 | 25 | officers to conduct traffic stops and issue citations |

Hill & Romero
Certified Court Reporters

60

| | | |
|---|---|---|
| 11:31:28 | 1 | to whoever was observed making contact with the |
| 11:31:30 | 2 | Mayor's political opponents and counseling to change |
| 11:31:36 | 3 | citations to warnings for friends and political |
| 11:31:38 | 4 | allies. |
| 11:31:38 | 5 | A.   Yes, sir. |
| 11:31:38 | 6 | Q.   Okay.  Sounds like what you're saying is, |
| 11:31:42 | 7 | that you're complaining to the D.A., City Manager, and |
| 11:31:48 | 8 | the FBI, that the Mayor is ordering you to issue |
| 11:31:52 | 9 | traffic citations to his opponents and to take away |
| 11:31:56 | 10 | citations from his friends? |
| 11:31:56 | 11 | A.   Yes. |
| 11:31:56 | 12 | Q.   Okay.  Was there anything else you were |
| 11:32:02 | 13 | reporting? |
| 11:32:02 | 14 | A.   It didn't happen in that particular order |
| 11:32:12 | 15 | there.  First -- |
| 11:32:12 | 16 | Q.   No.  I'm just trying to get a total -- |
| 11:32:14 | 17 | A.   Okay. |
| 11:32:14 | 18 | Q.   -- of everything.  I'm not saying the order. |
| 11:32:16 | 19 | A.   As far as what -- you want to know what we |
| 11:32:18 | 20 | reported? |
| 11:32:18 | 21 | Q.   What you were reporting, right. |
| 11:32:20 | 22 | A.   Okay, sir.  Terroristic threats. |
| 11:32:22 | 23 | Q.   Okay.  Hang on a second.  I'm not saying |
| 11:32:24 | 24 | what you characterize it as.  I'm asking what your |
| 11:32:28 | 25 | actually reporting happened. |

Hill & Romero
Certified Court Reporters

61

11:32:28 1   A.   That's what I'm reporting.  I reported the
11:32:30 2   officers were being threatened --
11:32:30 3   Q.   No.  No.  No.  What I want to know is, what
.:34 4   was actually being done?  In other words, not -- I'm
.02:36 5   not asking -- saying somebody was threatened is an
11:32:40 6   interpretation --
11:32:40 7   A.   Okay.
11:32:40 8   Q.   -- okay?  I'm asking what did they actually
11:32:44 9   say to make you think they were threatened, for
11:32:46 10  example?  So first thing is -- first, you're -- you're
11:32:52 11  reporting that the Mayor was ordering the thing about
11:32:54 12  the tickets, Give them to my opponents, don't give
11:32:56 13  them to my supporters, right?
11:32:58 14  A.   Yes.
11:32:58 15  Q.   What else were you reporting was actually
11:33:10 16  being done or said?
11:33:14 17  A.   That the officers were ordered to dismiss
11:33:18 18  their own tickets.
11:33:18 19  Q.   Okay.
11:33:18 20  A.   Traffic warning.
11:33:20 21  Q.   You've said that already.
11:33:20 22  A.   Okay.
11:33:22 23  Q.   What else?
11:33:22 24  A.   That actually was being said or done?
11:33:22 25  Q.   Right.  That you reported.

62

11:33:28 1   A.   That Hernan Guerra was taking items from the
11:33:32 2   evidence room.
11:33:34 3   Q.   What else?
11:33:38 4   A.   That the Mayor would dictate and -- on where
11:33:44 5   we were supposed to patrol and what areas to stay away
11:33:48 6   from.
11:33:50 7   Q.   He would dictate where you should patrol?
11:33:54 8   A.   Yes.
11:33:54 9   Q.   Okay.  What else?
11:33:54 10  A.   He would order --
11:34:12 11  Q.   I'm asking what you reported.
11:34:14 12  A.   Yes.
11:34:14 13  Q.   Not what you were seeing or whatever else.
11:34:14 14  A.   That he would order -- show up at traffic
11:34:16 15  stops and order the officers let the person go, not
11:34:22 16  give them a ticket.
11:34:22 17  Q.   That's part of the first thing you said,
11:34:24 18  isn't it?
11:34:24 19  A.   Okay.
11:34:24 20  Q.   Give the tickets to his opponents and don't
11:34:26 21  give them to his --
...4:28 22  A.   Yes.
28  23  Q.   -- supporters?
11:34:28 24  A.   That we spoke to Rolando before asking for
11:34:32 25  help, because what they would do is sort out the

63

11:34:36 1   tickets every month by officers.  You know, we stack
11:34:38 2   for every officer, call in the officer, tell them to
11:34:42 3   dismiss those tickets.
11:34:42 4   Q.   Is that the same thing as the first one we
11:34:44 5   were talking about?
11:34:44 6   A.   Yes.  But this was -- this is the way we
11:34:48 7   were being threatened.
11:34:50 8   Q.   Okay.
11:34:52 9   A.   In other words --
11:34:52 10  Q.   The interpretation -- okay.  I see what
11:34:54 11  you're saying.
11:34:54 12  A.   -- being told that --
11:34:56 13  Q.   What you're saying is, that as part of the
11:34:56 14  first one, monthly?
11:35:00 15  A.   Yes.
11:35:00 16  Q.   Monthly --
11:35:02 17  A.   Sometimes --
11:35:04 18  Q.   -- the Mayor would do what?  Was it the
11:35:06 19  Mayor?
11:35:08 20  A.   The one complaining on that initially was
11:35:10 21  Hernan Guerra.  He would show me the stacks of tickets
11:35:14 22  that he would have compiled on his desk and tell me
11:35:16 23  that the Mayor was ordering him to get the officers to
11:35:18 24  make those into warnings.
11:35:20 25  Q.   How would the Mayor know which tickets were

64

11:35:22 1   there?
11:35:22 2   A.   He would be the ones bringing us the
11:35:24 3   tickets.
11:35:24 4   Q.   The Mayor would bring you the tickets?
11:35:26 5   A.   Yes.  He would bring us the violator's
11:35:28 6   copies, as well as the originals that he would pull
11:35:30 7   out from the quarter -- or from the file box that we
11:35:34 8   had prior to them being submitted to the Court.
11:35:36 9   Q.   Okay.  In order to do that, the Mayor
11:35:36 10  would've had to have gone into the box and pulled them
11:35:40 11  out?
11:35:40 12  A.   Yes, sir.
11:35:40 13  Q.   So the Mayor would -- would pull tickets out
11:35:44 14  of -- what's this box?
11:35:46 15  A.   That was just a box there in the office
11:35:50 16  where the officers would submit their citations on a
11:35:52 17  daily basis.  From there, the dispatcher would log
11:35:54 18  them down into a citation log and then submit them
11:35:58 19  into court.
11:36:00 20  Q.   And he would stack them on Hernan's desk?
11:36:04 21  A.   Yes.
11:36:04 22  Q.   And ask them to do what?
11:36:08 23  A.   Talk to the officers, make those tickets
11:36:10 24  warnings.
11:36:12 25  Q.   Okay.  What else?  Basically, that was

65

11:36:30 1 monthly, the Mayor would pull tickets from the box,
11:36:34 2 stack them in Hernan's desk, then tell the officers to
11:36:36 3 make them into warnings?
:36 4 A. Yes.
...36:38 5 Q. Okay. What else?
11:36:38 6 A. He would interfere with our investigations.
11:36:40 7 Q. How?
11:36:40 8 A. Showing up at burglary scenes and
11:36:44 9 contaminated the -- going through the properties on
11:36:48 10 his own.
11:36:48 11 Q. Which burglary did he show up?
11:36:50 12 A. There was one that I remember he showed up
11:36:50 13 at Jesse's Food Store.
11:36:54 14 Q. When was that?
11:36:54 15 A. I don't recall.
11:36:56 16 Q. What month or year?
11:36:58 17 A. I believe it was the same year.
11:37:00 18 Q. What month?
11:37:00 19 A. I don't recall, sir.
11:37:02 20 Q. What year?
11:37:02 21 A. 2003.
11:37:04 22 Q. You don't remember what month he did that?
11:37:06 23 A. No, sir.
11:37:06 24 Q. You can't identify any other times
11:37:10 25 specifically that he showed up?

66

11:37:10 1 A. Not off the top of my head, no. But there
11:37:14 2 was more than that.
11:37:14 3 Q. Okay. And what would he do at the
11:37:16 4 burglaries?
11:37:16 5 A. Well, he would go through the scene, you
11:37:18 6 know, after we tell him, Don't touch anything, because
11:37:22 7 we are going to process the scene for -- for latent
11:37:24 8 prints.
11:37:24 9 Q. Did you report that to the D.A.?
11:37:30 10 A. I don't know if I did.
11:37:30 11 Q. Okay. More likely than not, you didn't,
11:37:32 12 right?
11:37:34 13 A. The person that went over there for me was
11:37:34 14 Blas Gonzalez to the D.A.'s office.
11:37:38 15 Q. But you don't remember actually reporting
11:37:40 16 that part, right?
11:37:42 17 A. I don't recall, sir.
11:37:42 18 Q. Okay. What about the thing about the Mayor
11:37:48 19 pulling the tickets, stacking them on Hernan's desk,
11:37:50 20 telling the officers to make them into warnings? Did
11:37:52 21 that actually get reported to the D.A.?
:7:54 22 A. Yes, sir, that was.
:54 23 Q. Okay. What else? What else got reported to
11:37:56 24 the D.A.?
11:37:58 25 A. The part about Hernan taking items from the

67

11:38:00 1 evidence room.
11:38:02 2 Q. Right. You mentioned that already.
11:38:02 3 A. Yes.
11:38:04 4 Q. What else?
11:38:04 5 A. I don't recall, sir.
11:38:06 6 Q. That's all that you can think about, right?
11:38:06 7 A. That's all I can recall now. I know that
11:38:10 8 prior to the date that we went to the D.A.'s office or
11:38:14 9 Blas Gonzalez went to the D.A.'s office, all the
11:38:16 10 statements that we had prior to that date were
11:38:16 11 submitted also to the D.A.'s office.
11:38:20 12 Q. Say it again?
11:38:20 13 A. Statements from the officers --
11:38:22 14 Q. The officers' statements, right?
11:38:22 15 A. Yes.
11:38:22 16 Q. And those statements had to do with Hernan
11:38:28 17 pressuring them into writing letters of no confidence,
11:38:30 18 right?
11:38:30 19 A. And based on the statements, Hernan
11:38:34 20 threatening them to make their citations into warnings
11:38:36 21 or getting terminated.
11:38:38 22 Q. Okay. And on those statements, basically,
11:38:40 23 it wasn't -- none of them actually said they talked to
11:38:44 24 the Mayor, or that the Mayor had said that, they all
11:38:48 25 said that Hernan had said that, right, as far as you

68

11:38:50 1 understood?
11:38:50 2 A. I don't recall. I would need to review
11:38:52 3 them. It's been a while already.
11:38:54 4 Q. Okay. Any that you can remember that
11:38:54 5 actually talked to the Mayor as opposed to just
11:38:58 6 talking to Hernan? In other words, most of those at
11:39:02 7 least, were that Hernan was saying, The Mayor had said
11:39:06 8 this?
11:39:06 9 A. Yes. And -- and they also stated that the
11:39:10 10 Mayor would tell them, you know, who to ticket and who
11:39:12 11 not to, where to patrol, where not to.
11:39:14 12 Q. Now, the main complaint seems to
11:39:18 13 be -- the main complaint that was being made to the
11:39:20 14 D.A.'s office seems to be -- and to the Sheriff's
11:39:22 15 Office -- and when we say the complaints to the D.A.'s
11:39:26 16 office, we're really talking about the complaint
11:39:26 17 really to the Sheriff's Office, right, because the
11:39:30 18 Sheriff does the investigations for the D.A.?
11:39:30 19 A. The -- Blas Gonzalez went to the District
11:39:34 20 Attorney's Office, and that same week I went to the
11:39:36 21 Sheriff's Office.
11:39:38 22 Q. Okay. Now, were you with Blas when he went
11:39:40 23 to the Sheriff's Office?
11:39:40 24 A. No, sir.
11:39:42 25 Q. So you don't know actually what happened

73

11:51:34 1  because I'm going to see if we can apprehend this
11:51:36 2  suspect.
11:51:36 3  Q.    Uh-huh.
:38 4  A.    Mayor went ahead and made a press release
:40 5  with the Channel 48 news there and told them who the
11:51:44 6  suspect was and what was found inside the vehicle.
11:51:46 7  Q.    Okay.
11:51:48 8  A.    And, basically, the other instances of
11:51:52 9  showing up at the scenes when somebody's arrested,
11:51:54 10  going through the vehicles -- the suspect's vehicles
11:51:56 11  himself.  One time I saw him take a Stetson hat from
11:52:02 12  inside the vehicle, put it --
11:52:02 13  Q.    Hang on.  Hang on.  You're jumping around.
11:52:04 14  I'm trying to get one thing at a time.  Other times
11:52:08 15  when he'd show up at scenes and go through the
11:52:10 16  evidence?
11:52:12 17  A.    Yes.
11:52:12 18  Q.    Okay.  What other scenes?
11:52:16 19  A.    I would have to write them down, because --
11:52:20 20  Q.    Any that you can think of right now?
11:52:22 21  A.    I don't recall the dates, though.
11:52:24 22  Q.    No.  What -- what -- give me what happened
11:52:26 23  or whatever.  In other words, you told me already
11:52:28 24  about the -- the poking of the marijuana, told me
11:52:30 25  about the Guerra pursuit.  What other -- I want to

Hill & Romero
Certified Court Reporters

74

11:52:34 1  know what you reported, not necessarily what else you
11:52:36 2  think he did.
11:52:38 3  A.    Just the -- the tampering with the evidence.
11:52:40 4  Q.    Which other tampering?
11:52:42 5  A.    Contaminating.
11:52:44 6  Q.    Huh?
11:52:44 7  A.    Several other vehicles that we caught with
11:52:46 8  marijuana.
11:52:46 9  Q.    This is what you reported to him?
11:52:46 10  A.    Yes.
11:52:46 11  Q.    So then if I go ask -- what's his name?
11:52:48 12  A.    Sergeant Robert Caples.
11:52:50 13  Q.    Sergeant Caples.  If I go ask Sergeant
11:52:54 14  Caples, he should have a statement that you wrote or
11:52:56 15  something like that that was sent to him saying this
11:53:00 16  is what I'm complaining about, right?
11:53:02 17  A.    Everything that I had statements and
11:53:06 18  everything, he should have.
11:53:06 19  Q.    Okay.
11:53:06 20  A.    It was given to him.
11:53:08 21  Q.    You gave a statement also saying this is
13:10 22  what the Mayor's doing, right?
:12 23  A.    Afterwards when -- when I talked to the
11:53:14 24  investigators.
11:53:14 25  Q.    At the --

Hill & Romero
Certified Court Reporters

75

11:53:14 1  A.    They took another statement from me.
11:53:16 2  Q.    And that statement should have all this
11:53:18 3  information you're telling me now?
11:53:18 4  A.    Should.
11:53:20 5  Q.    Okay.
11:53:22 6  A.    I reported an incident where we arrested a
11:53:28 7  subject we had warrants for.  The subject resisted
11:53:32 8  arrest and he was pepper sprayed.  We took him to the
11:53:34 9  station, and I was going to allow him to rinse his
11:53:38 10  face off since he was sprayed with pepper spray.
11:53:40 11      The Mayor walked into the bathroom,
11:53:42 12  grabbed the subject, pulled him out, and he said,
11:53:46 13  (Spanish), sit him down on the cooler there, said,
11:53:48 14  You're not going to let him rinse himself off.  So the
11:53:54 15  guy just took it until the Mayor walked out and then
11:53:56 16  we allowed him to rinse himself off.
11:54:00 17  Q.    Okay.  What else did you report?
11:54:00 18  A.    That's all I can remember right now.
11:54:06 19  Q.    Okay.  The items I'm looking at is, Mayor
11:54:12 20  ordering tickets for the opponents naming his
11:54:14 21  supporters, none of the supporters, right?
11:54:18 22  A.    (No audible response).
11:54:18 23  Q.    Guerra taking items from the evidence room
11:54:24 24  is what you reported, right?
11:54:24 25  A.    Yes.

Hill & Romero
Certified Court Reporters

76

11:54:26 1  Q.    Mayor dictating where you could patrol, the
11:54:32 2  monthly Mayor would pull the tickets from the box and
11:54:34 3  stack them in Hernan's desk and tell the officers to
11:54:36 4  make them into warnings?
11:54:36 5  A.    Sometimes it'd be monthly, sometimes weekly,
11:54:40 6  depending on the number of citations were issued.
11:54:48 7  Q.    Okay.  Showing up at investigation scenes
11:54:50 8  and going through the scenes?
11:54:50 9  A.    Yes.
11:54:50 10  Q.    For example, poking marijuana stacks, going
11:54:56 11  through evidence, the Guerra pursuit where he shows up
11:55:00 12  and gives a press release on the letter he found?
11:55:02 13  A.    Yes.
11:55:04 14  Q.    And grabbing a suspect and not letting him
11:55:06 15  rinse off the pepper spray?
11:55:06 16  A.    Yes.
11:55:08 17  Q.    Anything else that you can think of that you
11:55:10 18  reported?
11:55:10 19  A.    No, sir.  I don't remember.
11:55:10 20  Q.    Okay.  On the first one, him ordering
11:55:24 21  tickets for the opponents and none for his supporters,
11:55:28 22  do you know if that violates any law?  And if so, what
11:55:28 23  law does it violate?
11:55:30 24  A.    I couldn't tell you off the top of my head
11:55:34 25  what law.

