IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| MARIO ALANIZ, JR. AND BLAS GONZALEZ, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | C.A. No. B-04-40 |
| THE CITY OF SULLIVAN CITY, TEXAS, ET AL. | § § § § § | |
| Defendants. | § | |

## ORDER AND OPINION

BE IT REMEMBERED that on July 13, 2005, the Court considered Defendants' Motion to Dismiss Claims of Plaintiff Blas Gonzalez [Dkt. No. 25] and Defendants' Motion for Summary Judgment [Dkt. No. 28].

### I. Introduction and Procedural Background

Plaintiff Mario Alaniz originally brought claims against Defendants for constitutional First Amendment and Fourteenth Amendment Due Process violations pursuant to 42 U.S.C. §§ 1983 and 1985. Additionally, Plaintiff brought state claims for defamation of character, intentional infliction of emotional distress, civil conspiracy, and violations of the Texas Whistleblower statute. On August 4, 2004, the Court granted in part Defendants' first Motion to Dismiss. The Court dismissed with prejudice the Whistleblower claims against the individuals and dismissed without prejudice the other claims in the event Plaintiff had not pled his best case. After dismissal, only the Texas Whistleblower claim against the City of Sullivan City ("the City"), and the free speech retaliation and defamation claims against the individuals remain. On August 5, 2004, likely before Plaintiff had received the Court's dismissal order, Plaintiff sought leave to amend his complaint to add Blas Gonzalez as a Plaintiff. The Court granted Plaintiff leave to amend. Plaintiffs' amended complaint simply adds factual allegations specific to Blas Gonzalez, but

otherwise restates the same claims as alleged in the original complaint.[1]  On March 3, 2005, Defendants collectively moved to dismiss the amended complaint.  At that time, Defendants did not move to dismiss the free speech claims asserted against all Defendants or the Texas Whistleblower claim against the City.  See Defs' Motion to Dismiss, at p. 2 [Dkt. No. 25].  Rather than restate portions of the Court's August 4, 2004, dismissal order, the Court incorporates by reference all previous rulings in that order, and applies them to Plaintiff Blas Gonzalez.  Based on its previous order, the Court **grants in part and denies in part** Defendants' Motion to Dismiss Claims of Plaintiff Blas Gonzalez [Dkt. No. 25].  Now pending before the Court is Defendants' Motion for Summary Judgment, to which Plaintiffs have failed to respond.

## II.  Undisputed Factual Background

At the core of this dispute are Plaintiffs allegations that in late November 2003 they began reporting to the Hidalgo County District Attorney's ("D.A.") Office "violations of law" . . . "occurring in . . . Sullivan City."  Pl's Am. Cmplt. ¶ 3.3.  Plaintiffs complain the Mayor of Sullivan City was "interfering with . . . police business" by "ordering the officers to conduct traffic stops and issue citations" to the Mayor's political opponents.  Id.  In addition, Plaintiffs allege the Mayor ordered officers and city personnel to issue warnings only (instead of citations) to friends and political allies.

Plaintiff Mario Alaniz, Jr. served as the Chief of Police for Sullivan City, Texas from July 27, 2002, until December 15, 2003, when he was terminated at a City Commissioners' Meeting.  See Defs' Motion for Summary Judgment ("MSJ"), Ex. A-1 (Alaniz Depo. at p. 173:1-17).  Plaintiff Blas Gonzalez is the former warrant officer for the City's Magistrate Judge.  Id., Ex. A-2 (Gonzalez Depo. at pp. 67:17-68:20).  Gonzalez's employment began as a warrant officer, but he understood that when a City police officer's position opened, he would move into that position.  Id. at p. 69:7.  On January 27, 2004, an

---

[1] In particular, Plaintiffs allege in the amended complaint that Plaintiff Alaniz reported certain violations of the law to the Hidalgo County District .Attorney's office through Plaintiff Blas Gonzalez, and Gonzalez complained directly to the administration about the Mayor's oppressive behavior and Hernan Guerra's "no confidence initiative."  See Pls' Am. Cmplt. ¶¶ 3.3, 3.4, 3.6.

internal memorandum from the City Manager indicated the "temporary Warrant Officer position w[ould] be terminated effective on the last day of [January]." *Id.*, Ex. B. Despite the date stated in the memo, Gonzalez's last day of employment was March 8, 2004. *Id.*, Ex. A-2 (Depo. at p. 111:9-16).