Hill & Romero
Certified Court Reporters

89

| | | |
|---|---|---|
| 12:05:56 | 1 | A. Of what happened? |
| 12:05:56 | 2 | Q. If the guy found out and jumped into Mexico? |
| 12:06:02 | 3 | A. According to family, he did. |
| :02 | 4 | Q. Okay. And the family said that because of |
| ..08 | 5 | the Mayor's press release? |
| 12:06:08 | 6 | A. Because he saw it on the news. |
| 12:06:10 | 7 | Q. Okay. Because he saw it on the news. |
| 12:06:12 | 8 | Because he saw his name on the news or because he saw |
| 12:06:16 | 9 | his vehicle on the news? |
| 12:06:16 | 10 | A. Because the Mayor said that they knew -- |
| 12:06:20 | 11 | Q. I'm asking what the family said. In other |
| 12:06:22 | 12 | words, did the family say he jumped into Mexico |
| 12:06:26 | 13 | because -- |
| 12:06:26 | 14 | A. He knew we were looking. |
| 12:06:28 | 15 | Q. Because he saw his vehicle or because of |
| 12:06:30 | 16 | what the Mayor said? |
| 12:06:30 | 17 | A. Because he knew that we were looking for |
| 12:06:34 | 18 | him. |
| 12:06:34 | 19 | Q. Okay. |
| 12:06:34 | 20 | A. Because -- |
| 12:06:34 | 21 | Q. Because of the name? |
| 12:06:36 | 22 | A. Yes. |
| 12:06:36 | 23 | Q. Okay. How is that interfering -- you said |
| 12:06:38 | 24 | that's interfering with an investigation. How is that |
| 12:06:40 | 25 | a violation of the statute? What statutes says you |

Hill & Romero
Certified Court Reporters

90

| | | |
|---|---|---|
| 12:06:46 | 1 | can't interfere with an investigation like that? |
| 12:06:46 | 2 | A. I can't tell you the exact statute. But by |
| 12:06:50 | 3 | him giving out that information, we weren't able to do |
| 12:06:52 | 4 | our jobs. |
| 12:06:52 | 5 | Q. Okay. Whether that's a violation of law or |
| 12:06:56 | 6 | not, you're not sure? |
| 12:06:56 | 7 | A. I believe it is. |
| 12:06:58 | 8 | Q. Okay. But you just don't know the statute? |
| 12:07:00 | 9 | A. Yes, sir. |
| 12:07:00 | 10 | Q. Okay. Anything else that that's a violation |
| 12:07:04 | 11 | of? |
| 12:07:04 | 12 | A. No, sir. |
| 12:07:06 | 13 | Q. Okay. The Mayor grabbing the suspect and |
| 12:07:08 | 14 | not letting him rinse off the pepper spray, that's |
| 12:07:12 | 15 | what a violation of? |
| 12:07:12 | 16 | A. Civil Rights. |
| 12:07:14 | 17 | Q. Okay. Is it -- do you know if it's a |
| 12:07:16 | 18 | violation of statute? |
| 12:07:18 | 19 | A. I don't know if you can classify it as |
| 12:07:30 | 20 | assault -- as an assault. I know the Civil Rights |
| 12:07:32 | 21 | were violated. |
| :07:36 | 22 | Q. Wouldn't be an assault, kind of almost the |
| .38 | 23 | opposite of an assault not letting him rinse of? |
| 12:07:40 | 24 | A. The way he grabbed him -- |
| 12:07:42 | 25 | Q. The grabbing him would've been the assault. |

Hill & Romero
Certified Court Reporters

91

| | | |
|---|---|---|
| 12:07:44 | 1 | Did you report that? |
| 12:07:46 | 2 | A. Yes. |
| 12:07:46 | 3 | Q. Okay. So when you reported these things, |
| 12:07:50 | 4 | did you say, Hey, he was tampering with evidence, |
| 12:07:52 | 5 | interfering with an investigation and assaulted? |
| 12:07:56 | 6 | A. And the citations. |
| 12:07:58 | 7 | Q. And the other stuff. I'm just talking about |
| 12:08:00 | 8 | where he shows up at the scenes. |
| 12:08:00 | 9 | A. Yes. Everything that's in the statements |
| 12:08:02 | 10 | that -- I believe you got, that's what it was |
| 12:08:06 | 11 | reported. Plus the statements they took from us |
| 12:08:08 | 12 | there. |
| 12:08:10 | 13 | Q. You said everything that's in the statements |
| 12:08:12 | 14 | that I got -- |
| 12:08:12 | 15 | A. All the statements I submitted for this? |
| 12:08:14 | 16 | Q. From the officers? |
| 12:08:14 | 17 | A. Yes. |
| 12:08:14 | 18 | Q. Okay. You didn't -- |
| 12:08:16 | 19 | A. My -- my statement and the statements |
| 12:08:18 | 20 | that -- we provided different statements over there, |
| 12:08:20 | 21 | new statements. |
| 12:08:22 | 22 | Q. Did you provide me with a copy of a |
| 12:08:44 | 23 | statement you made to the D.A.'s office? Hello? |
| 12:08:52 | 24 | A. I know Frank had it. |
| 12:09:02 | 25 | MR. SALINAS: Let me go through Frank's |

Hill & Romero
Certified Court Reporters

92

| | | |
|---|---|---|
| 12:09:04 | 1 | file. |
| 12:09:06 | 2 | Q. (By Mr. Aguilar) What did that statement |
| 12:09:08 | 3 | say, just generally? |
| 12:09:10 | 4 | A. Basically, putting all the statements |
| 12:09:12 | 5 | together or what was reported to me by the officers. |
| 12:09:16 | 6 | Q. I've got a number of statements that were |
| 12:09:36 | 7 | made by different officers. |
| 12:09:38 | 8 | A. Yes, sir. |
| 12:09:38 | 9 | Q. I don't think I'm aware of any statement |
| 12:09:40 | 10 | that you signed. Are you talking about a statement |
| 12:09:44 | 11 | that looks like -- something like this? |
| 12:09:44 | 12 | A. It was more like a narrative, not -- not a |
| 12:09:48 | 13 | statement. |
| 12:09:48 | 14 | Q. More like Blas' narrative? Something more |
| 12:09:56 | 15 | like this? |
| 12:09:56 | 16 | A. Yes, sir. |
| 12:09:58 | 17 | Q. Okay. That's Blas' narrative. |
| 12:10:10 | 18 | MR. AGUILAR: Why don't we go off the |
| 12:10:12 | 19 | record for a moment. I want to se if -- if we can |
| 12:10:14 | 20 | find that other document, because I don't think I was |
| 12:10:14 | 21 | provided with a copy. |
| 12:10:16 | 22 | MR. SALINAS: Uh-huh. |
| 12:10:16 | 23 | (Recess.) |
| 12:21:04 | 24 | Q. (By Mr. Aguilar) Before we took a break, I |
| 12:21:04 | 25 | was asking you about the statement that you had |

Hill & Romero
Certified Court Reporters

DEPOSITION OF MARIO ALANIZ / TAKEN JANUARY 04/13/2005

97

```
12:25:24  1      A.    Robert Montes, the prior -- the previous
12:25:30  2  City Manager, almost on a weekly basis.
12:25:32  3      Q.    And what would you talk to Montes weekly
          4  about?
          5      A.    The -- the same, about the interference,
12:25:40  6  becoming upset at the officers, because they wouldn't
12:25:42  7  pick him up in the mornings to give him -- to have the
12:25:46  8  Mayor go patrolling with them -- with the officers.
12:25:48  9      Q.    I'm sorry, I didn't understand what you just
12:25:50 10  said.
12:25:50 11      A.    The Mayor would get upset, because every
12:25:54 12  morning he wants an officer to pick him up at 5:30 at
12:25:56 13  his office to take him on patrol.
12:25:58 14      Q.    Okay.
12:25:58 15      A.    The citations, that was an ongoing deal.
12:26:02 16      Q.    You complained -- you talked to Montes about
12:26:04 17  the Mayor wanting to go -- wanting the officers to
12:26:08 18  pick him up to go patrol with them?
12:26:10 19      A.    Yes.
12:26:10 20      Q.    What was the complaint there?  What was
12:26:12 21  wrong with doing that?
12:26:12 22      A.    That the Mayor would come tell me, I want
12:26:14 23  you to get rid of this guy.  He's got a bad attitude.
12:26:16 24  He doesn't pick me up in the mornings.
12:26:20 25      Q.    Okay.  What else?  What else would he say?
```

98

```
12:26:20  1      A.    The same deal about the -- not giving
12:26:26  2  tickets to certain people from certain --
12:26:28  3      Q.    No.  I guess I'm still talking about -- you
12:26:30  4  were talking about the Mayor having people pick him
12:26:34  5  up.  I was asking what was wrong with that.  You
12:26:36  6  started saying that he would tell you that they had a
12:26:42  7  bad attitude and you should let them go?
12:26:44  8      A.    Yes.
12:26:44  9      Q.    Okay.  Anything else happen with regard to
12:26:48 10  that?
12:26:48 11      A.    No, sir.
12:26:48 12      Q.    Okay.  And the other thing having to do with
12:26:48 13  the tickets and stuff?
12:26:48 14      A.    Yes, sir.
12:26:50 15      Q.    You complained to Montes about that?
12:26:50 16      A.    Yes, sir.
12:26:50 17      Q.    What else you talked to Montes about?
12:26:54 18      A.    Basically that.
12:26:56 19      Q.    Okay.
12:26:56 20      A.    Then after the new City Manager came in, we
12:27:00 21  deal with him.
12:27:02 22      Q.    Same thing?
12:27:02 23      A.    Yes.
12:27:02 24      Q.    Would you talk to him weekly also about the
12:27:04 25  same stuff?
```

99

```
12:27:06  1      A.    Not weekly.  It was more -- more separated.
12:27:10  2      Q.    I'm sorry?  It's more what?
12:27:12  3      A.    It wasn't that often when we talked to him.
12:27:14  4      Q.    Not weekly?
12:27:16  5      A.    No, sir.
12:27:16  6      Q.    How often would it be with the new City
12:27:22  7  Manager?
12:27:22  8      A.    I don't remember.  I remember I talked to
12:27:24  9  him when he came in as a City Manager.  Then when Blas
12:27:30 10  Gonzalez showed his desk there in Hernan
12:27:32 11  Guerra's desk and ask him for help on that.  And then
12:27:38 12  when this started happening when I started giving
12:27:40 13  these letters.
12:27:42 14      Q.    Okay.  And how often was it?  Like once a
12:27:42 15  month or twice a month?
12:27:44 16      A.    Once a month, maybe.
12:27:50 17      Q.    Okay.  Who else did you talk to about that?
12:27:54 18      A.    Commissioner Ruiz.
12:27:58 19      Q.    Who else?
12:28:00 20      A.    That's it.
12:28:04 21      Q.    The only one you ever complained to
12:28:06 22  about this was the D.A.'s office, Sheriff's office,
12:28:10 23  the Mayor, City Manager -- the former City Manager
12:28:14 24  Montes, current City Manager Gonzalez, and
12:28:14 25  Commissioner Ruiz?
```

100

```
12:28:18  1      A.    Yes.
12:28:18  2      Q.    Is that the same for all these complaints
12:28:20  3  we're talking about?
12:28:22  4      A.    As far as these complaints that led to this,
12:28:28  5  it was Rolando and Commissioner Ruiz.  In fact --
12:28:30  6      Q.    That's Rolando Gonzalez?
12:28:32  7      A.    Yes, sir.
12:28:34  8      Q.    And Commissioner Ruiz?
12:28:34  9      A.    Commissioner Ruiz, I gave him a copy of all
12:28:38 10  the affidavits and told him, you know, we needed help
12:28:38 11  to take care of this without having to go to an
12:28:42 12  outside agency.
12:28:42 13      Q.    Okay.  Other than Gonzalez and Ruiz, did you
12:28:46 14  talk to anybody else?
12:28:46 15      A.    No, sir.
12:28:48 16      Q.    Okay.  Any other complaints -- no.  You said
12:28:56 17  you already told us about all the complaints you made
12:28:58 18  to the Mayor, that he shouldn't interfere in police
12:29:02 19  business?
12:29:02 20      A.    Yes.
12:29:02 21      Q.    Okay.  You said that the Mayor then began to
12:29:06 22  conspire with Hernan and others to talk bad about you.
12:29:12 23  What do you understand the Mayor actually said?  What
12:29:16 24  are the words that the Mayor actually said?
12:29:16 25      A.    I don't know what he actually said other
```

**101**

| | |
|---|---|
| 12:29:20 | 1 than what the officers and Hernan would tell me. |
| 12:29:24 | 2 Q. Okay. So first of all, you never actually |
| 12:29:28 | 3 heard him say anything, right? |
| 1:28 | 4 A. Not at that point, no. |
| ...9:28 | 5 Q. And who is the one that told you that he |
| 12:29:36 | 6 said stuff? Hernan? |
| 12:29:34 | 7 A. Yes. |
| 12:29:36 | 8 Q. And who else? |
| 12:29:36 | 9 A. The officers. |
| 12:29:36 | 10 Q. What officers? |
| 12:29:38 | 11 A. Joel Gonzalez, Jose Gonzalez. |
| 12:29:44 | 12 Q. Who else? |
| 12:29:44 | 13 A. Tuto Melendez. |
| 12:29:46 | 14 Q. Who else? |
| 12:29:48 | 15 A. Dispatcher De La Garza, Jaime. |
| 12:29:52 | 16 Q. Okay. |
| 12:30:00 | 17 A. Fabian Ramirez. And that's who I -- |
| 12:30:06 | 18 Q. That's all? |
| 12:30:08 | 19 A. That I can remember yes, sir. |
| 12:30:20 | 20 Q. Okay. What did Hernan say that the Mayor |
| 12:30:14 | 21 had said? What are the words that Hernan said that |
| 12:30:18 | 22 the Mayor used? |
| 12:30:18 | 23 A. From this point when this all started |
| 12:30:22 | 24 happening? |
| 12:30:22 | 25 Q. At any time. In other words, you're saying |

**102**

| | |
|---|---|
| 12:30:24 | 1 he began to conspire -- that the Mayor began to |
| 12:30:26 | 2 conspire with Hernan to talk bad about you. I need to |
| 12:30:30 | 3 know everything -- all the words that were used by the |
| 12:30:34 | 4 Mayor, that the Mayor said, that you were told the |
| 12:30:36 | 5 Mayor had said this? |
| 12:30:38 | 6 A. Okay. |
| 12:30:38 | 7 Q. Not that it sounded like this or whatever. |
| 12:30:40 | 8 I want to know what he actually said, okay? |
| 12:30:40 | 9 A. Okay. |
| 12:30:42 | 10 Q. And what I'm asking is you, from all the |
| 12:30:44 | 11 different people you named, what did Hernan say? |
| 12:30:46 | 12 Because you didn't hear any of it, right? Right? |
| 12:30:48 | 13 A. I did hear something from the Mayor since, |
| 12:30:52 | 14 you know, this was brought in the open. |
| 12:30:54 | 15 Q. Uh-huh. |
| 12:30:54 | 16 A. That the Mayor would tell me he had already |
| 12:30:56 | 17 discussed it with both Commissioners, and that if I |
| 12:31:00 | 18 didn't settle down and get along with Hernan Guerra, |
| 12:31:02 | 19 need to start looking for another job. |
| 12:31:04 | 20 Q. Okay. But that's not talking bad about you? |
| 12:31:06 | 21 A. Okay. As far as -- |
| ...1:06 | 22 Q. I want to know what he said that was talking |
| .08 | 23 bad about you. What did Hernan say that the Mayor |
| 12:31:12 | 24 said that was bad about you? |
| 12:31:14 | 25 A. That he was going to fire me. |

Hill & Romero
Certified Court Reporters

**103**

| | |
|---|---|
| 12:31:18 | 1 Q. Okay. That's not calling you any names, |
| 12:31:20 | 2 though. I'm asking -- |
| 12:31:22 | 3 A. That -- you want to hear exactly what he |
| 12:31:26 | 4 was -- |
| 12:31:26 | 5 Q. Yes. |
| 12:31:26 | 6 A. That he didn't understand why I was causing |
| 12:31:26 | 7 these much problems. |
| 12:31:30 | 8 Q. Okay. |
| 12:31:30 | 9 A. Because he went as far as giving me his |
| 12:31:32 | 10 nalgas, you know, comments like that. |
| 12:31:34 | 11 Q. What else? |
| 12:31:36 | 12 A. I need to -- I don't recall. |
| 12:31:44 | 13 Q. I'm asking -- I got to ask you about each |
| 12:31:44 | 14 one of these guys. |
| 12:31:44 | 15 A. Yes, sir, I know. |
| 12:31:46 | 16 Q. As far as what Hernan said, you don't |
| 12:31:46 | 17 remember anything actually that the Mayor said |
| 12:31:50 | 18 that -- for example, he didn't call you a jerk? |
| 12:31:52 | 19 A. I don't know -- |
| 12:31:54 | 20 Q. You don't -- Hernan didn't say, The Mayor |
| 12:31:56 | 21 said these words bad about you? |
| 12:32:00 | 22 A. Yes. But you want me to use the -- |
| 12:32:04 | 23 Q. The actual words. |
| 12:32:06 | 24 A. That the Mayor's upset at me, because of the |
| 12:32:06 | 25 problems I'm causing. |

**104**

| | |
|---|---|
| 12:32:08 | 1 Q. Uh-huh. |
| 12:32:08 | 2 A. That he says (Spanish), that he's getting |
| 12:32:14 | 3 ready to fire me. |
| 12:32:14 | 4 Q. Okay. Nothing else? |
| 12:32:22 | 5 A. That I can recall right now, no. |
| 12:32:22 | 6 Q. Okay. What did Joel Gonzalez say that the |
| 12:32:24 | 7 Mayor had said about you? |
| 12:32:26 | 8 A. That the Mayor says that -- that I was |
| 12:32:28 | 9 a -- I think -- he said I was a pendejo, and that I |
| 12:32:32 | 10 thought I was the Chief of Police, but for them not to |
| 12:32:34 | 11 be calling me whenever I wasn't working, because he |
| 12:32:36 | 12 was the Chief of Police. |
| 12:32:36 | 13 Q. Okay. What else? |
| 12:32:44 | 14 A. There's a lot been said all years (sic), so |
| 12:32:46 | 15 I don't recall exactly. |
| 12:32:48 | 16 Q. I understand. Anything else that you can |
| 12:32:50 | 17 remember Joel Gonzalez said about you -- that the |
| 12:32:52 | 18 Mayor had said about you? |
| 12:32:52 | 19 A. No, sir. |
| 12:33:00 | 20 Q. What about Jose Gonzalez? What did he say |
| 12:33:18 | 21 bad about you -- talked bad about you? |
| 12:33:20 | 22 A. Jose Gonzalez talking bad about me? |
| 12:33:22 | 23 Q. No. What did he say that the Mayor -- |
| 12:33:24 | 24 A. Oh, that the Mayor said? |
| 12:33:24 | 25 Q. Nobody other than the Mayor ever talked bad |