The record is replete with references to internal disputes and strife between Plaintiff Alaniz, the Assistant Chief of Police, Hernan Guerra, and the Mayor of the City. *See, e.g., id.*, Ex. A-1 (Alaniz Depo. at pp. 52:1-54:4; 130:19-131:20); Ex. A-2 (Gonzalez Depo. at pp. 91:3-5; 94:2-23; 96:5 - 97:25). Over a year after Plaintiff was promoted to the Chief of Police position, at some time in October 2003, Alaniz discovered that a letter voicing discontent concerning his administration of the police department was circulating among police officers. *See id.*, Ex. A-1 (Alaniz Depo. at p. 50:23 - 51:25). Defendants have dubbed this letter the "no confidence" letter. *See id.*, Ex. D (letter from Alaniz to City Manager referring to the letter as a "no confidence letter."). Concerned that Assistant Chief of Police, Hernan Guerra, was orchestrating the "no confidence" initiative in an effort to oust Alaniz from his position as Chief, Alaniz held a meeting with the officers. *Id.*, Ex. A-1 (Alaniz Depo. at pp. 52:20-25). At this meeting, Alaniz gathered information from the officers about Hernan Guerra, who was not present. *See id.* In the course of his investigation of Guerra, Alaniz collected statements from the officers concerning Guerra's efforts to oust Alaniz as the Chief and Guerra's efforts to force officers to alter traffic citations and transform them into traffic warnings. *Id.* at p. 67: 7-21.

The day after the meeting with the officers, Alaniz met with the Mayor and explained to him that he believed Guerra was creating turmoil in the police department because he was seeking the officers' support to have Alaniz removed from his position. *See id.* at pp. 55:8-17. Alaniz further explained to the Mayor that because of these occurrences, and until he finished the investigation, Alaniz was going to relieve Guerra of his supervisory duties. *Id.* At the meeting with the Mayor, Alaniz was told to "think about it for a month until [Alaniz] cooled down," and not take action until the next City meeting. *Id.*

In addition to speaking with the Mayor, Alaniz sent Rolando Gonzalez, the City

3

Manager, a letter on October 28, 2003. *See id.*, Ex. D. The letter reads in its entirety:

> On October 27, 2003, I was approached by Sullivan City Police Personnel and advised about Assistant Chief Hernan Guerra's attempt to get everyone to write affidavits and back him up in creating a letter of no confidence against myself. Based on my observations of individuals involved, and information gathered, I am requesting to take this matter before the city commission, at which time my officers and I will present facts and my recommendation on this matter. Until this matter is resolved, I am relieving Asst. Chief Guerra of his supervisory duties.

*Id.*, Ex. D. The City Manager, also told Alaniz to refrain from taking any action against Guerra until the next City meeting. *Id.* at p. 55:23-25. A meeting in which Guerra's behavior was discussed with the city commissioners never occurred, *Id.* at p. 56:2-16.

On November 28, 2003, Alaniz sent the Mayor a letter concerning a discussion Alaniz and the Mayor had that same morning. The letter in its entirety states:

> This letter is in regards to our discussion this morning. I have received numerous complaints from the Sullivan City Police Personnel regarding your interference with their police duties, as well as complaints of you approaching them and making negative comments regarding the officers and myself, as well as ordering them not to call me whenever I am off because you run this department not me. As I informed you this morning, you have me here as the Chief of Police; Therefore, I am in charge of running this department.
>
> I am advising you that this matter has been taken to a higher authority. We are claiming protection under the Federal Whistle Blowers Act, and any actions taken against my officers or myself will be considered retaliation.

*Id.*, Ex. E (letter). Alaniz explains in his deposition that he wrote the above letter because on the morning of November 28, 2003, the Mayor had "interfered" with Alaniz's interactions with Dispatcher De La Garza, which apparently was an example of the Mayor's general "interference" with Alaniz's efforts to run the police department. *See id.*, Ex. A-1 (Alaniz Depo. at pp. 169:1 - 170: 21).

Around this time, Plaintiffs Alaniz and Gonzalez forwarded the officers' statements to the Hidalgo County Sheriff's Office. *Id.* at pp. 171:14-172:18. The officers' statements have not been submitted as evidence. Alaniz stated in his deposition, however, that these

4

statements concerned the Mayor's alleged actions concerning traffic citations, and Guerra's attempts to oust Alaniz. *See id.* at 173:19-176:5. The exact date Plaintiffs reported the alleged misconduct and violations of law to the Sheriff's Department is not evidenced in the record. Plaintiffs' amended complaint, however, states they reported the actions on December 8, 2003. *See* Pls' Am. Cmplt. ¶3.6 (stating Plaintiff Alaniz "met with and turned in information to the Hidalgo County Sheriff's office regarding" the Mayor's and Guerra's alleged behavior and actions).