Hill & Romero
Certified Court Reporters

125

| | | |
|---|---|---|
| 12:51:26 | 1 | A. Yes, sir. |
| 12:51:26 | 2 | Q. Why? |
| 12:41:26 | 3 | A. According to him, because he wanted Hernan |
| | 4 | in that position. |
| 12:51:32 | 5 | Q. Okay. So you believe that the Mayor |
| 12:52:02 | 6 | was actually trying to get rid of you as early |
| 12:52:04 | 7 | as -- starting at least as early as March of 2003? |
| 12:52:08 | 8 | A. Yes, sir. |
| 12:52:08 | 9 | Q. Okay. Getting back to the Mayor's comments |
| 12:52:14 | 10 | to Mr. Montes before you were terminated, you said, |
| 12:52:22 | 11 | one, he was trying to get rid of you, but what else |
| 12:52:24 | 12 | did he say bad about you? |
| 12:52:28 | 13 | A. I don't recall, sir. |
| 12:52:36 | 14 | Q. Nothing else that you can -- nothing else |
| 12:52:40 | 15 | that you can think of? |
| 12:52:42 | 16 | A. No, sir, that I can remember. |
| 12:52:42 | 17 | Q. Okay. Anybody else that told you the Mayor |
| 12:52:46 | 18 | made any comments about you either before or after -- |
| 12:52:50 | 19 | A. After? |
| 12:52:50 | 20 | Q. -- you were terminated? |
| 12:52:52 | 21 | A. After the meeting, Lydia Benavides. |
| 12:52:56 | 22 | Q. Who's she? |
| 12:52:56 | 23 | A. She's a business owner there. |
| 12:52:56 | 24 | Q. Lydia? |
| 12:53:00 | 25 | A. Yes. Benavides. |

Hill & Romero
Certified Court Reporters

126

| | | |
|---|---|---|
| 12:53:02 | 1 | Q. Benavides. What did she tell you? |
| 12:53:04 | 2 | A. She called me right after the meeting -- in |
| 12:53:06 | 3 | fact, she's the first one that called me after the |
| 12:53:08 | 4 | meeting -- |
| 12:53:08 | 5 | Q. After what meeting? |
| 12:53:08 | 6 | A. The meeting when I was terminated, December |
| 12:53:12 | 7 | the 15th. |
| 12:53:12 | 8 | Q. Okay. |
| 12:53:12 | 9 | A. And she told me that the Mayor took her into |
| 12:53:16 | 10 | his office and showed her -- showed her a letter that |
| 12:53:18 | 11 | says that we had blown the whistle, and that's why I |
| 12:53:22 | 12 | was terminated, and because I didn't know how to do my |
| 12:53:24 | 13 | job. |
| 12:53:26 | 14 | Q. What letter did he show her? |
| 12:53:28 | 15 | A. The letter where we're advising him that, |
| 12:53:32 | 16 | you know, that we had reported certain deals to other |
| 12:53:38 | 17 | agencies, and trying to claim protection under the |
| 12:53:42 | 18 | Whistle Blowers Act. Everybody calls that one the |
| 12:53:46 | 19 | whistle blower letter. |
| 12:53:48 | 20 | Q. Why did you feel a need to send that letter? |
| 12:53:54 | 21 | A. Because by what the Mayor was telling me, |
| :16 | 22 | myself and the officers felt we're going to get |
| .02 | 23 | terminated as soon as he found out what we're going to |
| 12:54:04 | 24 | go on. |
| 12:54:04 | 25 | Q. What was going to go on? |

Hill & Romero
Certified Court Reporters

127

| | | |
|---|---|---|
| 12:54:06 | 1 | A. As far as him finding out that we had |
| 12:54:06 | 2 | reported, and I thought it'd be best to give it to him |
| 12:54:12 | 3 | in writing and maybe, you know, things could settle |
| 12:54:14 | 4 | down. |
| 12:54:16 | 5 | Q. You thought that if you told the Mayor in |
| 12:54:20 | 6 | writing -- |
| 12:54:20 | 7 | A. I'd get him to back off. |
| 12:54:22 | 8 | Q. -- that you had submitted the complaint, |
| 12:54:24 | 9 | even though he was already aware, according to you, |
| 12:54:28 | 10 | that he -- that you had submitted the complaint, you |
| 12:54:32 | 11 | thought that by sending the letter that would get him |
| 12:54:36 | 12 | to back off? |
| 12:54:36 | 13 | A. Yes. Get things to settle down. |
| 12:54:38 | 14 | Q. Anyway, what else did Ms. Benavides say? |
| 12:54:44 | 15 | A. Basically that. |
| 12:54:46 | 16 | Q. What? |
| 12:54:48 | 17 | A. That he told her that I was fired, because |
| 12:54:50 | 18 | of that letter, that I had gone to Rene Guerra. |
| 12:54:56 | 19 | Q. Nothing else? |
| 12:54:56 | 20 | A. That's it other than -- |
| 12:54:58 | 21 | Q. What else did -- did anybody else ever say |
| 12:55:04 | 22 | that the Mayor had said anything bad about you? |
| 12:55:06 | 23 | A. Yes. |
| 12:55:06 | 24 | Q. Who? |
| 12:55:06 | 25 | A. The Fire Chief. |

Hill & Romero
Certified Court Reporters

128

| | | |
|---|---|---|
| 12:55:10 | 1 | Q. What's his name? |
| 12:55:10 | 2 | A. Waylon Berryman. |
| 12:55:14 | 3 | Q. What did he say? |
| 12:55:14 | 4 | A. The same deal about the -- that I was a |
| 12:55:18 | 5 | whistle blower. |
| 12:55:20 | 6 | Q. No. What did he say that the Mayor had |
| 12:55:20 | 7 | said? |
| 12:55:22 | 8 | A. Yes. Because that I was fired, because I |
| 12:55:24 | 9 | was a whistle blower, I'd stolen drugs and money, and |
| 12:55:28 | 10 | that I had pornographic material on the computer. |
| 12:55:38 | 11 | Q. Anything else? |
| 12:55:42 | 12 | A. That's it. |
| 12:55:42 | 13 | Q. Anybody else say anything -- said the Mayor |
| 12:55:48 | 14 | said anything bad about you? |
| 12:55:50 | 15 | A. Martin Sandoval, local resident there. He |
| 12:55:52 | 16 | also was at the meeting. |
| 12:55:52 | 17 | Q. What meeting? |
| 12:55:54 | 18 | A. The city meeting when I was terminated. |
| 12:55:56 | 19 | Q. Okay. What did he say? |
| 12:55:56 | 20 | A. That the Mayor went to his house and showed |
| 12:56:00 | 21 | him a letter, and that the Mayor told him that in that |
| 12:56:06 | 22 | letter I'm calling him a pendejo, that I was a |
| 12:56:06 | 23 | pendejo, because I thought I was the Chief, but he's |
| 12:56:10 | 24 | the Chief there. That's why he fired me. |
| 12:56:14 | 25 | Q. What else? |

Hill & Romero
Certified Court Reporters

129

| | | |
|---|---|---|
| 12:56:16 | 1 | A. That's it. |
| 12:56:16 | 2 | Q. Anybody else, other than Hernan? |
| 12:56:20 | 3 | A. I don't recall, sir. |
| | 4 | Q. Nobody else that you can think of that ever |
| 12:56:24 | 5 | said that the Mayor had said anything bad about you? |
| 12:56:26 | 6 | A. It was an investigator for the La Joya ISD. |
| 12:56:32 | 7 | Q. And do you remember his name? |
| 12:56:32 | 8 | A. Javier Rodriguez, I believe. |
| 12:56:36 | 9 | Q. And what did he say the Mayor had said? |
| 12:56:40 | 10 | A. He said he did my background, and when he |
| 12:56:44 | 11 | called Sullivan, he spoke to the Mayor. The Mayor |
| 12:56:48 | 12 | recommended that they didn't hire me, because I was a |
| 12:56:50 | 13 | trouble-maker, and I didn't know how to do my job and |
| 12:56:52 | 14 | all I was going to do is cause them problems. |
| 12:56:56 | 15 | Q. Anything else that he said? |
| 12:57:12 | 16 | A. That was it. |
| 12:57:12 | 17 | Q. What was his name, Javier what? |
| 12:57:14 | 18 | A. Rodriguez. I think he's an investigator. |
| 12:57:16 | 19 | Q. Okay. Anybody else who said that the Mayor |
| 12:57:18 | 20 | had said something bad about you at any time? |
| 12:57:20 | 21 | A. I don't know, sir. |
| 12:57:28 | 22 | Q. Okay. You started saying Hernan had also |
| 12:57:30 | 23 | said that the Mayor had said things about you, right? |
| 12:57:34 | 24 | A. Yes. |
| 12:57:34 | 25 | Q. What did Hernan say that the Mayor |

Hill & Romero<br>Certified Court Reporters

130

| | | |
|---|---|---|
| 12:57:38 | 1 | had -- had said? |
| 12:57:38 | 2 | A. Well, that week before I was suspended, he |
| 12:57:42 | 3 | called me at home -- called me on the cell phone and |
| 12:57:46 | 4 | told me that the Mayor was very upset at me, that |
| 12:57:50 | 5 | about the paperwork I had or anything I had against |
| 12:57:52 | 6 | him was all -- |
| 12:57:54 | 7 | Q. Okay. Actually, I think you already told me |
| 12:57:56 | 8 | that Hernan said that the -- you already told me what |
| 12:58:02 | 9 | Hernan said that the Mayor had said? |
| 12:58:04 | 10 | A. Okay. |
| 12:58:04 | 11 | Q. Okay. What I need to ask you, you said |
| 12:58:06 | 12 | Hernan also made comments to you? |
| 12:58:08 | 13 | A. To the officers. |
| 12:58:10 | 14 | Q. To the officers. What did Hernan say? |
| 12:58:12 | 15 | A. Just the same deal, not to get involved with |
| 12:58:16 | 16 | me. |
| 12:58:16 | 17 | Q. Okay. What else? What did he say bad about |
| 12:58:20 | 18 | you? |
| 12:58:20 | 19 | A. I don't recall, sir. Going blank. |
| 12:58:34 | 20 | Q. Nothing you can think of? |
| 12:58:36 | 21 | A. Whatever I -- whatever happened I put it in |
| 12:58:40 | 22 | writing on his deal. I don't recall right now, sir. |
| 12:58:42 | 23 | Q. Well, from what I recall -- I don't have |
| 12:58:44 | 24 | that document right now anyway. But from what I |
| 12:58:48 | 25 | recall from the other stuff is, that what Hernan was |

Hill & Romero<br>Certified Court Reporters

131

| | | |
|---|---|---|
| 12:58:50 | 1 | doing was trying to do the letter of no confidence? |
| 12:58:54 | 2 | A. Yes. |
| 12:58:54 | 3 | Q. And that -- saying that you were not a good |
| 12:59:02 | 4 | leader? |
| 12:59:02 | 5 | A. Yes. |
| 12:59:06 | 6 | Q. Did you understand that was just his |
| 12:59:08 | 7 | opinion? |
| 12:59:08 | 8 | A. That was his opinion. And the other deals I |
| 12:59:14 | 9 | heard him say before during the time that letter was |
| 12:59:18 | 10 | being created was, that telling the officers, you |
| 12:59:20 | 11 | know, why aren't they signing that letter, you know, |
| 12:59:24 | 12 | it looks like they like to get screwed by me and, you |
| 12:59:28 | 13 | know, criticizing. |
| 12:59:28 | 14 | Q. Do you think that -- I'm sorry. Go ahead. |
| 12:59:30 | 15 | A. Just criticizing, you know, my schedule |
| 12:59:36 | 16 | change or decisions I would make. |
| 12:59:34 | 17 | Q. Do you think that was just part of the power |
| 12:59:36 | 18 | struggle? |
| 12:59:38 | 19 | A. I think that was part of him wanting to get |
| 12:59:40 | 20 | rid of me to take over the department. |
| 12:59:48 | 21 | THE WITNESS: You want to take a break |
| 12:59:48 | 22 | for lunch? |
| 12:59:48 | 23 | MR. AGUILAR: Just a second. |
| 12:59:50 | 24 | MR. SALINAS: Whenever -- let him |
| 12:59:52 | 25 | finish his line of questioning, we'll take a break. |

Hill & Romero<br>Certified Court Reporters

132

| | | |
|---|---|---|
| 12:59:54 | 1 | THE WITNESS: Yes, sir. |
| 12:59:56 | 2 | Q. (By Mr. Aguilar) So other than that, you |
| 13:00:02 | 3 | don't remember anything Hernan actually said where he |
| 13:00:04 | 4 | called you names and stuff, right? |
| 13:00:08 | 5 | A. Not right now, sir. |
| 13:00:10 | 6 | Q. I'm sorry? |
| 13:00:12 | 7 | A. I don't recall right now, sir. |
| 13:00:12 | 8 | Q. Okay. Nobody else called you any names, |
| 13:00:18 | 9 | right? |
| 13:00:18 | 10 | A. No, sir. I don't think so. I don't |
| 13:00:24 | 11 | remember. |
| 13:00:24 | 12 | Q. You've already told us everybody that said |
| 13:00:28 | 13 | that the Mayor had said anything -- |
| 13:00:30 | 14 | A. Uh-huh. |
| 13:00:30 | 15 | Q. -- about you, right? |
| 13:00:30 | 16 | A. Yes, sir. |
| 13:00:32 | 17 | Q. Who's Reynaldo Ruiz? |
| 13:00:34 | 18 | A. That's a Commissioner. |
| 13:00:36 | 19 | Q. Did Mr. Ruiz ever say -- call you any names? |
| 13:00:38 | 20 | A. No, sir. |
| 13:00:40 | 21 | Q. Who is Froilan Ramirez? |
| 13:00:48 | 22 | A. Another Commissioner. |
| 13:00:50 | 23 | Q. Did Mr. Ramirez ever call you any names? |
| 13:00:52 | 24 | A. No, sir. |
| 13:00:54 | 25 | Q. Rolando Gonzalez, who is that? |

Hill & Romero<br>Certified Court Reporters

DEPOSITION OF MARIO ALANIZ, SR., TAKEN JANUARY 4, 2005

133

| | | |
|---|---|---|
| 13:01:02 | 1 | A. The City Manager. |
| 13:01:04 | 2 | Q. Did he ever call you any names? |
| 13:01:06 | 3 | A. No, sir. |
| | 4 | Q. Okay. Part of the Petition alleges |
| 13:01:28 | 5 | Mr. Gonzalez -- Blas Gonzalez complaining to the |
| 13:01:30 | 6 | administration about the Mayor's actions. When he did |
| 13:01:34 | 7 | those complaints, you weren't with him, right? |
| 13:01:38 | 8 | A. I don't think I was. |
| 13:01:40 | 9 | Q. Okay. So I need to ask him separately about |
| 13:01:42 | 10 | whatever he said, right? |
| 13:01:42 | 11 | A. He -- he -- I was with him when we |
| 13:01:46 | 12 | complained to Rolando Gonzalez about the -- we showed |
| 13:01:48 | 13 | him all the tickets that were being dismissed. That, |
| 13:01:50 | 14 | I do recall. |
| 13:01:56 | 15 | Q. When was that? |
| 13:01:56 | 16 | A. In June. I'm not sure on the date. I have |
| 13:02:00 | 17 | it documented in my paperwork. |
| 13:02:00 | 18 | Q. That's part of the things that you don't |
| 13:02:02 | 19 | have right now, right? |
| 13:02:02 | 20 | A. Yes. |
| 13:02:04 | 21 | Q. Do you remember the month? |
| 13:02:08 | 22 | A. I believe it was June 2003. |
| 13:02:10 | 23 | Q. 2003, right? |
| 13:02:12 | 24 | A. Yes, sir. |
| 13:02:12 | 25 | Q. You and Blas went to who? |

Hill & Romero
Certified Court Reporters

134

| | | |
|---|---|---|
| 13:02:16 | 1 | A. We were there at the police department and |
| 13:02:16 | 2 | Rolando came in, and we showed him all the tickets |
| 13:02:24 | 3 | that were there on Hernan's desk piled up by -- sorted |
| 13:02:28 | 4 | out by officer. And we told him, you know, we're |
| 13:02:34 | 5 | going to get in trouble over this. You got to help us |
| 13:02:36 | 6 | find a way to take care of this problem. |
| 13:02:38 | 7 | Q. You said that the Mayor had asked the |
| 13:02:40 | 8 | officers to change them to warnings? |
| 13:02:40 | 9 | A. That's when Hernan was taking care of that, |
| 13:02:42 | 10 | the tickets. |
| 13:02:44 | 11 | Q. Okay. So it's you and Blas or you and |
| 13:02:48 | 12 | Hernan that are talking to -- |
| 13:02:48 | 13 | A. Blas and I. |
| 13:02:48 | 14 | Q. Okay. And you mentioned that to -- |
| 13:02:54 | 15 | A. Rolando. |
| 13:02:54 | 16 | Q. -- Gonzalez and what did he say? |
| 13:02:56 | 17 | A. He said he would talk to the Mayor. |
| 13:03:00 | 18 | Q. Anything else happen in that? |
| 13:03:00 | 19 | A. No, sir. Just the next day he walked in and |
| 13:03:04 | 20 | ordered me to make a ticket into a citation. |
| 13:03:06 | 21 | Q. Who did? |
| [?8] | 22 | A. Rolando Gonzalez. |
| .0 | 23 | Q. Anything else? |
| 13:03:10 | 24 | A. No, sir. |
| 13:03:10 | 25 | Q. Okay. So that's the only time that you ever |

Hill & Romero
Certified Court Reporters

135

| | | |
|---|---|---|
| 13:03:20 | 1 | heard or saw Blas talk to anybody at the |
| 13:03:24 | 2 | administration? |
| 13:03:26 | 3 | A. Well, he was always talking to them, but -- |
| 13:03:28 | 4 | Q. But you weren't there? |
| 13:03:30 | 5 | A. No, sir. |
| 13:03:30 | 6 | Q. Okay. So I'll have to ask him about that. |
| 13:03:36 | 7 | MR. AGUILAR: Let's go off the record. |
| 14:06:32 | 8 | (Recess.) |
| 14:06:32 | 9 | Q. (By Mr. Aguilar) Before we took a break, I |
| 14:06:34 | 10 | was asking you about things that the Mayor and anyone |
| 14:06:40 | 11 | else had said bad about you, remember? |
| 14:06:40 | 12 | A. Yes, sir. |
| 14:06:40 | 13 | Q. Okay. In your Petition noticing you make a |
| 14:06:44 | 14 | reference to Hernan telling Blas that the City Manager |
| 14:06:52 | 15 | Rolando had instructed him to make the letter -- to |
| 14:06:56 | 16 | make a letter that he was going to be writing juicy by |
| 14:06:58 | 17 | adding that you were not doing your job. Were you |
| 14:07:02 | 18 | present during that meeting? |
| 14:07:04 | 19 | A. No. |
| 14:07:04 | 20 | Q. So you don't know anything about that |
| 14:07:06 | 21 | personally? |
| 14:07:06 | 22 | A. It was Hernan telling Dispatcher De La |
| 14:07:10 | 23 | Garza. |
| 14:07:10 | 24 | Q. Okay. But you weren't there? |
| 14:07:12 | 25 | A. No, sir. |