In response to the Plaintiffs' reports, an Assistant District Attorney sent a letter to Blas Gonzalez on December 12, 2003. This letter reads:

> Please be advised that I have reviewed the enclosed documents with Mr. Rene Guerra, District Attorney. We have concluded the evidence reference [sic] traffic citations being changed to warnings are insufficient for criminal charges. Mr. Guerra proposes to discuss the matter with you judge to resolve any confusion he may have about his authority of the law.
>
> In reference to your assistant chief, Mr. Guerra is of the opinion this matter needs to be addressed with [sic] internally. If you have any questions please feel free to call me.

*Id.*, Ex. C.

On December 7, 2003, Plaintiff Alaniz received a memorandum delivered to his residence, which informed him that he was suspended. The memorandum did not specify a reason for the suspension. *See* Pl's Original Cmplt, Ex. A; Defs' MSJ, Ex. A-1 (Alaniz Depo. at p. 172:19-25). On December 15, 2003, Alaniz was terminated as the Chief of Police at the City Commissioner meeting. *Id.*, Defs' MSJ, Ex. A-1 (Alaniz Depo. at p. 173:1-17). Alaniz and his attorney attended the meeting. *See id.*

### III. Motion for Summary Judgment

#### A. Summary Judgment Standard

Summary judgment shall be granted if the record, taken as a whole, "together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Factual controversies, if any exist, are resolved in favor of the nonmoving party. *See Little v.*

*Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *see also Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).  The party making a summary judgment motion has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings and discovery documents that demonstrate the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "[T]he burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case."  *Id.*; *see also Colson v. Grohman,* 174 F.3d 498, 506 (5th Cir.1999).  Although the party moving for summary judgment must "demonstrate the absence of a genuine issue of material fact," *Celotex Corp.*, 477 U.S. at 323, the party "need not negate the elements of the nonmovant's case." *Little*, 37 F.3d at 1075 (citing *Celotex,* 477 U.S. at 323).

If the moving party meets this burden, the non-movant then must designate specific facts, beyond the pleadings, showing there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(e); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Little*, 37 F.3d at 1071 (citing *Celotex*, 477 U.S. at 325).  "Unsubstantiated assertions" or "mere allegations or denials" will not adequately cast doubt on material facts at issue.  *See id.* (citing *Hopper v. Frank*, 16 F.3d 92 (5th Cir. 1994); *see also* Fed. R. Civ. P. 56(e).  Likewise, the nonmovant must present more than a mere "scintilla" of evidence.  *See Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1086 (5th Cir. 1994).  The evidence must be viewed in the light most favorable to the nonmovant.  *See Whelan v. Winchester Prod. Co.*, 319 F.3d 225, 228 (5th Cir. 2003); *Walker v. Thompson*, 214 F.3d 615, 624 (5th Cir. 2000).  Summary judgment should be granted "when the nonmoving party fails to meet its burden to come forward with facts and law demonstrating a basis for recovery that would support a jury verdict."  *Little*, 37 F.3d at 1071.

Plaintiffs have not filed a response to Defendants' Motion for Summary Judgment.  Local Rule 7.4 states that failure to respond to such a motion is interpreted as a representation of no opposition.  Nevertheless, a Court cannot grant summary judgment simply because there has been no opposition filed to the motion.  *Hibernia Nat'l Bank v.*

*Admin. Cental Sociedad Anonima*, 776 F.2d 1277, 1279 (5th Cir. 1985) (citation omitted). Stated differently, the Court may not issue a default summary judgment. The Court may, however, accept as undisputed the movant's version of the facts and grant summary judgment where the movant has met his initial burden of making a prima facie showing of his entitlement to summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986). If the movant fails to meet his initial burden, the non-movant is not required to respond to the motion. *See John v. State of Louisiana (Board of Trustees for State Colleges and Universities)*, 757 F.2d 698, 708 (5th Cir. 1985). But, once a movant meets his initial burden, the nonmovant is not permitted to rest on the "mere allegations of his pleadings." *Isquith for and on Behalf of Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 199 (5th Cir. 1988).

### B. Qualified Immunity for Individual Defendants

Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *See Austin v. Johnson*, 328 F.3d 204, 207 (5th Cir. 2003) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). The qualified immunity defense is available to individual municipal officials, but not to municipalities. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 113 S.Ct. 1160, 1162, 122 L.Ed.2d 517, 523 (1993).

> [Q]ualified immunity shields a state official from personal liability for damages under 42 U.S.C. § 1983 when the official's exercise of discretionary authority results in a violation of an individual's federal constitutional or statutory rights, unless at the time and under the circumstances of the challenged conduct all reasonable officials would have realized that it was proscribed by the federal law on which the suit was founded.