Hill & Romero
Certified Court Reporters

136

| | | |
|---|---|---|
| 14:07:12 | 1 | Q. Okay. I'd have to ask De La Garza about |
| 14:07:16 | 2 | what was actually said? |
| 14:07:18 | 3 | A. Yes, sir. |
| 14:07:20 | 4 | Q. You go on to say that the Mayor was informed |
| 14:07:30 | 5 | of y'all's complaints by the D.A., Rene Guerra. When |
| 14:07:36 | 6 | was that? |
| 14:07:38 | 7 | A. I believe it was the -- like a week before |
| 14:07:44 | 8 | my termination. |
| 14:07:46 | 9 | Q. Does -- how did he do so? |
| 14:07:50 | 10 | A. The last meeting that we had, I believe it |
| 14:07:58 | 11 | was that week prior to me being suspended. |
| 14:08:00 | 12 | Q. Okay. You were suspended on December 7? |
| 14:08:02 | 13 | A. Yes, sir. |
| 14:08:04 | 14 | Q. Okay. So like by December 1 you think this |
| 14:08:08 | 15 | conversation took place? |
| 14:08:10 | 16 | A. I think so. I'm not sure on the date, but |
| 14:08:12 | 17 | that week before I was suspended, the Mayor told me |
| 14:08:16 | 18 | that he already knew about the D.A.'s office. |
| 14:08:18 | 19 | Q. So the week before December 7? |
| 14:08:20 | 20 | A. Yes. |
| 14:08:20 | 21 | Q. Okay. What did -- how did you find out that |
| 14:08:26 | 22 | the Mayor was informed? |
| 14:08:28 | 23 | A. The Mayor told me. |
| 14:08:28 | 24 | Q. And what did he actually tell you? |
| 14:08:34 | 25 | A. Well, it was during that conversation when |

Hill & Romero
Certified Court Reporters

173

| | | |
|---|---|---|
| 14:50:16 | 1 | Q.    When you were terminated on December 15, how |
| 14:50:24 | 2 | were you terminated? |
| 14:50:24 | 3 | A.    **The commission meeting. Commissioners,** |
| | 4 | **Mayor, all motion to get me terminated. I was** |
| 14:50:34 | 5 | **terminated. That was it.** |
| 14:50:40 | 6 | Q.    Okay. That's the only notice you ever got? |
| 14:51:02 | 7 | A.    **Yes, sir. Some time later -- later I went** |
| 14:51:12 | 8 | **and picked up the copy of the F-5, which is the** |
| 14:51:14 | 9 | **termination form they send over to T-CLOSE.** |
| 14:51:16 | 10 | Q.    Uh-huh. |
| 14:51:16 | 11 | A.    **And that's the only explanation I have, that** |
| 14:51:20 | 12 | **terminated by City Commission, period.** |
| 14:51:24 | 13 | Q.    That's all it says, right? |
| 14:51:24 | 14 | A.    **Yes, sir.** |
| 14:51:24 | 15 | Q.    It doesn't say why you were terminated or -- |
| 14:51:26 | 16 | A.    **No, sir.** |
| 14:51:28 | 17 | Q.    -- anything like that? |
| 14:52:06 | 18 | (Exhibit No. 6 was marked). |
| 14:52:12 | 19 | Q.    (By Mr. Aguilar) I'm handing you what I |
| 14:52:14 | 20 | marked as Exhibit 6. You recognize this letter? |
| 14:52:22 | 21 | A.    **Yes, sir. This letter was shown to me by** |
| 14:52:24 | 22 | **Blas Gonzalez in January 2004.** |
| 14:52:24 | 23 | Q.    You didn't see it till January? |
| 14:52:28 | 24 | A.    **Yes, sir.** |
| 14:52:28 | 25 | Q.    This is the letter from the D.A.'s office to |

Hill & Romero
Certified Court Reporters

174

| | | |
|---|---|---|
| 14:52:40 | 1 | Blas indicating that his complaint involving the |
| 14:52:50 | 2 | documents that y'all had submitted, basically, didn't |
| 14:52:54 | 3 | have any merit or something like that, right? |
| 14:52:56 | 4 | A.    **Yes, sir.** |
| 14:52:56 | 5 | Q.    The evidence reference traffic citations |
| 14:52:56 | 6 | being changed to warnings or insufficient for criminal |
| 14:53:00 | 7 | charges. Did you ever indicate to him what you |
| 14:53:04 | 8 | thought -- what law you thought that violated? |
| 14:53:06 | 9 | A.    **No, sir. I indicated to him in the** |
| 14:53:12 | 10 | **paperwork we submitted the amount of tickets that were** |
| 14:53:14 | 11 | **being dropped on a monthly basis.** |
| 14:53:16 | 12 | Q.    Right. But you didn't tell him how you |
| 14:53:18 | 13 | thought that violated the law or what law that |
| 14:53:20 | 14 | would've violated even if it was happening? |
| 14:53:24 | 15 | A.    **No, sir.** |
| 14:53:28 | 16 | Q.    There's also reference to Mr. Guerra -- I |
| 14:53:32 | 17 | assume that's Hernan -- is of the opinion that this |
| 14:53:38 | 18 | matter needs to be addressed with -- internally. |
| 14:53:42 | 19 | What was the -- what was the issue involving Hernan |
| 14:53:46 | 20 | that -- that she's talking about? |
| 14:53:52 | 21 | A.    **That's the items that were taken from the** |
| 14:54:06 | 22 | **evidence room, as well as the officers' statements,** |
| | 23 | **which were stating that he was threatening to get them** |
| 14:54:06 | 24 | **fired if they didn't make their tickets into warnings.** |
| 14:54:12 | 25 | Q.    Was he threatening to get the officers |

Hill & Romero
Certified Court Reporters

175

| | | |
|---|---|---|
| 14:54:14 | 1 | fired? |
| 14:54:14 | 2 | A.    **Yes.** |
| 14:54:14 | 3 | Q.    Is that what you understood? |
| 14:54:16 | 4 | A.    **Yes, sir. It's in the statements I** |
| 14:54:16 | 5 | **provided.** |
| 14:54:20 | 6 | Q.    Didn't the statements actually say that he |
| 14:54:24 | 7 | thought you were going to fire them? |
| 14:54:28 | 8 | A.    **No, sir.** |
| 14:54:28 | 9 | Q.    Did -- how was he -- how did you understand |
| 14:54:36 | 10 | he was threatening to fire them? In other words, what |
| 14:54:36 | 11 | was he saying that, Look, you either sign this |
| 14:54:38 | 12 | statement or you get fired? |
| 14:54:40 | 13 | A.    **Yes.** |
| 14:54:40 | 14 | Q.    That's what you understood? |
| 14:54:42 | 15 | A.    **(No audible response).** |
| 14:54:42 | 16 | Q.    In other words, you understood that he was |
| 14:54:44 | 17 | threatening the officers, either they sign the letter |
| 14:54:46 | 18 | of no confidence -- |
| 14:54:46 | 19 | A.    **No. The citations into warnings.** |
| 14:54:52 | 20 | Q.    You understood that he was telling the |
| 14:55:04 | 21 | officers that unless they change the citations into |
| 14:55:08 | 22 | warnings, that they would get fired? |
| 14:55:10 | 23 | A.    **Yes, sir.** |
| 14:55:10 | 24 | Q.    That should be reflected in each of their |
| 14:55:12 | 25 | statements? |

Hill & Romero
Certified Court Reporters

176

| | | |
|---|---|---|
| 14:55:12 | 1 | A.    **Yes, sir.** |
| 14:55:12 | 2 | Q.    And this is what you understood the |
| 14:55:18 | 3 | Assistant D.A., Sofia Arizpe, was saying to Blas that |
| 14:55:22 | 4 | needed to be dealt with internally? |
| 14:55:24 | 5 | A.    **Yes.** |
| 14:55:24 | 6 | Q.    Okay. You talk about complaints |
| 14:55:40 | 7 | of -- you've got a complaint for violation of your |
| 14:55:44 | 8 | right to free speech. What speech do you believe you |
| 14:55:48 | 9 | made that deserves protection? |
| 14:55:50 | 10 | A.    **My First Amendment Right.** |
| 14:55:52 | 11 | Q.    Right. In other words, First Amendment |
| 14:55:54 | 12 | Right has to do with free speech? |
| 14:55:54 | 13 | A.    **Yes.** |
| 14:55:56 | 14 | Q.    But you have to speak? |
| 14:55:58 | 15 | A.    **Yes.** |
| 14:55:58 | 16 | Q.    What statements did you make that you think |
| 14:56:04 | 17 | you believe needed protection or deserved protection |
| 14:56:06 | 18 | under the First Amendment? |
| 14:56:08 | 19 | A.    **My reporting.** |
| 14:56:10 | 20 | Q.    Reporting? |
| 14:56:10 | 21 | A.    **What I thought -- where what I know** |
| 14:56:14 | 22 | **illegal.** |
| 14:56:14 | 23 | Q.    Reporting what you believe is illegal? |
| 14:56:16 | 24 | A.    **Yes.** |
| 14:56:18 | 25 | Q.    To the D.A. and -- and -- |

Hill & Romero
Certified Court Reporters

**165**

| | | |
|---|---|---|
| 14:40:20 | 1 | Q.    Did the Mayor do anything to you to |
| 14:40:52 | 2 | specifically try to hurt you, or was he just trying to |
| 14:41:00 | 3 | get somebody who would be able to dismiss the traffic |
| | 4 | tickets? |
| 14:...06 | 5 | A.    Hurt me in what way, sir? |
| 14:41:06 | 6 | Q.    In any way. In other words, did -- do you |
| 14:41:10 | 7 | think the Mayor was actually trying to do something |
| 14:41:12 | 8 | just to try to get you, to make your life difficult? |
| 14:41:14 | 9 | A.    No, sir. |
| 14:41:16 | 10 | Q.    He was just trying to get somebody to do |
| 14:41:18 | 11 | what he wants? |
| 14:41:18 | 12 | A.    Yes. |
| 14:41:20 | 13 | Q.    You don't think he was willfully trying to |
| 14:41:20 | 14 | hurt you, do you? |
| 14:41:42 | 15 | A.    About the tickets or -- and all that, no, |
| 14:41:44 | 16 | sir. |
| 14:41:44 | 17 | Q.    Well, for anything. In other words, getting |
| 14:41:46 | 18 | you fired, was he doing it just to try to make your |
| 14:41:48 | 19 | life difficult or make it -- to hurt you somehow? |
| 14:41:52 | 20 | A.    Getting me fired? |
| 14:41:52 | 21 | Q.    Yeah. |
| 14:41:54 | 22 | A.    I believe that was just because of the |
| 14:41:56 | 23 | problems he thinks I was causing by reporting this. |
| 14:42:00 | 24 | Q.    The report you made to the D.A. and to the |
| 14:42:34 | 25 | Sheriff had to do with what you've already told us |

Hill & Romero
Certified Court Reporters

**166**

| | | |
|---|---|---|
| 14:42:38 | 1 | about, basically, which had to do with the -- the |
| 14:42:42 | 2 | tickets and what else? |
| 14:42:46 | 3 | A.    The interference with the officers as far as |
| 14:42:52 | 4 | their... |
| 14:42:56 | 5 | Q.    I think you told us earlier what you |
| 14:43:02 | 6 | reported to the D.A. was tickets for the opponents, |
| 14:43:06 | 7 | none for the supporters, Guerra taking items from the |
| 14:43:08 | 8 | evidence room, Mayor dictating where you could patrol, |
| 14:43:10 | 9 | those sorts of things? |
| 14:43:10 | 10 | A.    Yes, sir. |
| 14:43:10 | 11 | Q.    All that you reported it to the D.A. and to |
| 14:43:14 | 12 | the Sheriff, right? |
| 14:43:16 | 13 | A.    Yes, sir. |
| 14:43:16 | 14 | Q.    Did you report it to anybody else? |
| 14:43:24 | 15 | A.    The FBI. |
| 14:43:26 | 16 | Q.    How did you report it to the FBI? |
| 14:43:28 | 17 | A.    That week of December the 8th when I talked |
| 14:43:36 | 18 | to the Sheriff Investigator, Norberto Leal, |
| 14:43:38 | 19 | recommended I talk to the FBI and gave me that |
| 14:43:42 | 20 | telephone number to one of the agents. |
| 14:43:44 | 21 | Q.    Which agent? |
| 1:..:44 | 22 | A.    Agent Steve Hawk. |
| | 23 | Q.    And did you talk to him? |
| 14:43:50 | 24 | A.    Yes, sir. I called him by phone, and he |
| 14:43:52 | 25 | told me that he was going to be occupied for the |

Hill & Romero
Certified Court Reporters

**167**

| | | |
|---|---|---|
| 14:43:56 | 1 | remainder of the month. So he set up an appointment |
| 14:43:58 | 2 | for January. |
| 14:43:58 | 3 | Q.    Did you talk to him in January? |
| 14:43:58 | 4 | A.    Yes, sir. |
| 14:44:00 | 5 | Q.    Of 2004? |
| 14:44:02 | 6 | A.    Yes, sir. |
| 14:44:02 | 7 | Q.    And was it a -- like a full meeting, or was |
| 14:44:06 | 8 | it just a -- a -- did you sit down and have a meeting |
| 14:44:10 | 9 | where you explained everything that you've told us |
| 14:44:12 | 10 | about? |
| 14:44:12 | 11 | A.    Yes, sir. |
| 14:44:12 | 12 | Q.    You went over all the same facts with him |
| 14:44:14 | 13 | that you went over with the Sheriff? |
| 14:44:14 | 14 | A.    Yes, sir. |
| 14:44:16 | 15 | Q.    And what happened after that? |
| 14:44:16 | 16 | A.    He took copies of all the paperwork as far |
| 14:44:20 | 17 | as all the statements. |
| 14:44:24 | 18 | Q.    Okay. |
| 14:44:24 | 19 | A.    Robert Montes was also present there. He |
| 14:44:30 | 20 | said he was going to contact Robert Montes back to |
| 14:44:32 | 21 | follow-up some other information he had, and told me |
| 14:44:34 | 22 | that he would be creating a file and they would be |
| 14:44:36 | 23 | reviewing it. And not to contact him. If they needed |
| 14:44:42 | 24 | any more additional information, they would be calling |
| 14:44:44 | 25 | me. |

Hill & Romero
Certified Court Reporters

**168**

| | | |
|---|---|---|
| 14:44:44 | 1 | Q.    Did they ever call you back? |
| 14:44:50 | 2 | A.    No, sir. |
| 14:44:50 | 3 | Q.    Did you complain to anybody else? |
| 14:44:54 | 4 | A.    No, sir. |
| 14:44:54 | 5 | Q.    Did you ever make any of these comments or |
| 14:44:58 | 6 | statements like to a -- in a City Commission meeting? |
| 14:45:02 | 7 | A.    No, sir. |
| 14:45:02 | 8 | Q.    Did you report to the newspaper or anybody |
| 14:45:04 | 9 | else? |
| 14:45:06 | 10 | A.    No, sir. |
| 14:45:06 | 11 | Q.    Basically, you were just doing a -- you were |
| 14:45:08 | 12 | trying to do a quiet, confidential -- |
| 14:45:10 | 13 | A.    Yes, sir. |
| 14:45:10 | 14 | Q.    -- report of what you thought were these |
| 14:45:12 | 15 | violations of law? |
| 14:45:12 | 16 | A.    Yes, sir. |
| 14:45:12 | 17 | Q.    And it was only to the law enforcement |
| 14:45:18 | 18 | agencies? |
| 14:45:20 | 19 | A.    Yes, sir. |
| 14:45:20 | 20 | (Exhibit No. 4 was marked.) |
| 14:45:56 | 21 | Q.    (By Mr. Aguilar) Hand you what I've marked |
| 14:45:56 | 22 | as Exhibit No. 4. You recognize this letter? |
| 14:46:04 | 23 | A.    Yes, sir. |
| 14:46:04 | 24 | Q.    You -- it's a letter you wrote, dated |
| 14:46:08 | 25 | November 28, to the Mayor. The first sentence reads |

Hill & Romero
Certified Court Reporters

169

```
14:46:12   1    that this letter is in regards to our discussion this
14:46:16   2    morning. What discussion did you have with the Mayor
14:46:18   3    on November 28th?
           4        A.    That's the morning that he came into my
14:46:22   5    office when I was meeting with Dispatcher De La Garza.
14:46:24   6        Q.    Okay. And what -- what did y'all discuss?
14:46:26   7        A.    Well, he became reprimanding De La Garza for
14:46:30   8    being in my office. And I told him he was there for a
14:46:32   9    reason, because I needed to speak with him. So he
14:46:36  10    continued reprimanding him. I told him that he had me
14:46:40  11    there as the Chief of Police.
14:46:42  12        Q.    That what?
14:46:42  13        A.    That -- that the Commission had put me there
14:46:44  14    as Chief of Police, and I was only doing my job. I
14:46:48  15    had to meet with this person regarding a training he
14:46:48  16    was doing.
14:46:50  17        Q.    Okay.
14:46:54  18        A.    I told him, you know, you can't be
14:46:54  19    interfering. I'm the one in charge of this
14:46:56  20    department.
14:46:58  21        Q.    You were telling that to the Mayor?
14:47:00  22        A.    Then I told him, You know what? Let me just
14:47:02  23    go ahead and put down in writing what's going on and
14:47:04  24    I'll give you the letter.
14:47:09  25        Q.    What letter?
```