*Palmer v. Johnson*, 193 F.3d 346, 351 (5th Cir. 1999) (citations omitted); *see also Thompson v. Upshur County*, 245 F.3d 447, 456 (5th Cir. 2001).

"To state a claim under § 1983, a plaintiff must (1) allege a violation of a right secured by the Constitution of laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000). Stated differently, the test for

qualified immunity necessitates a two-part or "bifurcated" test of (1) whether a violation of a clearly established constitutional right occurred; and if so (2) whether the defendant's conduct was objectively unreasonable in light of the clearly established law at the time of the incident.  *See Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 755 (5th Cir. 2001); *see also Thompson*, 245 F.3d at 456.

The initial question, therefore, is whether "taken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right."  *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.CT. 2151, 150 L.Ed.2d 272 (2001).  The plaintiff must demonstrate the official's wrong doing violated "clearly established" law and the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  Acts are "objectively reasonable" unless *all* reasonable officials under the same circumstances would have known the conduct violated the Constitution or federal law.  *See Thompson*, 245 F.3d at 457.  Qualified immunity allows officials to take reasonable but incorrect actions that constitute a constitutional violation.  *See Glenn v. City of Tyler*, 242 F.3d 307, 312 (5th Cir. 2001).  The defense of qualified immunity protects "'all but the plainly incompetent or those who knowingly violate the law.'"  *Austin*, 193 F.3d at 207 (quoting *Wooley v. City of Baton Rouge*, 211 F.3d 913, 918-19 (5th Cir. 2000)).

### C. Speech Retaliation Claims

Plaintiffs allege they suffered adverse employment actions (termination) as a result of their exercise of free speech.  Defendants contend Plaintiffs have no evidence demonstrating their speech was on a matter of public concern or that the Defendants' interest in promoting efficiency outweighed Plaintiffs' interests in commenting on matters relating to the internal operation of the Sullivan City Police Department.

There are four elements the Plaintiffs, as public employees, must establish to prevail on a First Amendment retaliation claim:  (1) they must suffer an adverse employment action; (2) they must establish that the speech involved a matter of public

concern; (3) they must establish that the speaker's interest in commenting on matters of public concern outweigh any interest the employer has in promoting efficiency; and (4) they must demonstrate the speech motivated or precipitated the employer's adverse action. *See Alexander v. Eeds*, 392 F.3d 138, 142 (5th Cir. 2004); *Teague v. City of Flower Mound, Texas*, 179 F.3d 377, 380 (5th Cir. 1999); *Harris v. Victoria Indep. Sch. Dist.*, 168 F.3d 216, 220 (5th Cir. 1999). Whether the speech involved a matter of public concern and whether the employee's interest as a citizen in commenting on the matters of public concern outweighed the interest of the state as an employer are legal questions determined by the Court. *See Connick*, 461 U.S. at 147-48, n.7; *Teague*, 179 F.3d at 380. Factual disputes concerning whether Plaintiffs' protected speech was a motivating factor in the adverse employment decision is left to the jury to resolve. *Branton v. City of Dallas*, 272 F.3d 730, 739 (5th Cir. 2001) (citing *Gardetto v. Mason*, 100 F.3d 803, 811 (10th Cir. 1996)).

### D. Matters of Public Concern

Matters of public concern are those that can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146. Speech that addresses mainly a personal employment dispute and is a matter of general concern is not considered speech on a matter of public concern. *See, e.g., Connick,* 461 U.S. at 148 n.8; *Terrell v. Univ. of Tex. Sys. Police*, 792 F.2d 1360, 1362 (5th Cir. 1986). The Fifth Circuit has used two main tests, sometimes together, to analyze whether speech is properly categorized as relating to a matter of public concern. *See Kennedy v. Tangipahoa Parish Library Bd. of Control*, 224 F.3d 359, 366 (5th Cir. 2000). Both tests originate from *Connick v. Meyers.* The first test is the "content-form-context test: '[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole court record.'" *Kennedy*, 224 F.3d at 366 (quoting *Connick*, 461 U.S. at 147-48); *see also Tompkins v. Vickers*, 26 F.3d 603, 606 (5th Cir. 1994)). The second or "shorthand" test is called the "citizen-employee test: 'when a public employee speaks not as a citizen upon matters of

public concern, but instead as an employee upon matters *only* of personal interest,'" the speech is not considered to involve matters of public concern. *Id.* (quoting *Connick*, 461 U.S. at 147); *see also Finch v. Fort Bend Indep. Sch. Dist.*, 333 F.3d 555, 563-64 (5th Cir. 2003); *Schultea v. Wood*, 27 F.3d 1112, 1120 (5th Cir. 1994), *superceded on other grounds by*, 47 F.3d 1427 (5th Cir. 1995)). The issue is whether the Plaintiff "[spoke] primarily in his role as a citizen rather than as an employee addressing matters only of personal concern." *Fiesel v. Cherry*, 294 F.3d 664, 668 (5th Cir. 2002).