Hill & Romero
Certified Court Reporters

170

```
14:47:08   1        A.    This letter.
14:47:08   2        Q.    The Mayor walked into your office and said
14:47:14   3    what that made you think he needed a letter?
14:47:18   4        A.    He began reprimanding the officer.
14:47:20   5        Q.    For being there?
14:47:22   6        A.    Yes.
14:47:22   7        Q.    Meaning the officer should be out
14:47:24   8    patrolling?
14:47:24   9        A.    No. He was -- his office was next door to
14:47:26  10    mine. He was training the dispatcher, and that's what
14:47:28  11    we were discussing when the Mayor came in. I --
14:47:32  12        Q.    Why was the Mayor upset that he was in your
14:47:34  13    office?
14:47:34  14        A.    I don't know. The Mayor was in my office
14:47:36  15    three, four times a day.
14:47:38  16        Q.    Okay.
14:47:40  17        A.    After I told him what he was doing there, he
14:47:42  18    continued reprimanding him and that's when I said, I
14:47:46  19    better put a stop to this and put everything in
14:47:50  20    writing, because everything had been verbal between us
14:47:52  21    and that wasn't working.
14:47:__  22        Q.    So when you told -- when the Mayor came into
      23    your office and said -- got mad at the officer for
14:47:58  24    being in your office, did you discuss with him, No, he
14:48:00  25    needed to be here --
```

Hill & Romero
Certified Court Reporters

171

```
14:48:02   1        A.    Yes, sir.
14:48:02   2        Q.    -- and I don't like you interfering with my
14:48:04   3    officers?
14:48:04   4        A.    Yes, sir.
14:48:04   5        Q.    Okay. And that's what you're talking about,
14:48:08   6    Our discussion this morning?
14:48:08   7        A.    Yes, sir.
14:48:08   8        Q.    Okay. And you're trying to tell him
14:48:12   9    during -- in this letter, that it's up to you to
14:48:28  10    decide what happens in the P.D. and not him?
14:48:30  11        A.    Yes, sir.
14:48:30  12        Q.    And you're telling him to quit interfering?
14:48:30  13        A.    Yes, sir.
14:48:30  14        Q.    And that's when you go on to say you're
14:48:40  15    claiming protection under the Whistle Blowers Act, and
14:48:42  16    that you've taken the matter to a higher authority?
14:48:44  17        A.    Yes, sir.
14:48:44  18        Q.    What authority were you referring to?
14:48:46  19        A.    Sheriff's Department.
14:48:48  20        Q.    Okay. Did you tell him that on the 28th, or
14:48:52  21    did you just leave the letter like it is?
14:48:52  22        A.    I left it like it is. When I'm telling
14:48:56  23    about -- about this, he just walks away.
14:49:02  24        Q.    Okay. So you didn't tell him what you
14:49:04  25    actually complained about?
```

Hill & Romero
Certified Court Reporters

172

```
14:49:04   1        A.    No, sir.
14:49:04   2        Q.    And based on this, all it's saying is -- it
14:49:10   3    looks like you're saying that you complain to somebody
14:49:14   4    else about him interfering with your job duties?
14:49:16   5        A.    Yes, sir.
14:49:16   6        Q.    And you're saying that your
14:49:24   7    complaints -- you're claiming protection under the
14:49:26   8    Whistle Blowers Act?
14:49:26   9        A.    Uh-huh. Yes, sir.
14:49:26  10        Q.    But you don't actually identify what it is
14:49:30  11    that you reported?
14:49:36  12        A.    No. Other than the fact about the
14:49:38  13    interference.
14:49:40  14        Q.    Interference with your police, basically --
14:49:42  15        A.    Yes.
14:49:42  16        Q.    -- interfering with your job as Police
14:49:44  17    Chief?
14:49:58  18        A.    Yes, sir.
14:49:58  19              (Exhibit No. 5 was marked).
14:50:00  20        Q.    (By Mr. Aguilar)  Handing you what I marked
14:50:02  21    as Exhibit No. 5. That's the letter from the City
14:50:06  22    Manager Rolando Gonzalez to you, dated December 7 in
14:50:12  23    which you were suspended with pay effective December
14:50:14  24    7, right?
14:50:16  25        A.    Yes, sir.
```

Hill & Romero
Certified Court Reporters

185

15:19:36  1    Q.    What about Rolando Gonzalez?  How did he

15:19:46  2    violate your rights?  Same thing?

15:19:52  3    A.    Yes.

   4    Q.    Anything else other than that?

15:19:54  5    A.    No, sir.

15:19:56  6    Q.    And the way the Mayor violated your rights

15:20:06  7    is in things he said and the -- the -- the termination

15:20:14  8    and all the different things that we've talked about

15:20:14  9    earlier, right?

15:20:16  10   A.    Yes.

15:20:16  11   Q.    Okay.  Otherwise, there's nothing else that

15:20:18  12   you can think of, no other -- I'm sorry.  Go ahead.

15:20:20  13   A.    Rolando Gonzalez, as far as giving me the

15:20:24  14   opportunity to -- we requested a hearing after I was

15:20:28  15   terminated, and that was also denied by him.  We

15:20:34  16   requested it be placed in the city meeting, and that

15:20:40  17   didn't accomplish anything.

15:20:42  18   Q.    What to be placed in the city meeting?

15:20:44  19   A.    My suspension.

15:20:48  20   Q.    In other words, your complaining that

15:20:48  21   Gonzalez also didn't give you a hearing and didn't set

15:20:50  22   it before the Commission to discuss?

15:20:52  23   A.    Yes.

15:20:54  24   Q.    Is that right?

15:20:54  25   A.    Yes, sir.

Hill & Romero
Certified Court Reporters

---

186

15:20:54  1    Q.    Any other way that either the Mayor,

15:21:06  2    Mr. Ruiz, Mr. Ramirez or Mr. Gonzalez violated your

15:21:10  3    rights or harmed you in any way that we haven't

15:21:12  4    already talked about?

15:21:14  5    A.    No, sir.

15:21:14  6    Q.    You already told us each law enforcement

15:21:50  7    agency that you reported the violations you -- what

15:21:54  8    you felt were violations, right?

15:21:56  9    A.    Yes, sir.

15:21:56  10   Q.    It was only to the D.A.'s office and to

15:22:00  11   the --

15:22:00  12   A.    Sheriff's Department.

15:22:02  13   Q.    -- Sheriff's Department and to the FBI?

15:22:04  14   A.    Yes, sir.

15:22:04  15   Q.    And you already told us about each report

15:22:06  16   that you made to each of those offices, right?

15:22:08  17   A.    Yes, sir.

15:22:08  18   Q.    And you indicated the people you met with at

15:22:40  19   the Sheriff's Department were Norberto Leal, Tim

15:22:44  20   Santos, Moises Flores, and Sheriff Henry Escalon.  In

15:23:00  21   your discovery responses you indicated those, but you

15:  :02  22   didn't identify anybody else that you met with.  You

   23   think there was another person present?

15:23:06  24   A.    Yes, sir.  During the meeting, the second in

15:23:10  25   command, I don't recall his name, walked in and sat

Hill & Romero
Certified Court Reporters

---

187

15:23:12  1    down during the meeting.

15:23:12  2    Q.    Who is Roman Rivera?

15:23:16  3    A.    He's -- he was a -- a ride-along for the

15:23:16  4    department.

15:23:16  5    Q.    He's a former officer?

15:23:24  6    A.    No, sir.  He was a security officer.

15:23:28  7    Q.    What's a ride-along?

15:23:30  8    A.    Civilians sign a waiver and get to go on

15:23:34  9    patrol with the officers to see what law enforcement's

15:23:36  10   about.

15:23:38  11   Q.    Did he do that a few times?

15:23:38  12   A.    Yes, sir.

15:23:40  13   Q.    Why would he do that?

15:23:42  14   A.    He was interested in becoming a police

15:23:44  15   officer.

15:23:44  16   Q.    Okay.  Why was he present with you when you

15:23:50  17   talked to Agent Hawk at the FBI?

15:23:52  18   A.    Because he also submitted a -- a report.

15:23:54  19   Q.    What -- what did his report say?

15:23:58  20   A.    His was handwritten.

15:24:04  21   Q.    That's one of the documents you've already

15:24:06  22   provided us?

15:24:06  23   A.    Yes.  Yeah.  It was, I believe, two of them

15:24:12  24   that were --

15:24:12  25   Q.    Okay.

Hill & Romero
Certified Court Reporters

---

188

15:24:12  1    A.    -- hand written by...

15:24:12  2    Q.    Just, generally, what do you recall he said?

15:24:16  3    A.    Yes, sir.

15:24:16  4    Q.    What do you recall he said?

15:24:16  5    A.    Basically, that the -- the conversation with

15:24:22  6    the -- the agent was between myself and Robert Montes.

15:24:26  7    Q.    I'm wondering what Rivera said.  I'm trying

15:24:30  8    to pull up his statement, but do you recall?

15:24:32  9    A.    No, sir, I don't recall.

15:24:32  10   Q.    You indicated on your discovery responses

15:25:28  11   that on December 3, the City Manager asked to see the

15:25:32  12   affidavits prepared by the officers regarding

15:25:34  13   misconduct on the part of the Mayor, and that he had

15:25:38  14   been told that the Mayor was offended by the letter he

15:25:42  15   had received?

15:25:42  16   A.    Yes, sir.

15:25:42  17   Q.    What letter are you referring to?

15:25:44  18   A.    The -- the one -- the whistle blower letter

15:25:48  19   that we call it where we reported --

15:25:50  20   Q.    The November 28th, letter?

15:25:50  21   A.    Yes, sir.

15:25:50  22   Q.    Okay.  You indicated also on December 5 that

15:26:10  23   you were told -- let me start all over.  You indicated

15:26:10  24   that you were told on December 5 by Dispatcher Jaime

15:26:16  25   De La Garza, that the Mayor had told him that the

Hill & Romero
Certified Court Reporters

1              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
2                     BROWNSVILLE DIVISION

3   MARIO ALANIZ, JR.           ) (
                                 ) (
4   VS.                         ) (        CIVIL ACTION NO.
                                 ) (
5   THE CITY OF SULLIVAN CITY,  ) (          B-04-040
    TEXAS, TEXAS, GUMARO FLORES,) (
6   In his and Official Capacity) (
    As Mayor of Sullivan City,  ) (
7   REYNALDO RUIZ and FROILAN   ) (
    RAMIREZ, in their Individual) (
8   And Official Capacities as  ) (
    Commissioners and ROLANDO   ) (
9   GONZALEZ, in his Individual ) (
    And Official Capacity as    ) (
10  City Manager                ) (

11

12

13                    REPORTER'S CERTIFICATE

14

15       I, JOHN W. FELLOWS, Certified Court Reporter,

16  certify that the witness, Mario Alaniz, Jr., was duly

17  sworn by me, and that the deposition is a true and

18  correct record of the testimony given by the witness on

19  January 4, 2005; that the deposition was reported by me

20  in stenograph and was subsequently transcribed under my

21  supervision.

22       I FURTHER CERTIFY that I am not a relative,

23  employee, attorney or counsel of any of the parties, nor

24  a relative or employee of such attorney or counsel, nor

25  am I financially interested in the action.



1      WITNESS MY HAND on this the ___20th___ day of

2   January_____, 2005.

3

4

5      _____John W. Fellows_____

6      JOHN WESLEY FELLOWS, Texas CSR #3335
       Expiration Date:  12/31/06

7      Firm Registration No.: 313
       10125 North 10th Street

8      Suite B
       McAllen, Texas   78504

15:50:34   (956) 287-8898

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Hill & Romero
Certified Court Reporters

# EXHIBIT A-2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| MARIO ALANIZ, JR.  )( | |
| Plaintiff  )( | |
|  )( | |
| VS.  )( | CIVIL ACTION NO. |
|  )( | B-04-040 |
| THE CITY OF SULLIVAN  )( | |
| CITY, TEXAS, GUMARO  )( | |
| FLORES, in his Individual )( | |
| and Official Capacity as  )( | |
| Mayor of Sullivan City,  )( | |
| REYNALDO RUIZ and FROILAN )( | |
| RAMIREZ, in their  )( | |
| Individual and Official  )( | |
| Capacities as  )( | |
| Commissioners and ROLANDO )( | |
| GONZALEZ, in his  )( | |
| Individual and Official  )( | |
| Capacity as City Manager  )( | |
| Defendants  )( | |

───────────────────────────────────────

ORAL DEPOSITION OF
BLAS GONZALEZ
FEBRUARY 24, 2005

───────────────────────────────────────

ORAL DEPOSITION OF BLAS GONZALEZ, produced as a

witness at the instance of the DEFENDANTS, taken in the

above styled and numbered cause on FEBRUARY 24, 2005,

from 9:45 a.m. to 1:53 p.m., before LOU ZUNIGA,

Certified Court Reporter No. 2198, in and for the State

of Texas, at the offices of Sanchez, Whittington, Janis

& Zabarte, 100 North Expressway 83, Brownsville, Texas,

pursuant to the Federal Rules of Civil Procedure.



HILL & ROMERO
CERTIFIED COURT REPORTERS



Page 66

1    Q. And when was that conversation with the mayor?
2    A. I cannot recall, sir.
3    Q. It was just before you actually resigned,
4  though, wasn't it?
5    A. That is correct.
6    Q. Because you were already taking down your stuff
7  on the walls?
8    A. That is correct.
9    Q. Was it like a day or two or the same date? In
10  other words, was the meeting with the mayor either the
11  same day or a day or two before the day you actually
12  submitted your letter?
13    A. I cannot recall how many days after, but it was
14  before -- this letter was done several days later.
15    Q. Okay. So for a few days you had no pictures or
16  anything on your wall?
17    A. That is correct, sir.
18    Q. Did you just take them home that day?
19    A. No, sir, I had them just --
20    Q. In a box?
21    A. -- in a box.
22    Q. So when you got that demotion memo, that was --
23  was that the same day as your resignation?
24    A. No, sir. It was before. I actually did the
25  whole resignation letter.

Page 67

1    Q. Because I'm trying to figure it out. It seems
2  like the mayor comes in and talks to you.
3    A. Yes, sir.
4    Q. You are already taking down your pictures. You
5  say a few days later you actually submitted your letter
6  of resignation; during the time in between you're still
7  working for the City?
8    A. That is correct, sir.
9    Q. And somewhere in between that time is when you
10  got the letter demoting you to sergeant in patrol?
11    A. That is correct, sir.
12    Q. But you can't tell us how many days were in
13  between any of that?
14    A. No, sir, I don't recall.
15    Q. Okay.
16      (Exhibit No. 6 marked).
17    Q. Now, you were I guess not working for a period
18  of about two weeks, right?
19    A. That is correct, sir.
20    Q. I'm handing you what's marked as Gonzalez
21  Exhibit 6. This is a letter or memo from Chief Alaniz
22  to City Administrator Mr. Gonzalez dated September 5,
23  2003. It starts off, as per our conversation on the
24  matter of hiring -- which it appears that Chief Alaniz
25  was talking to City Administrator Gonzalez -- a

Page 68

1  temporary warrant officer, I am recommending Blas
2  Gonzalez for this position. And then at the bottom it
3  says, Ok, RG, which I presume is Administrator
4  Gonzalez's signature or initials. And it's also signed
5  by Chief Alaniz. Did you get a copy of this document?
6    A. I think so, sir.
7    Q. Okay. It goes on to say you can also be
8  assigned to assist patrol personnel in the event of an
9  emergency situation or manpower shortage. The warrant
10  officer schedule will be from 8:00 a.m. to 5:00 p.m.
11  Monday through Friday. This schedule may be changed as
12  needed and will not exceed 40 hours per week. You said
13  you did get a copy of this?
14    A. I think so, sir.
15    Q. Okay. Did you get a copy around September 5,
16  shortly after you were actually hired?
17    A. Not at that specific date, sir.
18    Q. Around that time, though? Within a week or
19  two?
20    A. Yes, sir.
21    Q. Okay. You understood when you were hired that
22  it was a temporary position, right?
23    A. No, sir.
24    Q. Okay. You understood within a week or two when
25  you got this document that it was a temporary position,

Page 69

1  right?
2    A. Yes, sir.
3    Q. Okay. And if you weren't satisfied with that
4  you could have gone to the City and said, look, I don't
5  want to be a temporary position, I want a regular
6  full-time or whatever, right?
7    A. During the time when I got the -- this
8  paperwork, I asked about it and I was advised that this
9  was just temporary until they open a police officer
10  position and then I would be moved to the police
11  officer position.
12    Q. Okay. Who was telling you that?
13    A. I was advised that by Mario Alaniz, Judge De la
14  Garza, Rolando Gonzalez, city administrator, and the
15  assistant chief, Hernan Guerra.
16    Q. Okay. You understand, as you indicated
17  earlier, that it's the city administrator that does the
18  hiring, right?
19    A. That is correct, sir.
20    Q. You understand also that the city administrator
21  or the City in general can change their minds, right?
22    A. I presume so, sir.
23    Q. And you also understood at the time that you
24  were hired that it was going to be a temporary
25  position?

18 (Pages 66 to 69)

HILL & ROMERO
CERTIFIED COURT REPORTERS

f6c1df65-221e-40db-9d63-16c870121e39

Page 70

1    A. That is correct.
2    Q. Which meant that at any time you could lose
3    that position?
4    A. By what I was being told, no.
5    Q. Okay. You understand that the word temporary
6    means you could lose a position, right?
7    A. Yes, sir.
8    Q. You understand also that -- or you understood
9    at the time that if there was going to be an opening
10   that you would get that opening?
11   A. That is correct, sir.
12   Q. And you also agree that the city administrator
13   person hiring can decide to change his mind, right? Do
14   you agree with that?
15   A. No.
16   Q. You don't think he could change his mind?
17   A. Well, I think he could change his mind, but I
18   don't agree with it.
19   Q. Okay. You may not like it, but you know he can
20   do it?
21   A. Yes.
22   Q. I didn't mean agree like --
23   A. I understand, sir.
24   Q. Okay. Do you know whether any openings came up
25   between September of 2003 and March of 2004?

Page 71

1    A. Yes, sir, two.
2    Q. For which? When?
3    A. In January when Mario was fired, Mario Alaniz
4    was terminated, all they did was move the officers up,
5    so that left a position open. I spoke to Rolando
6    Gonzalez and again he promised me the position as well
7    as the assistant chief, and it was only after the
8    lawsuit was --
9    Q. Hang on a second.
10   A. Yes, sir.
11   Q. You said Gonzalez offered you or promised you
12   the position. Which position are you talking about?
13   A. The police officer position.
14   Q. Just a basic peace officer?
15   A. Sergeant investigator.
16   Q. If everybody got moved up, did somebody get
17   moved up into that position?
18   A. The assistant chief was given the title of
19   acting chief.
20   Q. Okay. Who had been the sergeant investigator?
21   A. I was still.
22   Q. No, no. When you were warrant officer?
23   A. I was still the sergeant investigator.
24   Q. You were doing the work of the sergeant
25   investigator?