Where an employee speaks from multiple motives courts have found the speech to be of a "mixed" nature. *See Markos v. City of Atlanta*, 364 F.3d 567, 572 (5th Cir. 2004) (observing that Fifth Circuit precedent "support[s] the principle that an employee's motivation in speaking is relevant to the [First Amendment] inquiry at hand."); *Foley v. Univ. of Houston Sys.*, 355 F.3d 333, 341 (5th Cir. 2003) ("Speech that is primarily motivated by, or primarily addresses the employee's own employment status rather than a matter of public concern does not give rise to a cause of action under § 1983."); *Bradshaw*, 207 F.3d at 818 (holding plaintiff's speech was unprotected because it was "more of an effort . . . to clear her name rather than some contribution to a public dialogue").[2] "In cases involving mixed speech, [courts] are bound to consider the *Connick* factors of content, context, and form, and determine whether the speech is public or private based on these factors." *Teague*, 179 F.3d at 382. Thus, the Courts must "decide whether the speech at issue . . . was made *primarily* in the plaintiff's role as citizen or primarily in his role as employee." *Terrell*, 792 F.2d at 1362. In this test, the role of context and form are elevated over content.

---

[2]Any Fifth Circuit case law holding the motivation of the speaker is irrelevant in determining whether the speech is of a matter of public concern is the exception beyond most Fifth Circuit jurisprudence and may be on shaky precedential ground. *See Chavez v. Brownsville Indep. Sch. Dist.*, 2005 WL 1403453, at * 4, n.1 (5th Cir. June 15, 2005) (unpublished opinion). *Compare, e.g., Denton v. Morgan*, 136 F.3d 1038, 1043 (5th Cir. 1998) (holding the accuracy of the speech and motivation of the speaker are not relevant to the First Amendment analysis) *with Markos*, 364 F.3d at 572 (noting motivation is a factor to be considered when thoroughly analyzing the content, form, and context).

The Fifth Circuit recently canvassed a large number of mixed speech cases and determined:

> First, the content of the speech may relate to the public concern if it does not involve solely personal matters or strictly a discussion of management policies that is only interesting to the public by virtue of the manager's status as an arm of the government . . . If releasing the speech to the public would inform the populace of more than the fact of an employee's employment grievance, the content of the speech may be public in nature . . . Second, speech need not be made to the public, . . . but it may relate to the public concern if it is made against the backdrop of public debate . . . And third, the speech cannot be made in furtherance of a personal employer-employee dispute if it is to relate to the public concern.

*Kennedy*, 224 F.3d at 372.[3] "The existence, [however], of an element of personal interest on the part of the employee in his or her speech does not . . . dictate a finding that the employee's speech does not communicate on a matter of public concern." *Thompson v. City of Starkville*, 901 F.2d 456, 463 (5th Cir. 1990); *see also Kennedy*, 224 F.3d at 366 (holding the "existence of an element of personal interest on the part of an employee in the speech does not prevent a finding that the speech as a whole raises issues of public concern."). "On the other hand, an employee cannot transform a personal conflict into an issue of public concern simply by arguing that individual concerns might have been of interest to the public under different circumstances." *Dodds v. Childers*, 933 F.2d 271,

---

[3]The Fifth Circuit has categorized a number of factual scenarios into those involving protected speech and those that do not. In *Kirkland v. Northside Indep. Sch. Dist.*, the Court analyzed:

> [P]rotecting the President's policies by commenting favorably upon an assassination attempt against his life is a matter of "public concern" meriting protection. Similarly, a public school teacher may publicly protect the school board's allocation of resources between athletics and academics, or a school's alleged racially discriminatory policy in a private conversation with the principal, without suffering retaliatory dismissal. We have held that public employees raise matters of public concern if they criticize the special attention paid by the police to a wealthy neighborhood, or the implementation of a federally funded reading program. Moreover, the quality of nursing care given to a group of people, including inmates, is a matter of public concern, as is the adequacy of a fire department's level of manpower. However, public employees raise matters of "private concern" if they criticize the morale problems or transfer policies of the district attorney's office; or criticize the performance of co-employees and supervisors; or protest an employer's unfavorable job evaluation.