Page 72

1    A. I still had the title of sergeant investigator.
2    Q. You had the title of sergeant --
3    A. Yes, as per their say-so.
4    Q. I've got Exhibit 6, which says you -- the only
5    position you had was temporary warrant officer. I
6    guess that was your official position, but you're
7    telling us that you were also doing the work of the
8    sergeant investigator?
9    A. Yes, sir, I still had the badge of sergeant
10   investigator and the uniform.
11   Q. Okay. What did that job entail?
12   A. The civil warrant's officer?
13   Q. Uh-huh.
14   A. Working alongside the municipal court judge,
15   picking up warrants, continuing with the -- any and all
16   investigations.
17   Q. Okay. So then after Alaniz gets fired,
18   Gonzalez promises you the position of sergeant
19   investigator. When was that?
20   A. Right after Alaniz was fired.
21   Q. January?
22   A. In January.
23   Q. Okay. And what happens after that?
24   A. They continue promising me that I was still the
25   sergeant investigator and that pretty soon I was going

Page 73

1    to be moved to the police officer position which
2    entailed 12.50 an hour instead of the $10 an hour,
3    because I advised them, well, if you want me to
4    continue doing sergeant investigator or the
5    investigations, I would like to get paid the same as
6    the other officer, which is 12.50 an hour.
7    Q. Okay.
8    A. And that would be going on a daily basis,
9    when are you going to move me over, when am I going to
10   be moved over there. Hold on, we are working on it,
11   very soon, very soon, just help me out with the
12   investigations, continue doing all the office
13   paperwork, which is the chief of police's job also.
14   Q. Okay. And then ultimately you got the notice
15   that the position was instead just being eliminated?
16   A. The same day that the lawsuit against them came
17   in to -- or they were served, I was there next to the
18   patrol officers -- it's like a little office where they
19   book in and book out personnel -- or prisoners. The
20   assistant chief walked in with a stack of papers.
21   Q. Is that Hernan?
22   A. Hernan. As well as the mayor. At the time an
23   argument ensued with the mayor concerning that
24   paperwork. To my knowledge, I was not aware of what
25   that paperwork was until the mayor mentioned that my

19 (Pages 70 to 73)

Page 90

1  was referring to?
2    A. No, sir, other than the hiring of --
3    Q. Joel?
4    A. -- Joel.
5    Q. Then the next paragraph you say on October 9,
6  2003 Assistant Chief Guerra went to your house again.
7  Officer Jose Gonzalez was apparently very upset at
8  Chief Alaniz because he had treated him badly. Do you
9  know what he was talking about there?
10    A. No, sir.
11    Q. Okay. He just mentioned that to you, he
12  didn't --
13    A. Yes, sir.
14    Q. -- explain more? He goes on -- you go on later
15  on to say, that same paragraph, Joel Gonzalez was the
16  cause of it all as the chief would only listen to Joel.
17  Did he talk about that? Do you remember that?
18    A. That was his statement, sir.
19    Q. Okay. Did you talk to him about that? In
20  other words, did you agree or disagree with him on
21  that?
22    A. No, sir.
23    Q. You were just listening?
24    A. I just listened.
25    Q. Then he goes on that he was going to have the

Page 91

1  chief fired as well as Joel, too. What was that? Is
2  it just a comment he made?
3    A. That was his statement as far as saying that he
4  had spoken to the officers and that they had agreed
5  that they needed to get rid of Chief Alaniz.
6    Q. Okay. And that was because of the stuff
7  relating to Joel Gonzalez?
8    A. Joel Gonzalez.
9    Q. Joel Gonzalez is different from Jose Gonzalez,
10  right?
11    A. That is correct.
12    Q. Okay. You go on, October 10, Chief Guerra
13  stopped over. City administrator was upset because
14  Chief Alaniz was not doing his job. All he did was sit
15  at the computer and be on the Internet. Do you know
16  anything about that?
17    A. That's what he advised me, sir.
18    Q. At this point you are just listening and
19  remembering --
20    A. Yes, sir.
21    Q. -- and writing it down?
22    A. Yes, sir, that is correct.
23    Q. You go on to say the city administrator was
24  also upset because the City of Penitas, Chief
25  Ontiveros, had gone to his office and told him that

Page 92

1  Chief Alaniz had told him that he had taken a pay cut
2  so that the administrator could take a raise. Did you
3  understand anything about that?
4    A. Other than what he stated there.
5    Q. Okay. Basically all he's saying is that Alaniz
6  goes over to Penitas and says, yeah, I got a pay cut so
7  the administrator could get a raise, something like
8  that?
9    A. No, sir.
10    Q. That's what --
11    A. What I'm saying was that -- what it says here
12  is that the chief of Penitas had gone and told the
13  administrator because he had been in Chief Alaniz's
14  office as per his say-so.
15    Q. Oh, I see. It's the other way around?
16    A. Yes, sir.
17    Q. In other words --
18    A. The chief of Penitas came to Sullivan City
19  instead of the chief of Sullivan going over there.
20    Q. And Ontiveros in Penitas is saying to Alaniz,
21  Mr. Alaniz, you took a pay cut just so the city
22  administrator could get a raise?
23    A. No. What Guerra stated was that the city
24  administrator advised him that Chief Ontiveros had
25  talked to Alaniz and Alaniz had mentioned that to him.

Page 93

1    Q. Okay. Alaniz had made the comment?
2    A. That's what he claimed.
3    Q. That's what he's passing on to you?
4    A. Yes.
5    Q. Okay. October 8, 9 and 10, these are all the
6  things that Chief Guerra is -- I'm sorry, Assistant
7  Chief Guerra is telling you, right?
8    A. That is correct.
9    Q. And you wrote down everything that he was
10  telling you at that time?
11    A. That is correct.
12    Q. Okay. You go on in the next paragraph, again
13  on October 10, on the same day while driving home he
14  told me when I resigned he was seeing that I was under
15  a lot of stress -- which is Assistant Chief Guerra,
16  right?
17    A. That is correct.
18    Q. Okay. And it's referring to the August 23
19  resignation?
20    A. That is correct.
21    Q. Is that your understanding?
22    A. Yes, sir.
23    Q. And at the very end of that paragraph he goes
24  on, Guerra stated, I don't know why you guys like to
25  get screwed by the chief. Do you know what he was

24 (Pages 90 to 93)

Page 94

1  talking about?
2      A.  Guerra would always say that we were stupid,
3  that we liked to get screwed by Chief Alaniz by, you
4  know, listening to whatever he said.
5      Q.  Okay.  Then on the next page, Saturday, October
6  11th, Assistant Chief Guerra again came to your house?
7      A.  That is correct.
8      Q.  He's talking about the letter of no confidence
9  on Chief Alaniz.  You had already talked to the city
10  administrator, and he is on my side.  Jaimito -- I
11  didn't quite understand whether you were saying you had
12  talked to the administrator or Guerra had talked to the
13  administrator.
14      A.  This is what Guerra is advising me.
15      Q.  So Guerra is saying that he had the letter of
16  no confidence on the chief, that he had -- that Guerra
17  had already talked to the city administrator and that
18  he was on Guerra's side?
19      A.  That is correct.
20      Q.  And Jaimito was going to be the one to type it
21  up?
22      A.  That is correct.
23      Q.  And then you said, look, I don't want to get
24  involved?
25      A.  That is correct, sir.

Page 95

1      Q.  Okay.  And then -- the next paragraph, you then
2  called Officer Jose Gonzalez, Assistant Chief Guerra
3  had approached him and told him that Chief Alaniz was
4  trying to screw him over.  Why did you call Jose
5  Gonzalez?
6      A.  He is a cousin of mine.
7      Q.  Okay.  Did you call him to tell him this or did
8  you call him just to talk and he starts mentioning it?
9      A.  I called him to ask him what was going on.
10      Q.  Okay.  And that's when Gonzalez, Jose, says
11  that Guerra had approached him and said that Chief
12  Alaniz was trying to screw him over?
13      A.  That is correct.
14      Q.  Do you remember anything else that he told you
15  that --
16      A.  Other than what's on here?
17      Q.  Uh-huh.
18      A.  That he had a problem also with the memos but
19  he did not agree --
20      Q.  Who did, Guerra?
21      A.  Jose Gonzalez.
22      Q.  Okay.
23      A.  He had a problem with the memos being posted
24  and people not being told directly what it was that
25  you're doing wrong, that they spoke in general and

Page 96

1  that --
2      Q.  Was that by Alaniz or Guerra or both?
3      A.  Both.
4      Q.  Okay.  And what else?
5      A.  And basically he was upset over that.  And what
6  I told him was, you know, this sounds to me like it's a
7  power struggle, you are playing a little game or Guerra
8  is playing a little game or something so you will
9  probably end up getting the short end of the stick
10  and --
11      Q.  Caught in the middle?
12      A.  -- you know, just stay out of it.  That was
13  my --
14      Q.  You go on to say there was something wrong with
15  what -- let me start over.  You go on to say that you
16  told Jose not to get involved because there was
17  something wrong with what Assistant Guerra was doing
18  and that you had the feeling this was all a game to get
19  somebody fired, and at the last moment Assistant Chief
20  Guerra was going to pull out and leave the officers
21  holding the bag?
22      A.  That is correct.
23      Q.  And that's what you are talking about, the
24  power struggle that you --
25      A.  Yes, sir.

Page 97

1      Q.  Okay.  Now, you go on in the next paragraph, on
2  October 14, Assistant Chief Guerra, you, Jaime De la
3  Garza and Officer Jose Gonzalez went to Padre Island
4  for training for the State-mandated course (crime
5  victims liaison).  Guerra insisted when we got back no
6  one would have a job because Chief Alaniz and Joel
7  Gonzalez were working together.  Was that the
8  conversation on the way over in the car or something?
9      A.  That is correct.
10      Q.  Okay.  What else was talked about during that
11  ride?
12      A.  Basically Guerra insisted that -- well, you
13  already said that -- that by the time we get there
14  we're not going to have a job, all of us, because
15  something about Mario and Joel conspiring against
16  everybody to get rid of everybody.
17      Q.  Okay.
18      A.  I think I told him if he was sure of that, that
19  if he was sure of that, I think I'm calling Mario
20  Alaniz and I would find out if I had a job or not.  And
21  I think Jaime De la Garza asked him because he kept
22  saying that if he was chief things would be different.
23  I don't recall exactly how he said it, but it amounted
24  to that.  Basically Jaime De la Garza asked him, so
25  you're guaranteeing that if you get rid of Chief Alaniz

25 (Pages 94 to 97)

Page 102

1    Q. Where and with whom?
2    A. At the office with all the officers.
3    Q. Okay.
4    A. To find out exactly what was going on. The
5    meeting was held by Mario Alaniz, myself, Judge De la
6    Garza was briefly there so that the officers would not
7    feel, per se, like threatened into thinking that
8    something was going to happen. So he was -- myself and
9    him were the neutral parties.
10   Q. You and who?
11   A. Jaime De la Garza, the judge, the municipal
12   judge.
13   Q. Let me get to that in a little while. Let me
14   finish going through this. Other than that -- other
15   than the meeting where they talked about something like
16   that, what my question had to do with was, was there
17   any other time that either Hernan or anybody else ever
18   talked about Mr. Gonzalez saying that the letter or the
19   no confidence letter needed to be juicier?
20   A. Just that one particular time.
21   Q. Just that one time?
22   A. Yes, sir.
23   Q. Okay. That's on October 20, right?
24   A. That is correct.
25   Q. Then you go on in the next paragraph, Wednesday

Page 103

1    and Thursday you heard the same thing over and over
2    again?
3    A. That is correct.
4    Q. On Friday, October 24, chief calls you into the
5    office, tells you that he had changed his schedule so
6    that you could work Saturday and Sunday because of a
7    training for a supervisor course, a 24-hour TCLEOSE
8    course. I told him -- that you told him that you
9    couldn't work those days because you had to fix your
10   car?
11   A. That is correct.
12   Q. What happened with that? Did you end up
13   working or not?
14   A. No, sir.
15   Q. Did the chief get mad at you for that?
16   A. From what Hernan Guerra told me, yes, but he
17   never talked to me as far as saying something bad to me
18   where I can say, yes, he got mad.
19   Q. In other words, Hernan said the chief got mad
20   but you never heard anything from the chief --
21   A. That is correct.
22   Q. -- that actually said he did get mad?
23   A. That is correct.
24   Q. Then you go on to say that -- basically Guerra
25   is still telling you that it's just not fair, it's not

Page 104

1    right, stuff like that, right?
2    A. That is correct. And also stating that, Chief,
3    you don't want to sign the letter and look what he's
4    doing.
5    Q. You go on at the end there to say, he started
6    again about R. Gonzalez being upset. I presume you are
7    talking about Hernan?
8    A. Yes.
9    Q. Hernan saying that Administrator Gonzalez was
10   upset because you were spending too much time at the
11   PD?
12   A. That is correct.
13   Q. And that the chief just wanted you to get in
14   trouble so that he could hire his friends. Can you
15   explain what he was talking about there?
16   A. During that time that this is going on, one of
17   Chief Alaniz's friends came and made an application.
18   He was an ex-captain from Hidalgo. I'm assuming people
19   started feeling threatened or something. But at no
20   time that I know of was he ever going to be hired. He
21   just made an application.
22   Q. Okay. And who is that person, captain from
23   Hidalgo? Do you remember his name?
24   A. No, sir, I don't, not at this time.
25   Q. Next paragraph you talk about on the drive home

Page 105

1    basically Hernan keeps complaining about the chief not
2    treating you-all right, right?
3    A. That is correct.
4    Q. And the next page, the last page, you talk
5    about Saturday you woke up at 3:00 o'clock in the
6    morning because you were stressed out?
7    A. That is correct, sir.
8    Q. You talk about other officers were under a lot
9    of stress and things needed to be fixed. Some officers
10   were having anxiety attacks and looking for work
11   elsewhere because -- you say Chief Guerra, but I assume
12   Assistant Chief Guerra?
13   A. Yes.
14   Q. -- was causing a negative work atmosphere.
15   You go on, there was the fear that some of us were
16   going to be fired as a result of signing the letter of
17   no confidence as Assistant Chief Guerra was using his
18   pull with the major and city administrator to have the
19   officers sign the letter of no confidence. You felt
20   that whatever was going on no one deserved to get
21   fired, not even Guerra?
22   A. That is correct.
23   Q. Okay. Basically are you just explaining that
24   everybody was stressed out because of this power
25   struggle going on?

27 (Pages 102 to 105)

Page 106

1   A. Yes.
2   Q. Then you signed it the 26th of October, 2003,
3   correct?
4   A. That is correct.
5   Q. You said after you signed this affidavit there
6   was a meeting, right?
7   A. Yes, sir.
8   Q. Why did you put together the affidavit? Did
9   somebody ask you to?
10  A. No, sir. I told -- this is what occurred. I
11  was talking to Mario Alaniz and I told him that I had
12  an affidavit for him, that we needed to speak because
13  there was some things going on that needed to be
14  clarified.
15  Q. Be aired out?
16  A. Yes, sir. So that everything would, you know,
17  stop.
18  Q. Okay.
19  A. So what I did was I gave him the affidavit
20  right there.
21  Q. You just drafted it on your own and walked up
22  to -- Claudia Reyes, is she there at the PD?
23  A. Not at the time that I gave the affidavit to
24  Mario because I did this at home. I just typed it up
25  because I had the dates and everything that was going

Page 107

1   on.
2   Q. Let me try to ask the question. You may not
3   have understood what I was asking. You typed this up
4   at home?
5   A. That is correct.
6   Q. Does Claudia Reyes work at the PD?
7   A. Yes, sir.
8   Q. Typed this up at home and then you took the
9   typed document to Claudia and said, can you notarize
10  this for me, and she just notarized it?
11  A. That is correct.
12  Q. And then you took this document once it was
13  notarized and that's when you went to talk to Alaniz?
14  A. No. I showed the document to Alaniz before I
15  notarized it.
16  Q. Okay. Did you change it at any time between
17  the time you had originally drafted it and the time
18  that you notarized it?
19  A. No, sir.
20  Q. Okay. You just showed it to Alaniz and then
21  you went straight over and got it notarized?
22  A. Yes, sir.
23  Q. Okay. You said after the -- after you gave it
24  to the chief there was a meeting?
25  A. That is correct.