890 F.2d at 798 n.10 (citations omitted).

273 (5th Cir. 1991); *see also Teague*, 179 F.3d at 382 ("[t]he mere insertion of a scintilla of speech regarding a matter of public concern would make a federal case out of a wholly private matter fueled by private, non-public interests.").

Similarly, "[t]he fact that the Plaintiffs cho[o]se to file internal grievances rather than publicize their complaints is not dispositive." *Benningfield v. City of Houston*, 157 F.3d 369, 375 (5th Cir. 1998) (holding police misconduct was a matter of public concern where plaintiffs filed complaints and followed internal grievance procedures). In an earlier pronouncement, the Fifth Circuit found speech involved a matter of public concern where a sergeant with a university health center's police force internally filed a written report detailing incidents of sexual misconduct. *Wilson v. UT Health Center*, 973 F.2d 1263 (5th Cir. 1992). Thus, "[t]he private nature of the statement does not . . . vitiate the status of the statement as addressing a matter of public concern." *Thompson*, 901 F.2d at 467 (quotations omitted). "A holding to the contrary would mean that loyal employees seeking to rectify problems would lose constitutional protection for attempting to correct problems in house." *Id*; *see also Harris v. Victoria Indep. Sch. Dist.*, 168 F.3d 216, 222 (5th Cir. 1999) (holding speech involved a matter of public concern because the teachers "spoke . . . as elected representatives of the faculty . . . in compliance with their duties" when they served on a committee formed to create and implement an improvement plan for the high school); *Thompson v. City of Starkville, Mississippi*, 901 F.2d 456 (5th Cir. 1990) (holding police officer who filed written grievance concerning, among other issues, unethical conduct of police officers who had received promotions spoke on matters of public concern).

The Fifth Circuit has noted that "more often than not the 'citizen versus employee' test will point us in the right direction, and so we consider it here, in conjunction with the more lengthy three-factor balancing test . . . . " *Teague*, 179 F.3d at 382; *see also Kennedy*, 224 F.3d at 375-76 (holding that the court "was not obligated to apply the citizen-employee test in mixed speech cases," but arriving at the same conclusion when applying it). In several cases, the courts have incorporated the citizen-employee test into

the content portion of the content-form-context test. *See, e.g., Dodds*, 933 F.2d at 274 (finding in mixed speech case that the plaintiff did not speak predominantly as a citizen, despite the allegation of "nepotism, favoritism, and misallocation of public funds"); *Markos*, 364 F.3d at 571.

In a third analytical approach taken by the Fifth Circuit, the focus is on "the hat worn by the employee when speaking rather than upon the 'importance' of the issue." *Gillum v. City of Kerrville*, 3 F.3d 117, 121 (5th Cir. 1993) (holding plaintiff overall did not speak on a matter of public concern because although "corruption in an internal affairs department" of a police department addressed a matter of public concern, "Gillum's focus was . . . on this issue only insofar as it impacted his wish to continue his investigation."). Because a First Amendment analysis is so fact intensive encompassing content, form, context, motivation, and personal and public matters, no one analytical approach governs. *See, e.g., Thompson*, 901 F.2d at 461 ("the definition of the term 'public concern' is far from clear-cut").

There are a number of cases in which the Fifth Circuit has determined the reporting of official misconduct was protected speech under the First Amendment because it involved matters of public concern. "There is perhaps no subset of matters of public concern more important than bringing official misconduct to light." *Davis v. Ector County, Texas*, 40 F.3d 777, 782 (5th Cir. 1994). In *Davis*, an investigator for a drug task force sent a letter to the County Commissioners' Court in which he detailed his wife's allegations of sexual harassment and alerted the Court to a potential cover-up. *See* 40 F.3d at 780-81. The Fifth Circuit determined the "letter squarely [fell] within *Brawner's* ambit: it address[ed] the misbehavior of public officials (the sexual harassment of public employees) and disclos[ed] the possibility of an official coverup." *Id.* at 782. The content of Davis's letter certainly addressed a matter of public concern. Davis wrote the letter in his capacity as a citizen and not as a public employee, which satisfies the content, context, and form test.