Page 108

1   Q. When was that meeting?
2   A. That same day I gave it to him -- or showed it
3   to him.
4   Q. It's notarized on the 26th of October. Would
5   it have been on the 26th of --
6   A. No, sir. It would have been on the -- I'm not
7   sure, sir, but it was a day before it was notarized,
8   I'm assuming.
9   Q. So that would have been the 25th?
10  A. I would think so, sir.
11  Q. Okay. On the 25th meeting with who? You said
12  the chief?
13  A. Chief, myself, the municipal judge, De la
14  Garza, all the officers, Jose Gonzalez.
15  Q. Isn't he an officer?
16  A. Yes, he's an officer. Officer Jose Gonzalez,
17  Officer Joel Gonzalez, Officer Arturo Melendez and
18  Officer -- I cannot remember if Officer -- yes, Officer
19  De la Garza, the dispatcher, and Officer Juan Flores
20  and Officer Fabian Ramirez, which was the full staff.
21  Q. Okay. And that's the only people who were
22  there?
23  A. Yes.
24  Q. Okay. And what was said at that meeting?
25  A. If I can recall correctly, Mario Alaniz asked

Page 109

1   about that letter.
2   Q. Which letter?
3   A. The letter that Guerra was --
4   Q. The no confidence?
5   A. Yes, the no confidence letter. And he advised
6   all the officers that if they felt that he had no --
7   really had no confidence that, you know, if they wanted
8   to go ahead and sign that letter they were -- he
9   couldn't stop them but he wanted to know what was going
10  on. At that meeting two officers broke down crying and
11  having anxiety attacks, as per their say-so.
12  Q. Okay.
13  A. One of them was Officer Jose Gonzalez who kept
14  saying he couldn't breathe, he was having an anxiety
15  attack because of all the stress that Guerra was
16  putting on them.
17  Q. Okay.
18  A. Basically because Guerra was using the leverage
19  that he and the mayor were real close, like
20  finger-tight close.
21  Q. Okay.
22  A. And that Guerra had advised some of them or
23  most of them that the mayor was with him as was the
24  city administrator.
25  Q. Was this what was being said at the meeting

28 (Pages 106 to 109)

Page 110

1  or --
2     A.  Yes.
3     Q.  Okay.  I'm sorry.
4     A.  I don't recall because at a certain time I
5  walked outside to go talk to Officer Jose Gonzalez
6  because, you know, he was hysterical.  I went outside
7  to comfort him.  I told him, you know, what was going
8  on, just basically trying to calm him down.  When I
9  went back in there, a few minutes later the meeting
10  ended.
11     Q.  So the only part that you heard was the chief
12  is asking about the no confidence letter, he says, it's
13  okay to sign but he wanted to know what's going on.
14  About that time Jose Gonzalez starts having his anxiety
15  attack and then you kind of walk out of the room and
16  you don't really remember much else from that meeting?
17     A.  No, because I remember Officer De la Garza also
18  walked out of the room right after us.
19     Q.  Did he also?
20     A.  Yes, that he was -- he had to take all his
21  Paxil and that he was having an anxiety attack and he
22  was fixing to quit, find another job.  And what I was
23  telling him was, look, you don't need to find another
24  job.  This problem should be resolved.  Hopefully these
25  two people will stop their power struggle.  And, you

Page 111

1  know, what I told them was, the only reason I'm here is
2  because I'm stuck in the middle, I'm stuck in the
3  middle of the assistant chief and the chief, you know,
4  I don't know what's going on between them as far as
5  what --
6     Q.  Okay.  Anything else that you remember from
7  that meeting?
8     A.  No, sir, not that I can recall.
9     Q.  Okay.  You continued on at the City until --
10     A.  March 8th.
11     Q.  March.  How did you get notified in March that
12  you were going to be let go?
13     A.  Verbally, sir.
14     Q.  Was it on the same day?
15     A.  March 8th, yes, sir.
16     Q.  Effective today?
17     A.  Yes, sir.  In the morning the city manager took
18  me out to breakfast, paid for breakfast.  And the
19  assistant chief called me into his office and verbally
20  told me that I no longer had a job, my position had
21  been abolished.
22     Q.  Who was the assistant chief at that time?
23     A.  Let me correct myself.  He was the acting
24  chief.
25     Q.  Acting chief.

Page 112

1     A.  Acting chief.  Hernan Guerra.
2     Q.  Effective immediately?
3     A.  Yes.
4     Q.  Effective that day?
5     A.  Yes, sir.
6     Q.  Okay.  So you cleaned up your stuff and left,
7  right, picked up your stuff?
8     A.  No, sir, we had a conversation.
9     Q.  Who did?
10     A.  Myself and Guerra.
11     Q.  That was when the chief was telling you the job
12  was abolished effective that same day.  What did you
13  say?
14     A.  I asked him why, what happened, what's going
15  on.  So he went into stating that I should have never
16  involved myself with Mario Alaniz, the mayor was very
17  upset.  And what I told him was, well, then it's true
18  about a rumor that had been floating around that as
19  soon as the political deal was done that I was going to
20  be fired.
21     Q.  What political deal?
22     A.  There were several campaigns going on.  One of
23  them involved Tino Flores, the other one was
24  commissioner, re-election of a commissioner that is
25  related to Tino Flores.  Rumors were that Tino Flores

Page 113

1  and that commissioner had advised Mayor -- the mayor
2  that as soon as the campaigns were over, then he could
3  go ahead and fire me, that way I could not affect their
4  political agendas as far as going out there and getting
5  the people to vote against him.  And he went into
6  asking me -- when I asked him about that rumor, he
7  says, I don't know, but he says, didn't Escalon hire
8  you?  I asked him, what does Sheriff Escalon have to do
9  with this?  He said, well, you went against the mayor
10  and you voted against Lupe Trevino.  And I asked him,
11  so what you're saying is this is political, you are
12  firing me because of politics, or what's going on?  And
13  he just didn't say anything.
14     Q.  Okay.  You said the campaigns were who?
15     A.  Tino Flores.
16     Q.  And who else?
17     A.  Joe Flores.
18     Q.  What was he running for?
19     A.  Precinct 3 commissioner.
20     Q.  Okay.  And who else?
21     A.  There were several other campaigns, sir, but I
22  cannot recall other than Lupe Trevino for sheriff.  But
23  the two people that were mentioned as far as that rumor
24  before I was terminated was Tino Flores and Joe Flores.
25     Q.  When was the election?

29 (Pages 110 to 113)

Page 114

1    A. The election ended on March 8th.
2    Q. When did they vote? When was the vote?
3    A. They began sometime in November, December.
4    Q. No, when was the actual vote?
5    A. March 8th.
6    Q. The actual -- where people go into the voting
7  booth --
8    A. Yes, the final date for voting is March 8th.
9    Q. And you said that Hernan asked you if Escalon
10 had hired you?
11   A. Yes.
12   Q. That was during that same --
13   A. Yes, sir.
14   Q. Did Escalon win the election?
15   A. No, Escalon lost the election.
16   Q. Okay. And why would he be asking you if
17 Escalon hired you if he lost?
18   A. I was -- how do I put this? They seemed to
19 think that I went against Lupe Trevino. I stayed out
20 of that election, basically because it was to the best
21 of my interest because it was a good election as far as
22 you don't know who is going to win. So I stayed out of
23 it. But because of me hanging around with a local
24 merchant, who is pro Escalon, she is all the way pro
25 Escalon, they assumed that I was out there with Escalon

Page 115

1  and going against what they call the billy ballet or a
2  camado ballet, either/or, same thing.
3    Q. Who is it that you were hanging around?
4    A. Lydia Benavides.
5    Q. And she is a supporter of whom?
6    A. Henry Escalon.
7    Q. Okay. After you did get let go, you asked for
8  a hearing, right?
9    A. That is correct, sir.
10       (Exhibit No. 8 marked).
11   Q. I'm handing you what's marked as Exhibit 8. Is
12 that the letter you submitted requesting a hearing?
13   A. That is correct, sir.
14   Q. You are requesting a hearing and reinstatement
15 and requesting notice in writing of abolishment of
16 position. Oh, before I forget, these comments that
17 Hernan was making on March 8th, you understand Hernan
18 did not have the authority to terminate you or abolish
19 the position, right?
20   A. Yes, sir.
21   Q. Okay. So whatever he's saying, you don't know
22 to what extent he's telling the truth or not, right?
23   A. That is correct, sir.
24   Q. That's just what he's saying. He didn't say,
25 the mayor told me specifically this, or, the

Page 116

1  administrator told me specifically this, or anything
2  like that, right?
3    A. Other than mentioning what the mayor said, no.
4    Q. You said that he had said that the mayor was
5  upset?
6    A. Yes.
7    Q. But as far as -- other than that, he didn't say
8  anything more about the mayor, right?
9    A. No, just that he was upset because of all that.
10   Q. Okay. And as far as the city administrator, he
11 didn't mention him at all, right?
12   A. No. He was over there still having breakfast.
13   Q. So that's just whatever Hernan said, right?
14   A. Yes, sir.
15   Q. And you didn't go back and check with the mayor
16 or city administrator or anything else like that,
17 right, on any of those things?
18   A. When the city administrator came in, I asked
19 him what was going on and he didn't want to talk to me.
20   Q. That same day?
21   A. Yes. Because this happened in the morning.
22   Q. Okay. So the city administrator didn't confirm
23 anything that Hernan was saying?
24   A. No. He just said sorry and walked away.
25   Q. Yeah.

Page 117

1    A. He didn't want to talk to me.
2    Q. Okay. Now, we were talking about Exhibit 8,
3  which is your request for a hearing. You go on to say,
4  I am appealing your decision to lay me off/fire me and
5  am requesting a hearing under the Sullivan City Police
6  Department's policy. That policy has never been
7  adopted by the City Commission as far as you're aware,
8  correct?
9    A. It has, sir.
10   Q. It has been adopted?
11   A. It has been adopted.
12   Q. And when did it get adopted?
13   A. I can't recall the specific date, sir.
14   Q. But your understanding is it was adopted?
15   A. It was adopted. They held a quorum, a meeting
16 and they -- it was a big, thick book. They adopted the
17 -- all the policies and procedures for the police
18 department.
19   Q. Okay. It goes on to say -- your letter goes on
20 to say, Exhibit 8 goes on to say a policy -- you
21 referenced Policy and Procedures No. 3.400.5,6,7,8,9
22 and then (1) disciplinary procedures.
23   A. That is correct.
24   Q. That's under the topic Disciplinary Procedures,
25 right?

30 (Pages 114 to 117)

Page 122

1    A. Yes.
2    Q. -- that the temporary position would be left
3  open until I could be moved to my regular duties as
4  sergeant investigator when any position was open at the
5  police department.
6    A. Yes.
7    Q. Okay. That's what you had talked to us about
8  earlier, right?
9    A. Yes.
10    Q. Okay. And I think you agreed also that the
11  City or city administrator could change its mind if
12  they wanted to?
13    A. Yes.
14    Q. Okay. You go on further down where you're
15  complaining about your pay or the pay you had been
16  getting while -- I think you are talking about the
17  sergeant or somebody else and the patrolman had the pay
18  of 12.50 an hour in violation of equal pay for equal
19  work civil rights law. What are you talking about?
20    A. At this point, sir, I cannot explain that
21  because I had looked it up under that -- I'm assuming
22  this particular law -- and what I'm referring to as the
23  sergeant investigator is myself being the civil warrant
24  and the sergeant investigator, doing the job of the
25  sergeant investigator and doing the job of the

Page 123

1  assistant chief -- or the acting chief.
2    Q. You are not talking about pay that somebody
3  else is actually getting, you're talking about the pay
4  that you should be getting because --
5    A. No. What I was talking about is that all the
6  officers equally were getting paid 12.50 an hour while
7  I was doing the job of --
8    Q. The same type of work?
9    A. Not the same type of work, sir, because they do
10  patrol.
11    Q. Okay. Different type of work but that you
12  should have also been getting 12.50 an hour?
13    A. Yes, as far as being out there on patrol.
14    Q. Okay. What I was wondering, though, is what's
15  the pay for equal work civil rights law that you are
16  talking about?
17    A. I remember I looked it up on the Internet. I
18  cannot at this point tell you --
19    Q. What it is?
20    A. -- exactly what it is.
21    Q. You go on to say, and a violation of the skelly
22  laws. Can you tell us what that is?
23    A. Under the same --
24    Q. The same thing?
25    A. -- thing. I looked it up.

Page 124

1    Q. But you can't tell us what that is right now
2  either, right?
3    A. Not at this point, sir, not right now.
4    Q. And then you also talk about the federal
5  Whistle Blower's Act?
6    A. Yes, sir.
7    Q. I assume you meant the state Whistle Blower's
8  Act?
9    A. Yes.
10    Q. Okay.
11        (Exhibit No. 9 marked).
12        (Recess).
13    Q. I'm handing you what's marked Exhibit 9. Do
14  you recognize that document?
15    A. Yes, sir.
16    Q. That was the letter sent to you by the city
17  administrator or city manager, Rolando Gonzalez,
18  indicating that your separation from the City was not
19  due to disciplinary action and also pointing out that
20  the warrant officer position was a temporary position,
21  the position was not a budgeted position and financial
22  restraints necessitated the elimination of the
23  position. Did you understand what he was saying in
24  this letter?
25    A. To a certain extent, sir.

Page 125

1    Q. In other words, you understood that when they
2  let -- did away with your position that it wasn't for
3  any disciplinary reason. You understand that part?
4    A. Yes.
5    Q. And you understood also that what he's saying
6  is that it was a temporary position. And I think you
7  agreed with us earlier, on Exhibit 6, the position
8  specifically said it was a temporary warrant officer
9  position, right?
10    A. Yes, sir.
11    Q. And then he's saying also that it was not a
12  budgeted position and for financial reasons he
13  eliminated the position. This is dated April 20th.
14    A. Yes, sir.
15    Q. You understood that's what he was saying also,
16  right?
17    A. Yes, sir.
18    Q. And of course I understand you disagreed with
19  that, right?
20    A. Yes, sir, that's correct.
21    Q. The part you disagreed with was the reasons for
22  eliminating the position?
23    A. Yes, sir.
24    Q. Okay. Anything in the City's -- I'm sorry, the
25  police department's policies that you were aware of,

32 (Pages 122 to 125)

Page 130

1    Q.  Just generally?
2    A.  Yes.  Even when Alaniz was not there, Chief
3  Guerra would come over and say, well, the mayor wants
4  you to drop this case.  It's not going to happen.
5    Q.  You never reported that to anybody else,
6  though, right?
7    A.  Other than when I spoke to the district
8  attorney's office?
9    Q.  Did you include that in the list of stuff that
10  you took to the DA's office?
11    A.  Verbally.  That was done verbally.
12    Q.  Anybody else?
13    A.  The sheriff or his investigators.
14    Q.  Anybody else?
15    A.  No, sir.
16    Q.  Okay.  And when did you mention it to the DA
17  and sheriff?
18    A.  The day that I took the paperwork to the
19  district attorney's office.
20    Q.  And when was that?
21    A.  I do not recall the date, sir.
22    Q.  Do you remember the month?
23    A.  No, sir.
24    Q.  You don't even --
25    A.  It's been a while, sir.  I do not recall.

Page 131

1    Q.  Okay.  You don't even remember the month in
2  which you went to go talk to the DA or the sheriff?
3    A.  The DA's office, I'm not sure if it was January
4  or February, sir.  It was before Alaniz was fired, or
5  even before January.  Let me -- October, November,
6  maybe.  November.
7    Q.  You think you went to the DA in November?
8    A.  I think so, sir.  I am not positive, sir, but I
9  believe sometime in November.
10    Q.  Your best recollection at this time would be
11  that you talked to the DA's office and the sheriff's
12  office in November of 2003?
13    A.  DA's office only, sir.
14    Q.  Okay.  Listen to my entire question.  Your best
15  understanding is that you went to the DA's office in
16  November of 2003?
17    A.  That's correct, sir.
18    Q.  And what about the sheriff?
19    A.  A month or a couple weeks later.
20    Q.  Also in November or December?
21    A.  Sometime in December.
22    Q.  Okay.  Any other reason that you believe that
23  your position was eliminated?
24    A.  None that I can think of, sir.
25    Q.  Okay.  As far as the Whistle Blower claim, what

Page 132

1  is it that you actually reported?
2    A.  All the allegations on the citations where
3  officers were being advised that if they did not sign
4  over citations into warnings they would be fired.
5    Q.  Okay.  What else?
6    A.  That interfering of the mayor with my criminal
7  investigation cases.
8    Q.  You are talking about the molestation and
9  assault cases?
10    A.  That, and also he would go out to the scenes
11  and he would be advised, sir, do not touch anything in
12  the area and he would go over there and pick up stuff
13  that should have been tagged as evidence.
14    Q.  Okay.
15    A.  Tampering with the evidence.
16    Q.  What else did you report?
17    A.  The warrants.  When I would go out there and
18  try to pick up people, the occupants would tell me,
19  well, he's gone.  The mayor came over here and told us
20  that you were going to pick up my son, so he went to
21  Mexico.  And I remember I had a conversation with that
22  -- with him and I told him that's very dangerous
23  because if one of us goes out there to pick up somebody
24  and he already knows that we're going to go pick him up
25  and before he leaves one of us could get hurt, shot, et

Page 133

1  cetera, et cetera.
2    Q.  Okay.  Anything else?
3    A.  That I can recall, no, sir.
4    Q.  Okay.  So the things you reported to the DA and
5  presumably to the sheriff as well was that the mayor
6  would change citations, interfere with warrants,
7  interfere at the scene and ask you to drop charges on
8  molestation and assault cases that you were
9  investigating?
10    A.  That is correct.
11    Q.  Those are all the things that you reported to
12  the DA and the sheriff?
13    A.  I'm going to have to say yes on that, sir.  I
14  don't recall.
15    Q.  Okay.  As far as any speech that you made for
16  which your rights were violated, is the speech you're
17  talking about the Whistle Blower's speech?
18    A.  Yes, sir.
19    Q.  Okay.  There's not any other speech that you're
20  claiming you made that you were punished for or
21  anything like that, right?
22    A.  Other than when I told them that I would not
23  look the other way.  And on several occasions I told
24  them that I was not going to be looking the other way
25  for all these allegations and all these things that

34 (Pages 130 to 133)

Page 134

1  were happening.
2      Q. Any other speech that you ever made or
3  communicated to anyone that you believe you were
4  retaliated for?
5      A. I don't recall, sir.
6      Q. And when you said that you told -- is it the
7  mayor that you would not look the other way?
8      A. The mayor, Tino Flores, the city manager; the
9  assistant chief, Guerra, or at that time appointed
10  chief and the officers.
11      Q. When you are talking about not looking the
12  other way, what are you talking about?
13      A. We were -- basically everything that had
14  happened and everything that was going on.
15      Q. What are you talking about, everything that had
16  happened?
17      A. The dropping of the cases.
18      Q. The Whistle Blower claim matters?
19      A. Yes, sir.
20      Q. Okay. Did the mayor ever make any statements
21  bad about you; in other words, where he called you
22  names or anything?
23      A. There are some things in there but they are not
24  bad, sir.
25      Q. Like what?

Page 135

1      A. The mayor telling people that supposedly I was
2  some type of undercover agent or Texas Ranger, for the
3  people not to trust me because I could get them in
4  trouble and have them arrested also.
5      Q. Okay. The mayor was saying things like, don't
6  trust -- don't trust you, but he wasn't calling you
7  names or anything?
8      A. No, sir, other than just that.
9      Q. And he wasn't saying anything about you in
10  particular, just saying don't trust you?
11      A. Yes, sir.
12      Q. Is that right?
13      A. Yes, sir.
14      Q. What about any of the other commissioners?
15      A. The commissioners --
16      Q. Did they ever say anything about you? Did they
17  call you names or anything?
18      A. Not that I can recollect, sir.
19      Q. What about Rolando Gonzalez, did he ever call
20  you any names or say any bad things about you?
21      A. Not that I can recollect, sir.
22      Q. Okay. Did -- other than just terminating your
23  position did anybody at the City, either the mayor, the
24  commissioners, Rolando Gonzalez, did anybody ever do
25  something just to try to hurt you as far as you

Page 136

1  understood?
2      A. As far as I understood, two officers, Officer
3  Jose Gonzalez and Officer Arturo Melendez, whom I sent
4  demand letters to.
5      Q. Who?
6      A. Demand letters to stop spreading gossip,
7  rumors.
8      Q. Who was that, what officers?
9      A. Officer Jose Gonzalez and Officer Arturo
10  Melendez.
11      Q. And you sent them demand letters to stop doing
12  what?
13      A. Stop spreading rumors and gossip about me.
14      Q. Okay. Anybody else?
15      A. No, sir.
16  .    Q. Okay. But as far as either any of the
17  commissioners or the mayor or Rolando Gonzalez, you
18  don't think any of them were doing something just so
19  that they could try to hurt you, right?
20      A. I don't understand the question.
21      Q. Okay. For example, they didn't go over --
22  during this time your wife wasn't pregnant. Let's
23  imagine she was pregnant. They didn't go over and just
24  try to kick her in the stomach?
25      A. No, sir.