Additionally, the Fifth Circuit has held, "the disclosure of misbehavior by public

officials is a matter of public interest and therefore deserves constitutional protection, especially when it concerns the operation of a police department." *Brawner v. City of Richardson, Tex.*, 855 F.2d 187, 192 (5th Cir. 1988). In *Brawner*, the Fifth Circuit determined the speech involved a matter of public concern when a patrol officer informed the President of the Combined Law Enforcement Agency of Texas ("CLEAT") of allegations of police misconduct. 855 F.2d at 191. CLEAT's attorney wrote a letter to the City Manager on behalf of Brawner alleging possible police misconduct. *Id.*

Conversely, there are instances where the Fifth Circuit determined the speech was not a matter of public concern. For example, in *Terrell v. University of Tex. Sys. Police*, the Court determined that a personal notebook diary was not speech on a matter of public concern because Terrell made no effort to communicate it to the public. 792 F.2d 1360, 1363 (5th Cir. 1986). In *Gillum*, the Court focused "on the hat worn by the employee when speaking rather than the 'importance' of the issue [to] reflect[ ] the reality that at some level of generality almost all speech of state employees is of public concern[.]" 3 F.3d 117, 121 (5th Cir. 1993). The Court in *Gillum* determined that whether the police chief had smoked dope with a woman who had a criminal record was of public concern. *Id.* But, Gillum's speech was not directed at ferreting out the police chief's misconduct. Rather, Gillum was responding to the fact that the internal affairs investigation would proceed without his further participation. Only then did Gillum declare that he would not compromise his badge, and he quit. *Id.* The Court did not explicitly conduct a content-context-form test, but determined that although corruption was certainly a matter of public concern, Gillum had spoken "as an employee embroiled in a personal employment dispute,"–that is, whether he would personally have a continued role in the investigation. *Id.* Finally, in *Teague v. City of Flower Mound, Texas*, the Fifth Circuit held two police officers had not demonstrated their speech was on a matter of public concern when they filed a grievance against the chief of police because their focus was primarily on clearing their own names and not on attacking internal misconduct. 179 F.3d 377, 382 (5th Cir. 1999).

### E. Was the Plaintiffs' Speech on a Matter of Public Concern?

Defendants argue the only speech identified by Plaintiffs involved matters of internal employment disputes spoken primarily in the Plaintiffs' roles as employees. More specifically, Defendants characterize Plaintiffs' speech as involving an ongoing power struggle with the Assistant Chief of Police, Hernan Guerra. Defendants point out that only after Guerra initiated the "no confidence" movement within the department did Alaniz send the November 28, 2003, letter to the Mayor and later report information to the Hidalgo County District Attorney's Office on December 8, 2003. In their complaint, Plaintiffs cite seven reports of incidents they argue constitute speech on a matter of public concern. Defendants, conversely, contend the speech relates to a power struggle in the police department. These instances of speech involve reports concerning: (1) the Mayor's or Guerra's orders regarding the issuance of traffic citations to the Mayor's political opponents; (2) Guerra's orders to change traffic citations to warnings for his friends and political allies; (3) the Mayor's orders to the officers to dismiss traffic citations they issued; (4) the Mayor's efforts to dictate where the officers patrolled; (5) Guerra's alleged tampering with evidence and removal of evidence from the evidence room; (6) the Mayor's interference with burglary investigations by arriving at the crime scenes and contaminating evidence by walking through the scene; and (7) the Mayor's alleged grabbing of a suspect and refusal to allow the suspect to wipe away the pepper spray. Plaintiffs allegedly[4] included these matters in the letters, affidavits, or reports they sent to the law enforcement authorities, but they are not contained in the record.

Regardless of whether the Court analyzes this retaliation claim under the content-context-form test or the employee-citizen test, the Court arrives at the same conclusion: Plaintiffs' speech was predominantly made in their roles as employees involved in an ongoing employment dispute concerning control of the Police Department. Thus, as a whole, Plaintiffs' speech was not on a matter of public concern. The Court is particularly

---

[4]Because Plaintiffs have failed to respond to Defendants' Motion for Summary Judgment, the Court is left to rely on Plaintiffs' amended complaint and deposition testimony attached to Defendants' motion. The Assistant District Attorney's letter, dated December 12, 2003, concerning Plaintiffs' reports only references "traffic citations being changed to warnings" and a generic reference to matters concerning the assistant chief. *See* Defs' MSJ, Ex. C.

disabled in this case because it is not privy to the exact speech comprising the reports to the Sheriff's Department. In order for speech to be considered a matter of public concern, the speech must be identified with a degree of precision, explaining "when [the] statement or statements were made, to whom they were made, whether they were oral or written, and the content of those statements." *Foley v. University of Houston*, 355 F.3d 333, 342 (5th Cir. 2003). Plaintiffs' allegations do not alone suffice to meet this standard.