Page 137

1      Q. Nothing like that that would hurt you,
2  specifically you, in a way that was something just to
3  say, see how you like it now, Mister, or something like
4  that?
5      A. Other than not being able to feed my kids.
6      Q. Right. Other than just abolishing the
7  position --
8      A. No, sir.
9      Q. -- nothing else that you are aware of that they
10  did so that you would -- just so they could try to hurt
11  you in some way? Nothing that you can think of, right?
12      A. Nothing that I can think of, sir.
13          (Exhibit No. 10 marked).
14      Q. Okay. I'm handing you what I'm marking as
15  Exhibit 10, which was also a copy of Exhibit 6 to Mr.
16  Alaniz's deposition. Do you recognize this document?
17      A. Yes, sir.
18      Q. Okay. This is a letter from Assistant District
19  Attorney Sofia Arizpe to you dated December 12, 2003.
20  Do you remember when you actually got this letter?
21      A. Sometime in January or February, sir.
22      Q. Okay. Because if it's addressed to the warrant
23  officer at P. O. Box 249, do you know why you wouldn't
24  have gotten it on December 12, 2003 or around that
25  time?

35 (Pages 134 to 137)

Page 138

1    A. Because she specifically asked me to pick it up
2  at her office. And at the time I was not being allowed
3  to leave the City.
4    Q. Did you call her and ask her to mail it?
5    A. No, I did not.
6    Q. Okay.
7    A. And then she called me sometime in January or
8  February, somewhere around there. I'm not too sure,
9  sir. But she advised me that she had that package for
10  me to go pick it up. When I advised her that I could
11  not because I was not allowed to leave the city, I had
12  another officer go out there and pick it up.
13    Q. So when she first called you, was it around
14  December 12th to come get it?
15    A. She called me sometime in January.
16    Q. It's dated December 12 and you're saying she
17  didn't call you or mail it to you until January?
18    A. That is correct, sir.
19    Q. Okay. And so when did you send the officer out
20  to get it, shortly after that?
21    A. Like I say, I don't recall the date she called
22  me. It was in the morning. And I sent Officer Jose
23  Gonzalez to go to the district attorney's office, drop
24  off some cases that I had finished and for him to go do
25  that --

Page 139

1    Q. To pick this up?
2    A. -- because I was not allowed to leave the city.
3    Q. Was that on the same day that she called you?
4    A. Yes.
5    Q. The letter indicates that she had reviewed the
6  documents -- the enclosed documents with Rene Guerra,
7  the district attorney -- evidence to reference traffic
8  citations being changed to warnings are insufficient
9  for criminal charges. In reference to your assistant
10  chief, Mr. Guerra -- this matter needs to be addressed
11  with internally. What did you understand she was
12  telling you by this letter?
13    A. That there was no charges.
14    Q. Okay. That there wasn't any basis for the
15  charges, right?
16    A. That is correct.
17    Q. Okay. At the beginning where you're talking
18  about traffic citations or she's talking about traffic
19  citations being changed to warnings, do you know what
20  law that would have violated?
21    A. Not right now, sir.
22    Q. Okay. You can't tell us of any law that you
23  can say it would have violated, right?
24    A. Not off the top of my head, sir.
25    Q. Okay. And then she goes on to say that the DA,

Page 140

1  Mr. Guerra, is of the opinion that this matter needs to
2  be addressed with internally. What did you understand
3  her to be saying in that one?
4    A. Basically that it needed to be handled within
5  the administration.
6    Q. Okay. What were the documents that were
7  attached?
8    A. If I recall, the documents that were attached
9  were all the affidavits provided by all the officers
10  from October all the way to January or sometime before
11  I took the paperwork.
12    Q. In your lawsuit, the latest petition and
13  amended complaint, you indicate that you started
14  reporting violations of law to the Hidalgo DA's office
15  and other law enforcement officials including the FBI.
16  Did you actually ever report anything to the FBI?
17    A. No, sir.
18    Q. Okay. Other than this report that we've been
19  talking about with the affidavits of the officers, is
20  that the report that you're talking about? Is that the
21  only report you ever made?
22    A. Myself, yes.
23    Q. And that was only made to the DA's office
24  first, right?
25    A. Yes, sir, that is correct.

Page 141

1    Q. And then you said you also made that to the
2  sheriff's department?
3    A. Sheriff's department, yes, sir.
4    Q. Did you provide all the same documents to the
5  sheriff's department that you provided to the DA's
6  office?
7    A. I think I provided more -- I had a disk of
8  information -- or not a disk, paperwork actually. I
9  had a disk to myself so I downloaded it into paperwork.
10    Q. Okay. The documents that you provided to the
11  sheriff, did you provide it to the sheriff at the same
12  time that you provided it to the DA or was this
13  sometime afterwards?
14    A. Sometime afterwards.
15    Q. I think you said two weeks afterwards. You
16  said sometime in December. Did you ever get any
17  response from the sheriff's department?
18    A. Other than them making contact with me on the
19  status of what was going on in the City, no.
20    Q. So as a practical matter, no real response from
21  the sheriff, right?
22    A. No. Their response was since it was a --
23  something under investigation, they could not disclose
24  the nature of their investigation.
25    Q. Okay. And did you tell them also that you

36 (Pages 138 to 141)

Page 142

1   turned over a lot of the same documents to the DA --
2       A.  Yes.  And --
3       Q.  -- to the DA's office?
4       A.  Yes.  What I was advised was it was a mistake.
5       Q.  What was a mistake?
6       A.  For me to turn in this paperwork to the DA's
7   office because nothing was going to be done.
8       Q.  Okay.  And the DA would be the one to decide
9   whether any charges would be brought, not the sheriff
10  anyway, right?
11      A.  No.
12      Q.  Who is it that decides whether to prosecute
13  claims, the DA or the sheriff?
14      A.  The district attorney.
15      Q.  So ultimately it would have been the DA's
16  decision one way or the other anyway, right?
17      A.  Yes, unless they send it to the grand jury.
18      Q.  It would be the DA who sends it to the grand
19  jury.  The DA has to decide whether to send it to the
20  grand jury, right?
21      A.  That is correct.
22      Q.  Okay.  When you're talking about you reported
23  to other law enforcement officials, again you said you
24  did not report to the FBI, right?
25      A.  That is correct.

Page 143

1       Q.  What laws were -- I'm sorry.
2       A.  In my recollection, that would be Mr. Mario
3   Alaniz.
4       Q.  That made that report?
5       A.  That made that report.
6       Q.  What laws were you claiming were violated?
7       A.  At the top of my head I don't recall, sir, but
8   I know I turned in a memo that was given to -- on my
9   part to the city attorney, the city manager where it
10  stated what laws were being violated and why and how
11  and that it needed to stop.
12      Q.  Did you save a copy of that?
13      A.  If I did, I gave it to my attorney, sir.
14      Q.  Do you know whether you did or not?
15      A.  I don't recall, sir.
16      Q.  And you can't tell us right now what laws you
17  believe were violated, right?
18      A.  Not at this moment.
19      Q.  Okay.  You indicated the mayor began to
20  conspire with Hernan Guerra and others who talk bad
21  about the plaintiff.  I think you agreed with us,
22  however, that the mayor himself didn't say anything,
23  right, didn't call you any names, didn't say
24  anything --
25      A.  Yes, sir.  I think that pertains to something

Page 144

1   else.
2       Q.  Okay.  It doesn't apply to you, that applies to
3   Mr. Alaniz?
4       A.  I'm assuming so, sir.
5       Q.  Okay.  It doesn't apply to you, though?
6       A.  Other than what I heard and what I stated.
7       Q.  Okay.  Well, what I'm saying is, what the
8   statement says is the mayor began to conspire with now
9   chief, then Assistant Chief Hernan Guerra and others
10  who talked bad about the plaintiff.  I'm not sure if
11  it's talking about you or Mr. Alaniz.
12      A.  If it does pertain to me, again I go back to
13  putting something in writing to my attorney.
14      Q.  Right.  And I asked you a while ago if there
15  was anything that the mayor said bad about you and you
16  said you couldn't think of anything, right?
17      A.  Yes, sir.
18      Q.  Okay.  And that's the same thing for any other
19  commissioners or Rolando Gonzalez, right?
20      A.  Correct, sir.
21      Q.  You indicated that the mayor was informed of
22  your complaints by the DA, Rene Guerra.  When did that
23  happen?
24      A.  I don't recall the specific date, but the way I
25  found out was through Dispatcher De la Garza who went

Page 145

1   and the mayor asked him to erase all his memos from the
2   telephone -- or messages.
3       Q.  From his cell phone?
4       A.  From his personal cell phone, yes.
5       Q.  Okay.
6       A.  And from what I recall the dispatcher stating
7   was that he had intercepted a message from Rene Guerra
8   stating that nothing was going to be done to him.  The
9   mayor later on quoted that himself to us.
10      Q.  And do you know when that message was received
11  by the mayor?
12      A.  No, because -- not exactly because what the
13  dispatcher stated was that those messages had been
14  there for a couple of days.  So it could have been
15  right after I turned in this paperwork to him or a
16  little bit further down the road.
17      Q.  December, January?
18      A.  It could have been one of those.
19      Q.  You just don't know?
20      A.  No, sir, I don't recall.
21      Q.  Okay.  And that's the extent of how and when
22  the mayor was supposed to be notified of your
23  complaints, right?
24      A.  Yes, sir, that's correct.
25      Q.  It wasn't until after the DA had apparently

37 (Pages 142 to 145)

Page 158

1    A. I don't recall, sir.
2    Q. Okay. There's reference to it being rumors
3 from other people saying the mayor had said that. But
4 you didn't hear any of that, right? You didn't hear
5 the mayor say that?
6    A. I don't -- I don't think so, sir. And if I did
7 I put it in writing and gave it to --
8    Q. And as far as who you heard it --
9    A. -- my attorney.
10    Q. Did you actually hear that rumor?
11    A. I don't recall, sir.
12    Q. Okay. You don't even know if you heard that or
13 not. You also indicated you have been told by other
14 officers and citizens that certain persons in the
15 police department have been spreading rumors about you.
16 Can you explain that any?
17    A. Yes, sir. That is in reference to what we
18 spoke on earlier about me giving the demand letters to
19 those two officers.
20    Q. Okay. They are saying -- I forget what they
21 are saying.
22    A. Spreading rumors and gossip.
23    Q. That they were just spreading rumors and
24 gossip, right?
25    A. Yes, sir.

Page 159

1        MR. AGUILAR: Let's take a short break. I
2 may be done.
3        (Recess.)
4    Q. One other thing I wanted to ask you about has
5 to do with what your complaints relate to as they
6 relate to the city commission. You told us a lot of
7 stuff about what the mayor did and how the city manager
8 did a few things, said a few things, how the mayor was
9 interfering and stuff like that. Do you have any
10 knowledge of anything that the city commissioners were
11 actually aware of whatever the mayor was doing?
12    A. Yes, sir.
13    Q. Okay. And how do you have that?
14    A. I spoke to Commissioner Ruiz, Reynaldo Ruiz,
15 basically because I went and dropped some paperwork at
16 his house to do with the City, and he asked me about
17 the problems that were going on, what I thought and
18 what --
19    Q. What problems?
20    A. As far as what was going on between the mayor
21 and Alaniz and Guerra and Alaniz and --
22    Q. The power struggle?
23    A. Yes, sir.
24    Q. Okay.
25    A. And I advised him of the traffic citations, I

Page 160

1 advised him of practically everything that I knew.
2    Q. You advised of what, the traffic citations?
3    A. The traffic citations, the interfering of the
4 mayor and what Guerra was doing as far as creating the
5 negative work atmosphere.
6    Q. Traffic citations, Guerra's negative
7 atmosphere. What else?
8    A. Work atmosphere. That the city administrator
9 was not doing anything about it. I also advised him
10 that it was not -- in my opinion it was not deemable.
11    Q. Not what?
12    A. Not deemable to put Guerra as the chief. And
13 he asked me why. And I advised him that my opinion was
14 because he could not use a computer, let alone write a
15 report. And I also advised him on the officers that
16 had turned in all those affidavits, as far as their
17 report writing skills, those two officers that were --
18 wanted the position -- one wanted the position as
19 sergeant and the other one as investigator.
20    Q. Okay.
21    A. And why I thought that it was not deemable,
22 basically because of their report writing and their
23 knowledge skills on how to do law enforcement work was
24 not based on what I thought, you know, was correct,
25 basically because of them wanting to be out there with

Page 161

1 a badge and picking up women, stopping only women, you
2 know, different things.
3    Q. Hang on a second. You jumped somehow from the
4 officers' affidavits regarding report writing to
5 officers picking up women?
6    A. Some of the officers we would get complaints
7 that they were out there only stopping women and asking
8 for their phone numbers and -- because he asked me what
9 the problem was with the officers with me, how come
10 they mostly didn't like me. And what I told him was
11 that and that my way of working was the correct way,
12 you do the correct thing or you don't belong here.
13    Q. Okay. This is all what you are talking to
14 Commissioner Ruiz about?
15    A. Yes, sir.
16    Q. Okay. What else?
17    A. And he asked me again about what I thought
18 about the mayor going over there and interfering. I
19 guess what he was told or given as far as paperwork
20 from Mario as far as everything overall in general,
21 everything that was going on.
22    Q. Hold on. I don't know if I understood that.
23 After you were talking about this other stuff, he asked
24 you what you thought about the mayor interfering?
25    A. Interfering and --

41 (Pages 158 to 161)

Page 162

1   Q. With what?
2   A. With citations, with the interfering of the
3   investigations, which I advised him that I had already
4   told him several times that that was illegal and to
5   stop. He said he would take care of that situation
6   because he was getting --
7   Q. Do you mean the commissioner or the mayor?
8   A. The commissioner. The commissioner said he
9   would be talking to the mayor, taking care of that
10  situation because he was getting pretty tired of
11  hearing complaints about that. And that was the end of
12  our conversation.
13  Q. Okay. Did you ever talk to any of the other
14  commissioners about any of that, about anything else --
15  A. No, sir.
16  Q. -- relating to the mayor?
17  A. No, sir, not that I can recall.
18  Q. Do you know if they had any knowledge in any
19  way about whatever you're saying the mayor was doing?
20  A. Again, during our conversation he stated that
21  he was pretty --
22  Q. You are talking about Ruiz?
23  A. Yes.
24  Q. Okay. You already -- I'm sorry. Go ahead and
25  finish what you were saying.

Page 163

1   A. Just that he knew what was going on as far as
2   our conversation.
3   Q. Right. You have told us what Commissioner Ruiz
4   told you during that conversation. What I'm asking is,
5   any other basis on which you have to believe that any
6   other commissioner was aware of anything that
7   Commissioner -- I'm sorry, that the mayor was doing?
8   A. I can't -- I don't know.
9   Q. You can't think of anything else?
10  A. No, sir.
11  Q. Okay. And as far as what the mayor was doing,
12  you're not saying any of the other commissioners were
13  doing that also, right?
14  A. No, sir.
15  Q. You agree with that, right?
16  A. That's correct.
17  Q. And none of that was actually discussed during
18  any city commission meeting, right?
19  A. Not that I am aware of, sir.
20  Q. Okay.
21      MR. AGUILAR: That's all I have. I will
22  go ahead and pass the witness.
23      MR. SALINAS: We'll reserve for trial.
24
25

Page 164

1           CHANGES AND SIGNATURE PAGE
2   PAGE LINE CHANGE              REASON
3   _____
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25

Page 165

1      I, BLAS GONZALEZ, have read the foregoing
    deposition and hereby affix my signature that same is
2   true and correct, except as noted above.
3
        _____
4           BLAS GONZALEZ
5
6
7
8   THE STATE OF TEXAS
9   COUNTY OF _____
10     BEFORE ME, _____, on this day
    personally appeared BLAS GONZALEZ, known to me or
11  proved to me to be the person whose name is subscribed
    to the foregoing instrument and acknowledged to me that
12  said witness executed the same for the purposes and
    consideration therein expressed.
13
       Given under my hand and seal of office this _____
14  day of _____, 2005.
15
        _____
        Notary Public in and for the State of Texas
16
17
18
19
20
21
22
23
24
25

42 (Pages 162 to 165)

HILL & ROMERO
CERTIFIED COURT REPORTERS

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

MARIO ALANIZ, JR.            ) (
        Plaintiff            ) (
                             ) (
VS.                          ) (     CIVIL ACTION NO.
                             ) (        B-04-040
THE CITY OF SULLIVAN         ) (
CITY, TEXAS, GUMARO          ) (
FLORES, in his Individual    ) (
and Official Capacity as     ) (
Mayor of Sullivan City,      ) (
REYNALDO RUIZ and FROILAN    ) (
RAMIREZ, in their            ) (
Individual and Official      ) (
Capacities as                ) (
Commissioners and ROLANDO    ) (
GONZALEZ, in his             ) (
Individual and Official      ) (
Capacity as City Manager     ) (
        Defendants           ) (


REPORTER'S CERTIFICATION
DEPOSITION OF BLAS GONZALEZ
FEBRUARY 24, 2005


    I, LOU ZUNIGA, Certified Court Reporter in and for

the State of Texas, do hereby certify that the above

and foregoing contains a true and correct transcription

of the oral deposition of BLAS GONZALEZ;

    I further certify that I am neither counsel for,

related to, nor employed by any of the parties or

attorneys in the action in which this proceeding was

taken, and further that I am not financially or

otherwise interested in the outcome of the action.


HILL & ROMERO
CERTIFIED COURT REPORTERS

Certified to by me this 14th day of
March _____, 2005.



_____
LOU ZUNIGA, Texas CSR 2198
Expiration Date: 12-31-05
Hill & Romero
10125 North 10th Street, Suite B
McAllen, Texas  78504
(956) 287-8898

HILL & ROMERO
CERTIFIED COURT REPORTERS