Nevertheless, it is clear from the deposition testimony and letters sent by Alaniz to the Mayor and City Manager, all of which are contained in the record as evidence, that Plaintiffs were predominantly and primarily concerned with Guerra's "no confidence" initiative and the Mayor's infringement on the administration of the Police Department. These concerns are more akin to employment disputes that are not predominantly matters of public concern. *See Kennedy*, 224 F.3d at 372. Moreover, as Defendants point out, Plaintiffs' reports to the Sheriff's Department were sent after Guerra began the "no confidence" initiative in which he tried to gather the officers' support to oust Alaniz from his position. Indeed, Alaniz's purpose in calling a meeting with the officers outside Guerra's presence was to launch a counter-attack against Guerra, who had thus far sought Alaniz's removal. Alaniz's follow-up meetings with the Mayor and City Manager likewise were focused on suspending Guerra who was allegedly causing disruption and unrest in the Department. Finally, it seems that any concerns Plaintiffs had about the Mayor's or Guerra's favoritism were more a reflection on their concern that Guerra and/or the Mayor were attempting to wrest control of the Department from Alaniz. Plaintiffs' actions were not directed at ferreting out the Mayor's misconduct as a whole, but rather were designed to restore Alaniz's full command of the Police Department. Understandable though these concerns may be, a matter of public concern, they are not. Thus, the content-context-form of the speech was decidedly private in nature, and Plaintiffs spoke predominantly in their capacities as employees and not as citizens attempting to bring corruption to light in an overarching public debate.

Having determined Plaintiffs' speech was not on a matter of public concern, the speech is not protected by the First Amendment. As a result, the Court need not analyze

the remaining elements of a First Amendment Retaliation. Moreover, without a constitutional First Amendment violation, the Court need not address § 1983 immunity for the individual defendants because Plaintiffs have failed to demonstrate the violation of a right secured by the Constitution.

### IV. Motion for Summary Judgment on the State Claims

Judicial economy, convenience, fairness to litigants, federalism, and comity are all factors the district court must consider in determining whether it should exercise supplemental jurisdiction over remaining state claims. *See Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 584 (5th Cir. 1992) (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)); *see also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 & n. 7 (1988) (citations omitted). Dismissing state claims after federal claims are dismissed is the general rule. *See Parker & Parsley*, 972 F.2d at 585.

In *Parker & Parsley Petroleum Co. v. Dresser Indus.*, the Fifth Circuit held a district court abused its discretion when it dismissed federal Rico claims, but refused to surrender jurisdiction over supplemental state claims. 972 F.2d at 584. In that case, the district court reasoned that "dismissal would be a tremendous financial drain to all the parties as well as a waste of judicial resources." *Id.* at 584. Despite substantial development in the case, the district court's ruling on a number of discovery matters, and a trial that was only weeks away, the Fifth Circuit determined the district court should not have exercised supplemental jurisdiction because discovery had not been completed, they were not on the eve of trial, and the parties were not ready for trial. *Parker & Parsley Petroleum Co.*, 972 F.2d at 587. The Fifth Circuit noted that "when the single federal-law claim is eliminated at an 'early stage' of the litigation, the district court has a 'powerful reason to choose not to continue to exercise jurisdiction.'" *Id.* at 585 (citing *Carnegie-Mellon*, 484 U.S. at 351).

The present case was filed on February 27, 2004; discovery is not scheduled to be completed until September 14, 2005; and trial is not set until February 2006. Similarly, the dispositive motion deadline is more than three months from today's date. Although the parties have certainly expended some energy litigating this case in federal court,

17

dismissing the state claims without prejudice to refiling in state court would not create a great deal of financial drain; little new legal research need be conducted; and any discovery completed thus far can be applied to the case if it is refiled in state court. *See Parker & Parsley Petroleum Co.*, 972 F.2d at 588. As the Fifth Circuit has stated, "[i]n short, the parties [are] not ready for trial." *Parker & Parsley Petroleum Co.*, 972 F.2d at 587. Thus, the Court will not exercise its supplemental jurisdiction over Plaintiffs' state law claims.

### V. Conclusion

The Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion to Dismiss Claims of Plaintiff Blas Gonzalez [Dkt. No. 25]; and **GRANTS** Defendants' Motion for Summary Judgment on Plaintiffs' remaining federal First Amendment Retaliation claim [Dkt. No. 28]. The Court declines to exercise its supplemental jurisdiction over Plaintiffs' remaining state claims under the Texas Whistleblower statute and common law defamation. The Court, therefore, **DISMISSES WITHOUT PREJUDICE,** Plaintiffs' state law claims. The Court will enter a separate final judgment concerning the federal claim pursuant to Federal Rule of Civil Procedure 58.

DONE at Brownsville, Texas, this 13th day of July 2005.

_____
Hilda G. Tagle
United States District Judge